Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Drake M. Rayshell
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:   jbrookner@grayreed.com
          dyork@grayreed.com
          drayshell@grayreed.com

**Counsel to Patrick Daugherty**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON, | |
| Plaintiff, | Adv. No. 22-03003-sgj |
| v. | *Removed from the 101st Judicial District Court of Dallas County, Texas Cause No. DC-22-00304* |
| PATRICK DAUGHERTY, | |
| Defendant. | |

### PATRICK DAUGHERTY'S BRIEF IN SUPPORT OF RESPONSE TO
### SCOTT ELLINGTON'S EMERGENCY MOTION TO ABSTAIN AND TO REMAND

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

ARGUMENTS & AUTHORITY ............................................................................................... 14

    I.      Ellington Fails to Meet His Burden for Mandatory Abstention. ........................... 15

          A.      This dispute is a "core" proceeding under 28 U.S.C. § 157 ..................... 16

          B.      Timely adjudication of the State Court Action is questionable,
                  at best ....................................................................................................... 18

    II.     The Balance of Equities Weighs in Favor of This Court Exercising
           Jurisdiction—Permissive Abstention or Equitable Remand is Improper ............. 20

CONCLUSION ......................................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Baudoin,*
981 F.2d 736 (5th Cir. 1993) ................................................20

*In re Brook Mays Music Co.,*
363 B.R. 801 (Bankr. N.D. Tex. 2007) (Jernigan, J.) ................................... *passim*

*Clint ISD v. Marquez,*
487 S.W.3d 538 (Tex. 2016) ................................................18

*In re Directory Distributing Associates, Inc.,*
566 B.R. 869 (Bankr. S.D. Tex. 2017) ................................................16

*In re Doctors Hosp. 1997, L.P.,*
351 B.R. 813 (Bankr. S.D. Tex. 2006) ................................18, 20, 23, 24, 25

*Edge Petroleum Operating Co., Inc. v. GPR Holdings, L.L.C.,*
483 F.3d 292 (5th Cir. 2007) ................................................15

*In re Hassell,*
No. 19-30694, 2020 WL 728890 (Bankr. S.D. Tex. Jan. 7, 2020) ........................................22

*In re Kewanee Boiler Corp.,*
270 B.R. 912 (Bankr. N.D. Ill. 2002) ................................................17

*In re Lorax Corp.,*
295 B.R. 83 (Bankr. N.D. Tex. 2003) ................................................15

*In re Montalvo,*
559 B.R. 825 (Bankr. S.D. Tex. 2016) ................................................20

*Residential Funding Co. v. UBS Real Estate Secs., Inc.*
*(In re Residential Cap., LLC),*
515 B.R. 52 (Bankr. S.D.N.Y. 2014) ................................................15

*In re Ritchey,*
512 B.R. 847 (Bankr. S.D. Tex. 2014) ................................................17

*In re Rodriguez,*
No. 10-70606, 2021 WL 4562254 (Bankr. S.D. Tex. Oct. 5, 2021) ........................................20

ii

*Sabre Techs., L.P. v. TSM Skyline Exhibits, Inc.*,
No. H-08-1815, 2008 WL 4330897 (S.D. Tex. Sept. 18, 2008)........................................21, 22

*In re Senior Care Centers, LLC*,
611 B.R. 791 (Bankr. N.D. Tex. 2019)...................................................................................15

*Welded Constr., L.P. v. The Williams Cos.*
*(In re Welded Constr., L.P.)*,
609 B.R. 101 (Bankr. D. Del. 2019) ......................................................................................15

*WRT Creditors Liquidation Tr. V. C.I.B.C. Oppenheimer Corp.*,
75 F. Supp 2d 596 (S.D. Tex. 1999) ......................................................................................18

**Statutes**

28 U.S.C. § 157.......................................................................................................................16

28 U.S.C. §§ 157(b)(2)(A) and (O)........................................................................................16

28 U.S.C. § 157(e).................................................................................................................24

28 U.S.C. § 1334................................................................................................................20, 22

28 U.S.C. § 1334(b).....................................................................................................14, 15, 16

28 U.S.C. § 1334(c)(1)......................................................................................................15, 20

28 U.S.C. § 1334(c)(2)......................................................................................................14, 15

Tex. Civ. Prac. & Rem. Code § 85.002 ................................................................................12

4859-2676-3023

Patrick Daugherty ("Daugherty") submits this Brief in Support of his Response to Scott Ellington's ("Ellington") Emergency Motion to Abstain and to Remand [Adv. Docket No. 3] (the "Motion to Remand"), and respectfully represents:

## INTRODUCTION

It has been said multiple times in this bankruptcy that "context matters." Therefore, the Court should review, and take account of, the overall context of this case as it reviews and decides the Motion to Remand.

In September 2011 Daugherty resigned from his senior executive position at Highland Capital Management, L.P. ("Highland" or the "Debtor"). Highland withheld Daugherty's compensation pending exit interviews with investors in the Highland Crusader Fund ("Crusader") and the Highland Credit Strategies Fund ("Credit Strategies"). Daugherty was also subpoenaed by UBS and the ex-wife of Highland's then-CEO James Dondero ("Dondero") to provide testimony under oath in cases where Highland and Dondero, respectively, were parties. In each of these instances, Daugherty told the unvarnished truth.

Highland, through Dondero, Ellington, and others, then retaliated against Daugherty by embarking on a campaign to smear his name and deprive him of his compensation because he refused to participate in, or acquiesce to, the Dondero cabal's attempts to defraud Highland's investors, its creditors, and Dondero's ex-wife. Ellington was one of the principal players in all of these disputes.

Daugherty possesses critical institutional knowledge about Dondero and Highland and their various affiliates, including: (i) inappropriate transfers between Crusader, Credit Strategies, and affiliates of Highland Financial Partners which were part of the UBS litigation; (ii) attempts to manipulate the value of Cornerstone Health Group shares owned by Crusader and Credit

1

Strategies to benefit entities affiliated with Dondero; (iii) attempts to manipulate the value of MGM shares for the benefit of Dondero-affiliated entities; (iv) attempts to manipulate the value and divert cashflows of Trussway Holdings; (v) the creation of the SAS platform and its connection to Sentinel Reinsurance and the human beings involved (including but not limited to Dondero, Ellington, Isaac Leventon and Matt DiOrio); and (vi) much more.

After control of Highland transitioned away from Dondero and Mark Okada, Daugherty shared his unique institutional knowledge with members of the Official Committee of Unsecured Creditors ("Committee") and its professionals as they attempted to dissect the 2,000-entity Byzantine empire that was created to thwart creditor recoveries by utilizing a "catch me if you can" strategy. It is in this spirit that Daugherty began working closely with Jim Seery ("Seery") starting in January 2021, and later the Litigation Trustee upon Highland's emergence from bankruptcy. Not only did Ellington play a central role in defrauding creditors and the Highland bankruptcy estate, but as discussed below, he was also a central figure in defrauding Daugherty of the assets that were purportedly set aside for some of his claims against Highland Employee Retention Assets LLC ("HERA") via an escrow account.

In December 2021, Highland filed a motion to approve a proposed settlement with Daugherty [Docket No. 3088] (the "Proposed Settlement") that would resolve Daugherty's claim and end years-long litigation between Daugherty and Highland, including Daugherty's claim against HERA, thereby saving the "new" Highland significant future legal exposure and fees. Importantly, the Proposed Settlement does not release Daugherty's claims against Ellington currently pending in Delaware Chancery Court. Ellington has twice unsuccessfully attempted to dismiss those claims. The latest instance was a letter from Ellington's counsel to the Delaware court falsely claiming the Proposed Settlement mooted Daugherty's claims against Ellington.

In response, Daugherty sent a letter to the Delaware court on December 17, 2021, wherein he refuted Ellington's misrepresentation of the Proposed Settlement. It appears this letter is what triggered Ellington to file the state court lawsuit against Daugherty that is the subject of the Motion to Remand (the "State Court Action"), alleging Daugherty has been stalking Ellington since February 2021. The State Court Action is nothing more than a transparent attempt by Ellington to attempt to thwart the Proposed Settlement. Ellington waited 11 months, until January 2022—a month *after* Highland filed the Proposed Settlement with this Court—to initiate the State Court Action. Strangely, despite Ellington's purported fear for his own safety he moved into the same neighborhood as Daugherty, and now lives less than one mile from Daugherty's home.

After filing the State Court Action, Ellington attempted to pressure Highland to restructure the Proposed Settlement based on the allegations made in the State Court Action. When that initiative failed, Ellington filed an objection to the Proposed Settlement, which relies entirely on the baseless allegations made in the State Court Action.

The State Court Action is also an improper attempt to obtain discovery from Daugherty and third parties that Ellington and others could use to violate the Court's gatekeeping orders. For all of these reasons, the State Court Action arises in, or a minimum relates to, this bankruptcy proceeding. The Court may therefore, and should, exercise jurisdiction over Ellington's state law claims, and deny the Motion to Remand.

## FACTUAL BACKGROUND

1. Daugherty is a former senior executive at Highland. During the course of his employment, Highland created HERA. As its name indicates, Highland established HERA to reward and incentivize Highland employees by granting equity-like awards in certain Highland-managed funds, and then distributing the proceeds of these assets to the employee unit owners.

3

Daugherty became the largest unit owner and member of HERA in October 2009.  HERA's company agreement stated its purpose was to receive and hold assets to be contributed by Highland and to distribute the proceeds of such assets from time to time to certain employees of Highland or of affiliates of Highland, as applicable) as HERA's Board determined from time to time in order to create a retention initiative for those employees.

2.      Daugherty's HERA units vested in May 2011.  His ownership percentage also increased as other Highland employees resigned prior to the vesting of their units.

3.      Daugherty resigned from Highland in the fall of 2011 after a dispute with Dondero concerning autonomy and compensation.  At the time of his resignation, Daugherty was still a Director of HERA.

4.      Following his resignation, Daugherty was asked to give an exit interview by the investors of Crusader and Credit Strategies. He was also subpoenaed by Dondero's ex-wife to testify in Dondero's divorce proceeding.  Daugherty answered questions truthfully in both instances, and his testimony was damaging to legal and factual positions Dondero had taken in the divorce and in discussion with the investors.  After Daugherty left the stand in the divorce, Dondero made comments that were not captured on the record that led Daugherty to believe Dondero was out to destroy him.

5.      Two weeks after his testimony in the divorce proceeding, Highland sued Daugherty in Texas state court (the "Texas Action").  Daugherty counterclaimed against Highland, Dondero, two other Highland executives, and HERA.  During the time the Texas Action was pending, Ellington was Highland's Chief Legal Officer and General Counsel. Ellington also personally worked with Dondero's legal team during the divorce trials.

4

6.      On February 16, 2012, while the Texas Action was pending, the other HERA Board members signed a Written Consent to immediately remove Daugherty from the HERA Board. Highland's in-house counsel prepared the Written Consent.   All of this was done without Daugherty's participation or knowledge.   Immediately thereafter, Highland and the new HERA Board executed a Second Amended and Restated HERA Agreement (the "Second Amendment"), which one of Ellington's deputies prepared.  The Second Amendment added a dispute-resolution provision that gave the new HERA Board the right to suspend and hold in escrow any member's units in the event the member brought any claim against HERA or any of HERA's members (including Highland), officers, directors, or agents.  In the event the litigating member did not prevail, the full costs of the litigation, including attorneys' fees, would be deducted from the escrow account and the balance would be distributed to the litigating member.

7.      Dondero then proceeded to orchestrate an unauthorized buy-out of all HERA members except Daugherty.  With Daugherty left as the only remaining equity holder of HERA, Dondero (with the assistance of in-house and outside counsel, including Ellington) denuded HERA of its underlying assets and transferred them all to Highland within days of Ellington resigning from the HERA board.   Then, Dondero, through Highland ERA Management LLC ("HERA Management"), executed a Third Amended and Restated Agreement of HERA (the "Third Amendment") that stripped virtually all the rights of HERA unit holders.  Among other things, the Third Amendment eliminated the original purposes for which HERA was created, and the requirement that HERA make cash distributions to unit holders to cover pass-through tax obligations attributable to HERA.  Most importantly, however, the Third Amendment materially changed the dispute-resolution provision found in the Second Amendment.  The Third Amendment eliminated the escrow requirement, and there was no recognition that a member who prevailed in

4859-2676-3023

any dispute would be entitled to its interest.  Instead, Highland could cancel out the value of the member's units by fiat and impose costs as an "offset" against value even if the member prevailed.

8.      Highland nonetheless entered into an Escrow Agreement (the "Escrow Agreement") with Abrams & Bayliss, LLP ("Abrams & Bayliss") shortly before the Texas Action went to trial.  Highland deposited cash and certain shares and interests with Abrams & Bayliss that were purportedly Daugherty's share of HERA.  According to Isaac Leventon ("Leventon"), Highland's then-associate general counsel, the assets were placed in escrow based on the Second Amendment's dispute-resolution provision.  The problem with that explanation was that the Second Amendment was not in effect at the time the Escrow Agreement was entered into. Leventon also falsely testified that the dispute-resolution language in the Second and Third Amendments were "identical."

9.      The Escrow Agreement contained the following material provision:

> In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee Retention Assets, LLC ("HERA") by Patrick Daugherty, his successors, or assigns ("Daugherty") in the case Highland Capital Management, L.P. and Cornerstone Healthcare Group Holding, Inc. v. Patrick Daugherty v. Sierra Verde, LLC et al., Cause No. 12-04005 in the 68th Judicial District of Dallas County, Texas ("Daugherty Action"), Escrow Agent shall, within 10 Business Days, transfer to HERA Deposit Assets equivalent to the amount of such judgment, or if the judgment against HERA exceeds the amount of Deposit Assets, Escrow Agent shall transfer to HERA all Deposit Assets, including accumulated income, held by Escrow Agent.

*See* App. 0006.

10.     The Texas Action proceeded to a three-week trial.  Ellington attended the trial and testified as part of Highland's case-in-chief. With the *appearance* of the escrow in place, Dondero and Michael Hurst ("Hurst"), counsel for HERA, told the jury that Daugherty would receive his escrowed HERA units if he prevailed on his counterclaims against HERA.

11. The jury found for Daugherty and against Highland and Dondero for defamation with malice. The jury also found for Daugherty on his claim that HERA breached its implied duty of good faith and fair dealing. Daugherty obtained a judgment against HERA for $2.6 million plus interest. That judgment has now grown to over $4 million. Both sides appealed the final judgment in the Texas Action, and the court of appeals affirmed in all respects.

12. Neither side filed a petition for discretionary review with the Supreme Court of Texas. Consequently, on December 1, 2016, the court of appeals issued its mandate, which rendered the judgment in the Texas Action final and non-appealable.



14. Highland also immediately initiated efforts to collect on its portion of the Texas court's final judgment against Daugherty. For example, Highland requested a writ of execution against Daugherty on December 2, 2016. *See* App. 0088. Three days later Highland filed a

judgment lien on Daugherty's home despite having already stripped HERA of all its assets. *See* App. 0089. On December 8, Highland filed an application for writ of garnishment naming HERA as garnishee. *See* App. 0090-0103. Highland attached an affidavit from Ellington in support of the application. *See* App. 0101-0103. Daugherty paid the judgment against him on December 14, 2016 not knowing that HERA had previously been stripped of its assets. *See* App. 0089.

15. On February 14, 2017, Daugherty demanded Abrams & Bayliss preserve the escrowed funds for his benefit in accordance with the Escrow Agreement. *See* App. 0104-0105.[1] Abrams & Bayliss responded that it had resigned as escrow agent under the Escrow Agreement on December 2, 2016, and that it transferred the escrowed assets to Highland, not HERA, three days later. The letter from Abrams & Bayliss was cc'd to Ellington. *See* App. 0106-0107.

16. As a result of the above, Daugherty commenced an action against Highland, Dondero, HERA and HERA Management in Delaware Chancery Court to recover the previously escrowed property (the "Delaware Recovery Case"). The court presiding over the Delaware Recovery Case determined that the crime-fraud exception applied to otherwise-privileged communications between or among Highland, Ellington, Highland's outside counsel and Abrams & Bayliss regarding the Escrow Agreement, finding there was a reasonable basis to believe the legal advice provided was to enable or aid Highland in the furtherance of a fraud.

17. Three days into the trial of the Delaware Recovery Case on October 16, 2019, Highland filed its chapter 11 petition, thereby automatically staying the Delaware Recovery Case.

18. Based on Dondero's testimony during the second day of trial in the Delaware Recovery Case, Daugherty filed a second suit in Delaware Chancery Court (the "Delaware Fraud

---

[1] The letter was incorrectly dated February 14, 2016.

4859-2676-3023

Case") for fraudulent transfers and conspiracy to commit fraud, among other claims, against Dondero, HERA, HERA Management, Leventon, Ellington, and certain of Highland's outside counsel: Hunton Andrews Kurth LLP ("HAK"), Mark Katz ("Katz") and Hurst. *See* App. 108-148.

19.     Daugherty later filed an unsecured claim against Highland for $40,710,819.42, consisting of his judgment against HERA, the value of the HERA units, contractual indemnification owed by Highland, past due compensation, and other miscellaneous damages. *See* Claim No. 205.

20.     In the Fall of 2020, Daugherty filed with this Court his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") seeking to sever Highland from the Delaware Recovery Case while consolidating the remaining claims in that case and the Delaware Fraud Case in order to proceed with one case against the non-debtor parties. The Court granted the Stay Motion on November 3, 2020 [Docket No. 1327] and Daugherty subsequently agreed to stay his Delaware actions pending the outcome of settlement negotiations with Highland.

21.     On January 8, 2021, Dondero admitted during a contempt hearing in this Court that he destroyed his cell phone. Daugherty also learned during this hearing that Ellington had apparently destroyed his cell phone as well. As a result of this bombshell, Daugherty began actively investigating whether Dondero and Ellington were transferring assets out of the reach of creditors. Daugherty learned that Ellington boasted he would move to the Cayman Islands if necessary, and that Ellington was storing high-end cars in a warehouse facility on Cole Street in Dallas. Ellington's condominium in the Ritz Carlton Residences was also listed for sale.

22.     In early February 2021, Daugherty and Highland reached an agreement in principle to settle his claim.  Because of his prior employment history and knowledge of Highland, Daugherty was asked by the Committee and new management if he had any information on certain transactions and projects that occurred while Dondero was running the company.  Daugherty assisted the Committee, new management of Highland and the Litigation Trustee in gaining an understanding of certain former Highland employees, including Ellington, who were involved in the creation of the "SAS platform" and the "Sentinel Platform" to secretly transfer Highland assets to special purpose vehicle entities established in the Cayman Islands.[2]  Daugherty also identified the association between Ellington, Dondero, CPCM, LLC and Highgate Consulting, Inc. d/b/a Skyview Group.[3]

23.     Daugherty's knowledge of Ellington's clandestine enterprise has helped Highland identify assets, entities, and the human beings involved in Ellington's and Dondero's network, despite Ellington and Dondero destroying evidence (disposed cell phones), as well as Ellington and others providing inconsistent and non-credible testimony.

24.     Daugherty has also discovered that Ellington appears to be fraudulently transferring his own personal assets to third parties.  Ellington signed onto his video deposition on February 16, 2021, using an alias.  *See* App. 0149.  Daugherty shared some of the information uncovered during his investigation with the Litigation Trustee and counsel for the Committee.[4]

25.     As settlement negotiations between Daugherty and Highland were being finalized, on October 15, 2021, the Litigation Trustee appointed under Highland's confirmed chapter 11 plan

---

[2] Daugherty is willing to produce these communications to the Court for an *in camera* inspection.

[3] Recently, Highland entered into a stipulation with Ellington, CPCM, LLC and Highgate Consulting, Inc. to resolve certain claims filed against Highland in this bankruptcy.  *See* Docket No. 3238.

[4] Daugherty is willing to provide these communications to the Court for an *in camera* inspection.

4859-2676-3023

filed an action in this Court against a variety of people and entities, including Ellington and other former Highland executives, asserting claims for, among other things, fraud and fraudulent transfers. *See generally* Adversary No. 21-03076.

26.     Daugherty and Highland eventually entered into a settlement agreement (the "Proposed Settlement") in connection with his proof of claim.  The Proposed Settlement was confidential until filed with this Court for approval on December 8, 2021, at Docket No. 3088. However, Ellington's counsel in the Delaware Fraud Case submitted a letter to the Delaware court *incorrectly* arguing the **confidential** Proposed Settlement mooted Daugherty's claims against Ellington, even though the terms of the Proposed Settlement were not publicly known.  *See* App. 0150-0152.[5]   Indeed, although the Proposed Settlement releases Daugherty's claims against Highland, it *expressly and specifically retains* his claims against Ellington and select other individuals and entities.  A hearing on the Proposed Settlement is set for March 1, 2022.

27.     On December 17, 2021, Daugherty's Delaware counsel responded to Ellington's incorrect letter to the Delaware court.  Among other things, Daugherty's letter pointed out that under the terms of the Proposed Settlement, if approved, Daugherty would obtain 100% control over HERA and HERA Management, and that Daugherty "should have the opportunity to obtain the client files of HERA and [HERA Management] from [HAK], Abrams & Bayliss, Hurst, Cole Schotz, and DLA Piper, among other counsel." *See* App. 0159.  This would, among other things, give Daugherty the right to view all communications between and among the individuals named as defendants in the Delaware Fraud Case, including Ellington, Katz and Hurst, because Daugherty

---

[5] Ellington's Delaware counsel also misrepresented to the Delaware court that he represented HERA and HERA Management in the Delaware Fraud Case.

would now control the attorney-client privilege for HERA and HERA Management. Obviously, this fact has shaken Ellington.

28.     On January 12, 2022, barely a month after the Proposed Settlement was filed with this Court and less than one month after Daugherty's December 17, 2021 letter to the Delaware court, Ellington commenced the State Court Action against Daugherty, which asserts two claims: (1) Stalking under Tex. Civ. Prac. & Rem. Code § 85.002; and (2) Invasion of Privacy by Intrusion. *See* App. 0366-0410. Notably, Ellington is represented in the State Court Action by Hurst, among others. The sum of Ellington's allegations is that since February 2021—a full 11 months before the State Court Action was commenced—Daugherty has purportedly driven by Ellington's home or office taking photographs and video recordings. Ellington also alleges he hired his own private investigator, who happens to be his long-time personal assistant, to follow Daugherty for months in order to document Daugherty's alleged stalking activity. The last alleged incident occurred on December 11, 2021.

29.     If Ellington was truly concerned about his safety or the safety of others, he could have filed suit long before January 2022. Instead, evidencing the charade that is the State Court Action, Ellington did nothing until almost a year after the alleged stalking activity began. And then "coincidentally" Ellington commenced the State Court Action less than a month after the Proposed Settlement was filed with the Court and more than a month after the allegedly last stalking activity. Despite this timing, Ellington's contended that there was an "emergency" requiring an immediate hearing on his application for temporary restraining order and a temporary injunction.

30.     Tellingly, in his affidavit attached to the petition in the State Court Action, Ellington swears under penalty of perjury that he feared Daugherty so much, he moved residences three

12

times in the last year—*with his current home being located only a few blocks from Daugherty's home*![6]

31.     Shortly after filing the State Court Action, Hurst sent a litigation hold notice to Daugherty's counsel. *See* App. 0411-0416. Among the categories of documents and materials that Hurst requested be retained were "[a]ll documents and communications with any other party, person, or entity regarding . . . the observation, surveillance, or investigation of any Ellington Party or Ellington Location." *See* App. 0412. It is clear the State Court Action attempts to circumvent this Court's gatekeeping orders by seeking information concerning Daugherty's communications with the Committee, the Litigation Trustee, and Seery concerning Ellington's actions described above.

32.     On January 18, 2022, Daugherty removed the State Court Action to this Court. Adv. Docket No. 1.

33.     On January 31, 2022, Ellington's counsel sent a letter to Highland's counsel informally raising a partial objection to the Proposed Settlement. That letter again falsely accused Daugherty of engaging "in a pattern of stalking [Ellington]." *See* App. 0417. Based on these allegations, Ellington's counsel requested Highland "revisit and voluntarily withdraw" two provisions from the Proposed Settlement: (1) Observation Access under Paragraph 3; and (2) Highland's transfer of shares in HERA and HERA Management to Daugherty (together, the "Observation and Transfer Provisions"). *See* App. 0418. Ellington's counsel acknowledged the assignment would "permit Mr. Daugherty to bring additional causes of action against [Ellington]"

---

[6] Ellington's state court petition and affidavit identify his residential address on Potomac Avenue in Highland Park, and Daugherty's residence on Cornell Avenue in Highland Park. *See* App. 0367 (Daugherty Address); 0373 (Ellington Address); 0409 (Ellington Address). The Court can, and should, take judicial notice of the distance between their respective residences.

relating to HERA and HERA Management. *See* App. 0418. Highland, rightfully, refused to modify the Proposed Settlement.

34. On February 16, 2022, Ellington filed his formal objection to the Observation and Transfer Provisions of the Proposed Settlement at Docket No. 3242 (the "Settlement Objection"). Throughout the Settlement Objection, Ellington references the State Court Action to support his arguments that the Proposed Settlement should not be approved if the Observation and Transfer Provisions are included. Settlement Objection ¶¶ 3-4, 8, 9, 13.[7] The Settlement Objection then concludes as follows: "In light of the allegations that have come to light subsequent to [Highland] agreeing to include the provisions above, [Highland] should be afforded the opportunity to determine the impact of these allegations on its decision to include them in the Settlement Agreement and revisit inclusion of these provisions in the Daugherty Settlement." *Id.* at ¶ 12.

35. It could not be clearer that the Settlement Objection and the underlying State Court Action are nothing but gambits by Ellington to insulate himself, by preventing Daugherty from accessing additional information that could expose Ellington to additional liability for his prior bad acts. Beyond being related to each other, the State Court Action and the Proposed Settlement (and the Settlement Objection) are inextricably intertwined.

## ARGUMENTS & AUTHORITY

36. Section 1334(b) of Title 28 of the United States Code grants this Court jurisdiction over "all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]." 28 U.S.C. §1334(b). Under certain circumstances, the Court is required to abstain from hearing certain matters. 28 U.S.C. § 1334(c)(2). In other circumstances,

---

[7] The Settlement Objection appears to imply Daugherty does not deny the stalking allegations against him. That claim could not be further from the truth. Daugherty fully denies these specious allegations and has said as much in his Answer filed in this adversary proceeding [Adv. Docket No. 8], which speaks for itself.

4859-2676-3023

the Court may, in the exercise of its discretion, abstain from hearing such cases "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). Such discretion must be tempered by the tenet that "federal courts have a virtually unflagging obligation to exercise the jurisdiction given to them, and may abstain only for a few extraordinary and narrow exceptions." *Welded Constr., L.P. v. The Williams Cos. (In re Welded Constr., L.P.)*, 609 B.R. 101, 112 (Bankr. D. Del. 2019) (internal quotation marks and alterations omitted) (citing *Residential Funding Co. v. UBS Real Estate Secs., Inc. (In re Residential Cap., LLC)*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014)); *see also In re Lorax Corp.*, 295 B.R. 83, 95 (Bankr. N.D. Tex. 2003).

37.     Neither mandatory nor discretionary abstention is appropriate in this case, warranting a denial of the Motion to Remand.

## I.     Ellington Fails to Meet His Burden for Mandatory Abstention.

38.     Ellington first asserts that abstention is mandatory under 28 U.S.C. § 1334(c)(2) because the State Court Action "exclusively involves Texas state law and does not even 'relate to' the chapter 11 case." Adv. Docket No. 3 at 2. This Court is very familiar with the four-factor test for mandatory abstention. *In re Senior Care Centers, LLC*, 611 B.R. 791, 800 (Bankr. N.D. Tex. 2019).[8] Ellington must prove the existence of each factor by a preponderance of the evidence and is not entitled to mandatory abstention if he fails to prove any one of the statutory requirements. *In re Lorax Corp.*, 295 B.R. 83, 90 (Bankr. N.D. Tex. 2003). He has not done so here.

---

[8] Those four factors are: (1) the claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court. *Senior Care Centers*, 611 B.R. at 800 (citing *Edge Petroleum Operating Co., Inc. v. GPR Holdings, L.L.C.*, 483 F.3d 292, 300 (5th Cir. 2007)).

39.     Daugherty acknowledges that the first and third factors are not in dispute; that is, there is no independent basis for federal jurisdiction other than § 1334(b), and Daugherty removed a state court action to this Court.  The second and fourth factors, however, do not exist to support mandatory abstention.

**A.      This dispute is a "core" proceeding under 28 U.S.C. § 157.**

40.     The State Court Action is a core proceeding because Ellington contends in the Settlement Objection that his state law claims concern the administration of the bankruptcy estate and other proceedings affecting the adjustment of the debtor-creditor relationship.  Settlement Objection ¶¶ 3-4, 8, 9, 13.  "Core proceedings include, but are not limited to…(A) matters concerning the administration of the estate…[and] (O) other proceedings affecting… the adjustment of the debtor-creditor… relationship." 28 U.S.C. §§ 157(b)(2)(A) and (O); *In re Directory Distributing Associates, Inc.*, 566 B.R. 869, 875 (Bankr. S.D. Tex. 2017) (holding the court had jurisdiction over a removed action and subsequent competing motions to transfer venue because the transfer "will affect the administration of the Debtor's Chapter 11 case").  Here, there cannot be any legitimate dispute that Daugherty is a creditor of Highland or that the Proposed Settlement directly affects both the administration of the estate and the adjustment of the debtor-creditor relationship.  Ellington is using the State Court Action in an attempt to alter the Proposed Settlement between Daugherty and Highland, and thereby interfere with the agreed-upon resolution of the debtor-creditor relationship between the Debtor (Highland) and one of its largest creditors (Daugherty).

41.     The letter from Ellington's counsel to Highland's counsel that pre-dated the Settlement Objection directly tied Ellington's objections to the Proposed Settlement to the allegations in the State Court Action.  *See* App. 0417-0419.  As if that were not enough, the letter

16

from Ellington's counsel goes so far as to effectively threaten Highland: the letter contends that Highland's refusal to accede to Ellington's wishes by removing the Oversight and Transfer Provisions of the Proposed Settlement "could expose the Debtor's estate to claims that it *aided and abetted Mr. Daugherty in the commission of a crime against our Client.*" *See* App. 0418 (emphasis added).

42.     Putting aside the fact that the State Court Action, the January 31 letter from Ellington's counsel to Highland's counsel and the Settlement Objection are clearly intended to disparage Daugherty and otherwise interfere with the Proposed Settlement, Ellington's demands further potentially impact the administration of this case because—according to Ellington—if the Proposed Settlement is approved, there could be claims made by Ellington against the estate.

43.     Consequently, the Settlement Objection makes it abundantly clear that Ellington's State Court Action is a fabricated exploit created to attempt to (1) directly affect the administration of the bankruptcy estate and (2) assault the creditor-debtor relationship between Daugherty and Highland.

44.     Additionally, "bankruptcy courts have core jurisdiction to interpret and enforce their own orders." *In re Ritchey*, 512 B.R. 847, 856 (Bankr. S.D. Tex. 2014) (*quoting In re Kewanee Boiler Corp.*, 270 B.R. 912, 917 (Bankr. N.D. Ill. 2002)). This matter is a core proceeding because, *inter alia*, it involves matters concerning this Court's enforcement of its own gatekeeping orders. As discussed above, Daugherty has shared his investigation into Ellington's transfer of certain assets with the Litigation Trustee, the Committee and Seery. Ellington's counsel in the State Court Action sent Daugherty's counsel a litigation hold letter. *See* App. 0411-0416. Among the categories of documents and materials that Ellington requested be retained were "[a]ll documents and communications with any other party, person, or entity regarding . . . the observation,

17

surveillance, or investigation of any Ellington Party or Ellington Location." *See* App. 0412. It is clear that Ellington's lawsuit attempts to circumvent this Court's gatekeeping orders by seeking Daugherty's communications with the Committee, Highland, and Seery concerning Ellington's attempts to conceal his assets to keep them out of the reach of his creditors. The timing of the State Court Action is indicative of its retaliatory nature because Daugherty expressly retained his claims against Ellington in the Proposed Settlement.

45. This factor weighs against mandatory abstention.

**B.      Timely adjudication of the State Court Action is questionable, at best.**

46. Ellington concedes that establishing the fourth required factor for mandatory abstention requires more than a "naked assertion that a proceeding can be timely heard in state court," yet fails to overcome the requirement's "relatively low hurdle." Adv. Docket No. 3 at 6 (citing *WRT Creditors Liquidation Tr. V. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp 2d 596, 605–06 (S.D. Tex. 1999)). As the party moving for mandatory abstention, Ellington bears the burden to satisfy this requirement. *In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 846 (Bankr. S.D. Tex. 2006) (concluding that the movant could not satisfy this factor absent any evidence that the state court could timely adjudicate the removed proceeding).

47. Ellington fails to offer anything more than a bald assertion that the State Court Action can be timely adjudicated in state court, relying entirely upon the state court's emergency hearing and order on his application for a temporary restraining order ("TRO"). But those pretrial proceedings, by their very nature, are designed to be expeditious in order to preserve the status quo of the subject matter of the litigation until a trial on the merits. *Clint ISD v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). The fact that the state court ruled on Ellington's emergency TRO application

does not establish the state court can timely adjudicate Ellington's claims through a trial on the merits. Consequently, Ellington's mandatory abstention argument fails without more.

48.     Nonetheless, the evidence shows the state court cannot timely adjudicate the state law claims. The state court was not conducting jury trials while the Dallas County COVID-19 risk level is red.[9] As a result, the state court faces a severe backlog of cases ready for trial. For example, the court in which the State Court Action was pending has 65 trial settings (comprised of 52 jury trials, and 13 non-jury trials) concurrently scheduled to begin on March 22. Twenty-three of those cases are over two years old. Another is three years old, and one is more than four years old. *See* App. 0420-0429. The state court also has 85 trial settings (75 jury and 10 non-jury) for the week of April 18, 2022. Nine of those cases are over two years old, and one is over three years old. *See* App. 0430-0439. It is thus really anyone's guess when the State Court Action would actually get to trial in the state court, or if or when pre-trial dispositive motions can be heard and ruled upon.

49.     This Court, on the other hand, has previously acknowledged that it can adjudicate state court actions fairly quickly, and that a quick resolution could be "in the furtherance of the efficient administration of the estate." *In re Brook Mays Music Co.*, 363 B.R. 801, 817 (Bankr. N.D. Tex. 2007) (Jernigan, J.). Daugherty defers to the Court's discernment regarding its docket and ability to timely adjudicate this action.

50.     This factor also weighs against mandatory abstention.

---

[9]   *See* *https://www.dallascounty.org/government/courts/civil_district/101st/covid-19.php* ("No jury trials will be conducted while the Dallas County COVID-19 risk level is RED"). The risk level was changed to orange on February 21, 2022. https://www.dallascounty.org/Assets/uploads/docs/covid-19/press-releases/2022/02/02212022-Press-Release-Dallas-County-Reports-New-Positive-2019-Novel-Coronavirus-(COVID-19)-Cases.pdf

**II.    The Balance of Equities Weighs in Favor of This Court Exercising Jurisdiction—Permissive Abstention or Equitable Remand is Improper.**

51.    Ellington alternatively argues for permissive abstention under § 1334(c)(1) because there is no independent basis for federal jurisdiction.  Adv. Docket No. 3 at 2-3.  Though a bankruptcy court may exercise its discretion to permissively abstain or equitably remand a removed action when all the requirements for mandatory abstention are not met, the balance of factors here weighs in favor of this Court maintaining jurisdiction.  *In re Montalvo*, 559 B.R. 825, 836–40 (Bankr. S.D. Tex. 2016) (concluding that abstention and remand is unnecessary where the requisite factors, on balance, weigh in favor of the court's exercise of jurisdiction); *see also In re Rodriguez*, No. 10-70606, 2021 WL 4562254, at *4–6 (Bankr. S.D. Tex. Oct. 5, 2021); *In re Doctors Hosp.*, 351 B.R. at 847–54.

52.    Exercising jurisdiction over the State Court Action is proper. As the Court has in the past recognized, the legislative history of 28 U.S.C. § 1334 reveals Congress's intent to avoid "the inefficiencies of piecemeal adjudication of matters affecting the administration of bankruptcies and inten[t] to give federal courts the power to adjudicate all matters having an effect on bankruptcy." *In re Brook Mays Music Co.*, 363 B.R. at 815 n. 12 (citing *In re Baudoin*, 981 F.2d 736, 741 (5th Cir. 1993)).  Accordingly, bankruptcy courts evaluate fourteen (14) factors in determining whether to abstain or equitably remand a removed action: (1) the effect or lack thereof on the efficient administration of the estate if the court recommends remand or abstention; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficult or unsettled nature of applicable law; (4) the presence of related proceeding commenced in state court or other non-bankruptcy proceeding; (5) the jurisdictional basis, if any, other than § 1334; (6) the degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core

20

bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; (12) the presence in the proceeding of non-debtor parties; (13) comity; and (14) the possibility of prejudice to other parties in the action. *In re Brook Mays Music Co.*, 363 B.R. at 817.

53. The majority of the above factors weigh against abstention and remand, and all but one of the other factors are neutral:

a. *The effect or lack thereof on the efficient administration of the estate if the court recommends remand or abstention.* As detailed above and in Daugherty's notice of removal [*see* Adv. Docket No. 1], Ellington's transparent purpose in filing the State Court Action is to thwart this Court's efficient administration of the Debtor's estate by interfering with a proposed settlement between Highland and one of its largest creditors. *See Sabre Techs., L.P. v. TSM Skyline Exhibits, Inc.*, No. H-08-1815, 2008 WL 4330897, at *5 (S.D. Tex. Sept. 18, 2008) (refusing to remand or abstain because litigation involving the debtor's largest creditor would be more efficiently resolved by the bankruptcy court). This factor weighs against abstention and remand.

b. *The extent to which state law issues predominate over bankruptcy issues.* Ellington's State Court Action relies upon Texas law; however, his state law claims are clearly asserted for no purpose other than gaining a tactical advantage in this Court in connection with its consideration of core bankruptcy issues. Accordingly, this factor favors maintaining the State Court Action in this Court or, at worst, this factor is neutral.

c. *The difficult or unsettled nature of applicable law.* The issues presented in the State Court Action, although sounding in Texas state law, are not difficult or unsettled.[10] *See In re Hassell*, No. 19-30694, 2020 WL 728890, at *4 (Bankr. S.D. Tex. Jan. 7, 2020) (court favored retaining case where it would "be tasked with nothing more than applying Texas law to the facts of this case."). Daugherty respectfully submits that this Court is more than capable of dealing with the application of the law to the facts, something this Court does every day in cases before it. This factor weighs against abstention and remand.

d. *Presence of related proceeding commenced in state court or other non-bankruptcy proceeding.* There is no parallel proceeding pending in state court or in any other non-bankruptcy tribunal concerning the relief requested in this adversary proceeding. Moreover, although the State Court Action was commenced postpetition, it did not proceed beyond the initial emergency TRO application hearing, and all related proceedings are before this Court. *See Sabre Techs*, 2008 WL 4330897, at *5 (concluding the evidence weighed against abstention or remand because the state court proceeding was removed "before the state court expended any significant resources"). This factor weighs against abstention and remand.

e. *Jurisdictional basis, if any, other than § 1334.* Daugherty agrees there is no independent basis for jurisdiction other than § 1334. However, as discussed above, the State Court Action presents a core proceeding. This factor, therefore, is neutral.

f. *Degree of relatedness or remoteness of proceeding to main bankruptcy case.* The State Court Action is inextricably intertwined with the main bankruptcy proceeding because it seeks to influence a proposed settlement between Highland and one of its largest creditors, which impacts the overall resolution of the bankruptcy. Moreover, Ellington has effectively threatened

---

[10] Ellington's State Court Action suffers from multiple legal and evidentiary sufficiency barriers in any event.

4859-2676-3023

Highland with additional claims against the estate if the Proposed Settlement is approved. This factor weighs against abstention and remand.

g.     *The substance rather than the form of an asserted core proceeding.* The substance of this core proceeding weighs heavily against abstention and remand. Ellington's goal in bringing the State Court Action is unquestionably to influence this Court's consideration of the Proposed Settlement.

h.     *The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in the state court with enforcement left to the bankruptcy court.* This factor is not applicable because all claims are state law claims.

i.     *The burden on the bankruptcy court's docket.* As stated above, Daugherty defers to the Court's ability to ascertain the burden this proceeding will have on its docket. However, as previously mentioned, Daugherty believes Ellington's State Court Action suffers from a multitude of legal and evidentiary issues that will lead to a quick resolution of the pending dispute should the Court retain jurisdiction over the matter. *See In re Brook Mays Music Co.*, 363 B.R. at 818 (evidence favored retention where the court "has familiarity with the parties and the disputes."). This factor weighs against abstention and remand.

j.     *The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties.* Daugherty has detailed his argument that Ellington brought the State Court Action merely to gain a tactical advantage in front of this Court. Daugherty removed the State Court Action to avoid the cloak and dagger tactics employed by Ellington, and so this Court has first-hand awareness of the arguments, facts, and the reality of Ellington's claims, specifically in light of the Court's gatekeeping orders. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. at 850 (holding that factor "militates against abstention and in favor of keeping

the Adversary Proceeding in this Court" where "the [Plaintiff is] forum shopping to escape [the bankruptcy court]"); *In re Brook Mays Music Co.*, 363 B.R. at 818 (opining that "forum shopping is likely a possibility on the part of the plaintiffs" in denying discretionary abstention). This factor weighs heavily against abstention and remand.

k.      *The existence of a right to jury trial.*  Ellington and Daugherty are entitled to request a jury trial if the state law claims proceed in state court.  This Court may also preside over a jury trial with the consent of all parties.  28 U.S.C. § 157(e).  Ellington stated in his Motion to Remand that he "intends to demand" a jury trial.  Daugherty would consent to a jury trial before this Court if the case survives dispositive motion practice.  Additionally, if the Court retains jurisdiction, Ellington is free to file a motion to withdraw the reference (and meet the applicable legal standards), to have a jury trial in the District Court and will thus not be prejudiced.  This factor is neutral.

l.      *The presence in the proceeding of non-debtor parties.*  Only non-debtor parties are present in this proceeding.  Yet, both parties are associated with the main bankruptcy proceeding.  *See In re Brook Mays Music Co.*, 363 B.R. at 818 (weighing in favor of retention because "[t]here are nondebtor parties, but all have participated extensively in the bankruptcy case and would appear not to be inconvenienced by this or the district court forum").  Daugherty is one of the largest creditors of the Debtor, and Ellington is a defendant in the Litigation Trustee's adversary proceeding; both parties have been, and will continue to be, before this Court in various capacities. This factor is neutral.

m.      *Comity.*  Like *In re Doctors Hosp. 1997, L.P.*, the State Court Action exclusively concerns state law claims, and due to Ellington's posturing, this suit is intended to directly affect the administration of Highland's bankruptcy estate.  351 B.R. at 853.  Also, there

are no state law interests that "outweigh the collective judicial interest in stopping forum shopping, which is best served by this suit remaining in this Court." *Id.* Therefore, this factor militates against abstention and remand.

        n.     *The possibility of prejudice to other parties in the action.* Ellington does not identify any prejudice he would suffer if this Court retained jurisdiction over his state law claims. This factor favors maintaining jurisdiction.

    54.     The above factors strongly weigh in favor of the Court exercising jurisdiction over Ellington's state law claims. *Id.* Doing so will lead to the efficient and just resolution of the main bankruptcy proceeding.

## CONCLUSION

    For the foregoing reasons, mandatory abstention does not apply, and the Court should exercise its discretion to maintain jurisdiction. Ellington's Motion to Remand should be denied.

    Respectfully submitted this 23rd day of February 2022.

**GRAY REED**

By: /s/ *Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    Andrew K. York
    Texas Bar No. 24051554
    Drake M. Rayshell
    Texas Bar No. 24118507
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:     jbrookner@grayreed.com
            dyork@grayreed.com
            drayshell@grayreed.com

**COUNSEL TO PATRICK DAUGHERTY**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 23rd day of February 2022, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed.

*/s/ Jason S. Brookner*
Jason S. Brookner

26