Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Drake M. Rayshell
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
      dyork@grayreed.com
      drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON, | |
| Plaintiff, | Adv. No. 22-03003-sgj |
| | *Removed from the 101st Judicial District Court of Dallas County, Texas Cause No. DC-22-00304* |
| v. | |
| PATRICK DAUGHERTY, | |
| Defendant. | |

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**APPENDIX TO PATRICK DAUGHERTY'S BRIEF IN SUPPORT OF RESPONSE TO SCOTT ELLINGTON'S EMERGENCY MOTION TO ABSTAIN AND TO REMAND**

Pursuant to N.D. Tex. Local Bankruptcy Rule 7007-1 (g), Patrick Daugherty submits this appendix to Patrick Daugherty's Brief in Support of Response to Scott Ellington's Emergency Motion to Abstain to Remand.

| Page No. | Description |
| --- | --- |
| 0001-0004 | Declaration of Andrew K. York |
| 0005-0010 | Escrow Agreement between Highland Capital Management, L.P. and Abrams & Bayliss, LLP |
| 0011-0087 | Patrick Daugherty's Pretrial Brief, *Patrick Daugherty v. Highland Capital Management, et. al. v. Highland Employee Retention Assets, LLC*, C.A. No. 2017-0488-MTZ, in the Court of Chancery of the State of Delaware. (**REDACTED**). |
| 0088 | Highland Capital Management's Request for Writ of Execution, *Highland Capital Management v. Patrick Daugherty v. Sierra Verde, LLC et. al.,* Cause No. 12-04005, in the 68th District Court of Dallas County (Filed December 2, 2016). |
| 0089 | Highland's Release of Judgment Lien against Daugherty (recorded October 10, 2017). |
| 0090-0103 | Plaintiff Highland Capital Management L.P.'s Application for Writ of Garnishment, Cause No. 12-16-15669, in the 68th District Court of Dallas County (Filed December 8, 2016). |
| 0104-0105 | February 14, 2017 letter to Abrams & Bayliss, LLP |
| 0106-0107 | February 16, 2017, letter from Abrams & Bayliss, LLP |
| 0108-0148 | Delaware Fraud Case Verified Complaint, *Daugherty v. Dondero et. al.*, Case No. 2019-0956-MTZ, in the Court of Chancery of the State of Delaware |
| 0149 | Screenshot during Scott Ellington's February 16, 2021 deposition. |
| 0150-0152 | November 29, 2021, letter to the Honorable Vice Chancellor Morgan T. Zurn from Stephen Brauerman in the Delaware Fraud Case. |
| 0153-0365 | December 17, 2021, letter from Tom Uebler to Vice Chancellor Zurn in the Delaware Fraud Case. |

| 0366-0410 | Petition filed by Ellington in Cause No. DC-22-00304 in the 101st Judicial District of Dallas County, Texas ("State Court Action"). |
| 0411-0416 | January 13, 2022, Litigation Hold letter from Michael Hurst. |
| 0417-0419 | January 31, 2022, letter from Michelle Hartman to John A. Morris and Jeffrey N. Pomerantz. |
| 0420-0429 | Copy of the 101st District Court of Dallas County's Hearing Docket for the week of March 21, 2022 (last visited February 17, 2022). |
| 0430-0439 | Copy of the 101st District Court of Dallas County's Hearing Docket for the week of April 18, 2022 (last visited February 17, 2022). |

Respectfully submitted this 23rd day of February, 2022.

**GRAY REED**

By: /s/ *Jason S. Brookner*

Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Drake M. Rayshell
Texas Bar No. 24118507
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
dyork@grayreed.com
drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

 The undersigned hereby certifies that on the 23rd day of February, 2022, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed.

*/s/ Jason S. Brookner*
Jason S. Brookner

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON, | |
| Plaintiff, | Adv. No. 22-03003-sgj |
| v. | *Removed from the 101st Judicial District* |
| | *Court of Dallas County, Texas* |
| PATRICK DAUGHERTY, | *Cause No. DC-22-00304* |
| Defendant. | |

## DECLARATION OF ANDREW K. YORK

Andrew K. York declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Andrew K. York. I am over 18 years of age and fully competent to make this Declaration. I have personal knowledge of the facts contained herein, and they are all true and correct.

2.      I am a partner at Gray Reed & McGraw LLP, and am one of the counsel to Patrick Daugherty ("Daugherty") in the above-referenced adversary proceeding. Gray Reed & McGraw LLP also served as counsel to Daugherty in *Scott Byron Ellington v. Patrick Daugherty*; Cause No. DC-22-00304; in the 101st Judicial District Court, Dallas County, Texas (the "State Court Action") while it was pending in the state court. Previously, I along with other attorneys at Gray Reed &

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

McGraw, P.C. f/k/a Looper Reed & McGraw, P.C. represented Daugherty in *Highland Capital Management, L.P. v. Patrick Daugherty*; Cause No. DC-12-04005; in the 68th Judicial District Court, Dallas County, Texas (the "Highland Action").

3.      Attached hereto as Appendix pages 0005-0010 and incorporated herein is a true and correct copy of the Escrow Agreement between Highland Capital Management, L.P. and Abrams & Bayliss, LLP.

4.       Attached hereto as Appendix pages 0011-0087 and incorporated herein is a true and correct copy of a pretrial brief filed by Daugherty in the Delaware Recovery Case.

5.      Attached hereto as Appendix pages 0088 and incorporated herein is a true and correct copy of a request for writ of execution filed by Highland Capital Management, L.P. in the Highland Action.

6.      Attached hereto as Appendix pages 0089 and incorporated herein is a true and correct copy of a release of judgment lien filed in the Dallas County public records relating to the final judgment entered in the Highland Action.

7.      Attached hereto as Appendix pages 0090-0103 and incorporated herein is a true and correct copy of an application for writ of garnishment filed by Highland Capital Management, L.P. in the Highland Action.

8.      Attached hereto as Appendix pages 0104-0105 and incorporated herein is a true and correct copy of a letter sent by Delaware counsel on Daugherty's behalf to Abrams & Bayliss, LLP on February 14, 2017.

9.      Attached hereto as Appendix pages 0106-0107 and incorporated herein is a true and correct copy of a letter from Abrams & Bayliss, LLP to Daugherty's Delaware counsel dated February 16, 2017.

10. Attached hereto as Appendix pages 0108-0148 and incorporated herein is a true and correct copy of the complaint filed in Daugherty's Delaware Fraud Case against James Dondero, HERA, HERA Management, Isaac.

11. Attached hereto as Appendix page 0149 and incorporated herein is a true and correct copy of a screenshot picture taken by Patrick Daugherty on February 16, 2021, during Scott Ellington's deposition.

12. Attached hereto as Appendix pages 0150-0152 and incorporated herein is a true and correct copy of a November 29, 2021, letter submitted by Stephen B. Brauerman, counsel for Scott Ellington, among others, in Daugherty's Delaware Fraud Case, to the Delaware court.

13. Attached hereto as Appendix pages 0153-0365 and incorporated herein is a true and correct copy of a December 17, 2021, letter submitted by Thomas Uebler, counsel for Daugherty in Daugherty's Delaware Fraud Case, to the Delaware court.

14. Attached hereto as Appendix pages 0366-0410 and incorporated herein is a true and correct copy of Scott Ellington's original petition and application for temporary restraining order in the State Court Action.

15. Attached hereto as Appendix pages 0411-0416 and incorporated herein is a true and correct copy of a litigation hold letter sent by Michael Hurst to myself and others in the State Court Action on January 13, 2022.

16. Attached hereto as Appendix pages 0417-0419 and incorporated herein is a true and correct copy of a January 31, 2022 letter from Michelle Hartman to John Morris and Jeffrey Pomerantz, counsel for Highland in the bankruptcy. Mr. Morris sent me a copy of the letter on February 9, 2022.

17.     Attached hereto as Appendix pages 0420-0429 and incorporated herein is a true and correct copy of the 101st Judicial District Court's trial docket sheet for the week of March 21, 2022, which was obtained on February 17, 2022.

18.     Attached hereto as Appendix pages 0430-0439 and incorporated herein is a true and correct copy of the 101st Judicial District Court's trial docket sheet for the week of April 18, 2022, which was obtained on February 17, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Dallas, Texas on this 23rd day of February, 2022.

Andrew K. York

4

0004

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT is entered into December 13, 2013, by and between Highland Capital Management, L.P. ("Depositor"), and Abrams & Bayliss, LLP, as escrow agent (the "Escrow Agent").

**WHEREAS**, from time to time, pursuant to certain transactions, Depositor receives and holds certain funds; and

**WHEREAS**, Depositor is desirous of appointing the Escrow Agent as its agent to hold these funds subject to the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. **Appointment.** Depositor hereby appoints Escrow Agent as its escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2. **Deposit Assets.** Depositor agrees to deposit with Escrow Agent the assets as set forth in Schedule 1 (the "Deposit Assets"). Escrow Agent shall hold the Deposit Assets as set forth in this Escrow Agreement. Escrow Agent shall not have any liability for any loss sustained as a result of any increase or decrease of value of any Deposit Assets or for the failure of an Authorized Representative of Depositor to give Escrow Agent instructions regarding any Deposit Asset. All interest or other income earned under this Agreement shall be accumulated and become part of the Deposit Assets. Depositor hereby represents to Escrow Agent that Depositor shall file all necessary tax documentation in relation to the Deposit Assets and no other tax reporting of any kind is required given the underlying transaction giving rise to this Agreement.

3. **Disposition and Termination.**

(a) The Escrow Agent shall deliver the Deposit Assets upon, and pursuant to, the written instructions of Depositor in compliance with Section 3(b). Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of the Deposit Assets, must be in writing or set forth in a Portable Document Format ("PDF"), executed by Depositor as evidenced by the signatures of the person or persons signing this Agreement or one of its designated persons as set forth in Schedule 2 (each an "Authorized Representative"), and delivered to Escrow Agent only by confirmed facsimile or attached to an email on a Business Day only at the fax number or email address set forth in Section 8 below. No instruction for or related to the transfer or distribution of the Deposit Assets shall be deemed delivered and effective unless Escrow Agent actually shall have received it on a Business Day by facsimile or as a PDF attached to an email only at the fax number or email address set forth in Section 8 and as evidenced by a confirmed transmittal to Depositor's transmitting fax number or email address and Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. Escrow Agent shall not be liable to Depositor or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Deposit Assets if delivered to any other fax number or email address, including but not limited to a valid email address of any employee of Escrow Agent. Depositor acknowledges that Escrow Agent is authorized to use the following funds transfer instructions to disburse any Deposit Assets due to Depositor, respectively, without a verifying call-back, as set forth in Section 3(b) below:

Depositor: Bank name:     Compass Bank
                             Account Name: Highland Capital Management, L.P. (Master Operating Account)
                             Routing# 113010547
                             Account# 0025876342

{A&B-00276659-2}           1



DEFENDANT'S EXHIBIT 10

PLAINTIFFS 0799691

(b) Escrow Agent shall only transfer Deposit Assets under the following circumstances:

i. In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee Retention Assets, LLC ("HERA") by Patrick Daugherty, his successors, or assigns ("Daugherty") in the case *Highland Capital Management, L.P. and Cornerstone Healthcare Group Holding, Inc. v. Patrick Daugherty v. Sierra Verde, LLC, et al.*, Cause No. 12-04005 in the 68th Judicial District of Dallas County, Texas ("Daugherty Action"), Escrow Agent shall, within 10 Business Days, transfer to HERA Deposit Assets equivalent to the amount of such judgment, or if the judgment against HERA exceeds the amount of Deposit Assets, Escrow Agent shall transfer to HERA all Deposit Assets, including accumulated income, held by Escrow Agent.

ii. In the event Escrow Agent is provided a final, non-appealable order dismissing Daugherty's claims against HERA in the Daugherty Action, Escrow Agent shall, within 10 Business Days, transfer all Deposit Assets, including accumulated income, to Depositor.

All transfers made in this Section 3(b) shall be made subject to Sections 6 and 7 herein.

(c) As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any Federal holiday. Upon delivery of the Deposit Assets by Escrow Agent, this Agreement shall terminate, subject to the provisions of Sections 6 and 7 herein.

4. **Escrow Agent.** Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature. No other duties shall be implied, and under no circumstances shall the Escrow Agent be deemed a fiduciary of Depositor for the purposes of this Agreement. Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement, instrument or document other than this Agreement. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by Depositor believed by it to be genuine and to have been signed by an Authorized Representative without inquiry and without requiring substantiating evidence of any kind. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it pursuant to, or in relation to this Agreement, except for willful misconduct causing direct loss to Depositor. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. Escrow Agent shall have no duty to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

5. **Resignation; Succession.** Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving ten (10) days advance written notice specifying a date when such resignation shall take effect. Escrow Agent shall deliver the Deposit Assets to any appointed successor escrow agent, or to the Depositor, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

6. **Compensation.** Depositor agrees to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder as agreed by Escrow Agent and Depositor.

7. **Indemnification and Reimbursement.** Depositor agrees to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, partners, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, attorney's fees, expert fees and expenses and out-of-pocket expenses) (collectively "Losses"), arising out of or in connection with (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction through a final, non-appealable order to have been caused by the willful misconduct of

{A&B-00276659-2}                                                    2

PLAINTIFFS 0799692

such Indemnitee; and (b) Escrow Agent's following any instructions or directions from Depositor received in accordance with this Agreement. Depositor shall pay all expenses (including attorney's fees) incurred by such Indemnitee as they are incurred in advance of the dispute's final disposition. The foregoing indemnification includes, but is not limited to, disputes between Depositor and Escrow Agent arising out of or in connection with this Agreement. Depositor hereby grants Escrow Agent a lien on, right of set-off against and security interest in the Deposit Assets for the payment of any claim for indemnification, fees, expenses and amounts due to Escrow Agent or an Indemnitee. In furtherance of the foregoing, Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Deposit Assets for its own account or for the account of an Indemnitee any amounts due to Escrow Agent or to an Indemnitee under Section 6 or 7. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

8.      **Notices.** All communications hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions from Depositor to the Escrow Agent shall be executed by an Authorized Representative, and shall be delivered in accordance with the terms of this Agreement by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

|  |  |
|---|---|
| If to Depositor: | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, Texas, 75201<br>Attention: General Counsel<br>Tel No.: (972) 628-4100<br>Fax No.: (972) 628-4147<br>Email: sellington@hcmlp.com |
| If to Escrow Agent: | Abrams & Bayliss, LLP<br>20 Montchanin Road, Suite 200<br>Wilmington, Delaware 19807<br>Attention: Jean Chaney<br>Tel No.: (302) 388-2457<br>Fax No.: (302) 261-0293<br>Email: chaney@AbramsBayliss.com |

9.      **Compliance with Court Orders.** Escrow Agent shall provide Depositor with prompt written notice in the event that any of the Deposit Assets shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court. Escrow Agent hereby is expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to Depositor hereto or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

10.     **Miscellaneous.** The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and Depositor. Neither this Agreement nor any right or interest hereunder may be assigned by Depositor without the prior consent of Escrow Agent. This Agreement shall be governed by and construed under the laws of the State Delaware. Depositor and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the courts located in the State of Delaware. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party shall not claim, and hereby irrevocably waives, such immunity. Escrow Agent and Depositor further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement. No party to this Agreement is liable to any other party for losses due to, or if it is unable to

PLAINTIFFS 0799693

perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Depositor represents warrants and covenants that each document, notice, instruction or request provided by Depositor to Escrow Agent shall comply with applicable laws and regulations. Except as expressly provided in Section 7 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and Depositor any legal or equitable right, remedy, interest or claim under or in respect of the Deposit Assets or this Agreement. The parties agree that irreparable harm would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of this Agreement or any other agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective on the date set forth above:

HIGHLAND CAPITAL MANAGEMENT, L.P.
As Depositor

By: _____
Name: James Dondero
Title: President of Strand Advisors, Inc., as general partner


ABRAMS & BAYLISS, LLP
As Escrow Agent

By: _____
Name: Kevin G. Abrams
Title: Managing Partner

PLAINTIFFS 0799694

0008

**SCHEDULE 1**

The following shall be the Deposit Assets:

| Asset | Amount |
|---|---|
| Cash (USD) | $ 1,210,502.03 |
| Highland Restoration Capital Partners, L.P. limited partner interest (USD as of 9/30/2013) | $ 1,820,050.49 |
| Cash equivalent of NexPoint Credit Strategies Deposit Assets (such amount to be updated at the end of each calendar month) | 1088.42 shares |

PLAINTIFFS 0799695

0009

SCHEDULE 2

**Telephone Numbers and Authorized Signatures for**
**Person(s) Designated to Give Joint Instructions and Confirm Deposit Assets Transfer Instructions**

For Depositor:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1. Scott Ellington | (972) 419-2584 | |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of each Party.

PLAINTIFFS 0799696

0010

**EFiled: Aug 29 2019 04:55PM EDT**
**Transaction ID 64146007**
**Case No. 2017-0488-MTZ**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PATRICK DAUGHERTY,<br><br>    Plaintiff,<br><br>      v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND EMPLOYEE RETENTION ASSETS LLC, HIGHLAND ERA MANAGEMENT LLC, and JAMES DONDERO,<br><br>    Defendants,<br><br>      and<br><br>HIGHLAND EMPLOYEE RETENTION ASSETS LLC,<br><br>    Nominal Defendant. | C.A. No. 2017-0488-MTZ<br><br>**A Public Version of this Document Will Be Filed on September 6, 2019** |

## PATRICK DAUGHERTY'S PRETRIAL BRIEF

YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE

If you are not authorized by Court Order to view or retrieve this document, read no further than this page. You should contact the following person:

Thomas A. Uebler (#5074)
McCollom D'Emilio Smith Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401, Wilmington, DE 19808
(302) 468-5960

*Attorneys for Patrick Daugherty*

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

     Plaintiff,

        v.

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND EMPLOYEE RETENTION ASSETS LLC, HIGHLAND ERA MANAGEMENT LLC, and JAMES DONDERO,

     Defendants,

        and

HIGHLAND EMPLOYEE RETENTION ASSETS LLC,

     Nominal Defendant.

C.A. No. 2017-0488-MTZ

## PATRICK DAUGHERTY'S PRETRIAL BRIEF

Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Kerry M. Porter (#6067)
Hayley M. Lenahan (#6174)
MCCOLLOM D'EMILIO SMITH
  UEBLER LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960

*Attorneys for Patrick Daugherty*

Dated: August 29, 2019

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

0012

# TABLE OF CONTENTS



THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT

013

O.    █████████████████████████████████

█████████████████████████████████████████

█    █████████████████████████████████████

A.    █████████████████████████████████

B.    █████████████████████████████████

C.    █████████████████████████████████

D.    █████████████████████████████████

E.    █████████████████████████████████

█    █████████████████████████████████████

A.    █████████████████████████████████

B.    █████████████████████████████████

C.    █████████████████████████████████

D.    █████████████████████████████████

███████████████████████████████████████████

A.    █████████████████████████████████

B.    █████████████████████████████████

C.    █████████████████████████████████

███████████████████████████████████████████

A.    █████████████████████████████████

B.    █████████████████████████████████

C.    █████████████████████████████████

D.    █████████████████████████████████

E.    █████████████████████████████████

iv

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

F. ███████████████████████████████████████

██ ████████████████████████████████████████

█████████████████████████████████████████████

v

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



vi

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████

███████████████████████████████████████████

███████████████████████████████████████████

vii

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



1
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



2
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**B.**

3

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



5
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



6
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



7
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



8
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



E.

9
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

0026



10
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



11
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



12

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**E.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



14
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



15

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**F.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



17
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



18
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



19
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



20

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**H.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



23

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**I.**

24
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



25
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



26
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**K.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



28
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



29
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



30
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



31
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



32
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



33
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



34
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



35
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



36
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



37
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



38
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**B.**

39
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



Γ.

40
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

0057



41
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



42
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



43
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



44
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



45
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



46
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



47
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



48
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



49
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



50
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



51
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



52
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

53
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



54
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



55
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



56

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



57
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



58
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



59
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



60
THIS DOCUMENT IS A CONFIDENTIAL FILING.



61
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



62
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



63
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



64
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**E.** 

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



**F.**

**V.**

66
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



67
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



68
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████

████████████████████

██████████

/s/ Thomas A. Uebler
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Kerry M. Porter (#6067)
Hayley M. Lenahan (#6164)
MCCOLLOM D'EMILIO SMITH
  UEBLER LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, Delaware 19808
(302) 468-5960

*Attorneys for Patrick Daugherty*

Words: 13,693

Dated: August 29, 2019

69
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2019, I caused a true and correct

copy of the foregoing to be served by File & ServeXpress on the following

counsel:

John L. Reed
Peter H. Kyle
Harrison S. Carpenter
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

*/s/ Thomas A Uebler*
Thomas A. Uebler (#5074)

1

COMPLETE THIS FORM WHEN REQUESTING THE ISSUANCE OF AN ABSTRACT
OF JUDGMENT, WRIT OF EXECUTION OR ORDER OF SALE ONLY

*FILED*
*16 DEC -2 AM 11: 18*
*FELICIA FITRE*
*DISTRICT CLERK*
*DALLAS CO., TEXAS*
*Anita Freeney*
*DEPUTY*

## POST-JUDGMENT REQUEST FORM

A COPY OF THE ORDER OR JUDGMENT MUST BE FURNISHED

CIRCLE ONE: FAMILY or CIVIL     CAUSE No. 12 - 4005

DATE REQUESTED: 12-2-2016

JUDGMENT DATE: 7-14-2014

PETITIONER/PLAINTIFF: Highland Capitol Management

VS.

Patrick Daugherty

REQUEST:                              DELIVER TO: (CHECK ONE ONLY)

ABSTRACT OF JUDGMENT _____        MAIL TO ATTORNEY _____

EXECUTION _____✓_____             ATTORNEY PICK UP ___✓___

ORDER OF SALE _____              COUNTY CLERK _____

                                     SHERIFF OR CONSTABLE _____

AMOUNT OF CREDIT
PAID TOWARD JUDGMENT (IF ANY): $ _____

LAST KNOWN ADDRESS OF JUDGMENT DEBTOR        D.O.B. _____

_____             D.L. # _____

_____             S.S.N. _____

ATTORNEY: Andrews & Kurth
(or party making request)

ADDRESS: 1717 Main St 3700            DATE ISSUED: _____

CITY: Dallas Tx 75201                DEPUTY: _____

PHONE #: 214 659 4647                ROUTED TO: _____

0088

CHICA

GF# 8000891700501

ELECTRONICALLY RECORDED 201700286326
10/10/2017 12:21:48 PM REL JDGMT 1/1

### RELEASE OF JUDGMENT LIEN

On July 14, 2014, in Cause No. DC-12-04005, the 68th Judicial District Court of Dallas County, Texas, entered a Final Judgment (the "**Final Judgment**"), which, amongst other things, found Defendant/Counter-Plaintiff/Third-Party Plaintiff Patrick Daugherty liable to pay Plaintiff/Counter-Defendant Highland Capital Management, L.P. ("**Highland**") the total principal amount of $2,800,000.00, plus interest (the "**Monetary Award**"). On December 5, 2016, the Final Judgment was recorded in the Dallas County Real Property Records as Instrument No. 201600338631. I am the authorized agent for Highland, who is the party entitled to receive payment of the Monetary Award under the Final Judgment. The Monetary Award granted in the Final Judgment is now completely satisfied and no additional amounts are owed thereunder. Therefore, Highland hereby releases Daugherty from any lien existing because of the Final Judgment.

SIGNED on 10/6/2017            By: _Crystal ___ Woods_

On behalf of Highland Capital Management, L.P.

This instrument was acknowledged before me on 10 6 2017 by Crystal Jamison Woods.

DEBORAH A JOHNSON
NOTARY ID #1054296-9
My Commission Expires
June 03, 2020

_____
Notary Public, State of Texas

My Commission Expires:

6/3/2020

**Filed and Recorded**
**Official Public Records**
**John F. Warren, County Clerk**
**Dallas County, TEXAS**
**10/10/2017 12:21:48 PM**
**$26.00**
**201700286326**

DAL:962536.1

0089

FILED
DALLAS COUNTY
12/8/2016 9:52:12 AM
FELICIA PITRE
DISTRICT CLERK

Marissa Pittman

DC-16-15669

CAUSE NO. _____

| | | |
|---|---|---|
| **HIGHLAND CAPITAL** | § | **IN THE DISTRICT COURT OF** |
| **MANAGEMENT, L.P.** | § | |
| | § | |
| **Plaintiff/Garnishor** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **HIGHLAND EMPLOYEE** | § | |
| **RETENTION ASSETS, LLC** | § | |
| | § | |
| **Garnishee.** | § | **68th JUDICIAL DISTRICT** |

## PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## APPLICATION FOR WRIT OF GARNISHMENT

Pursuant to Texas Rule of Civil Procedure 658 and Texas Civil Practice and Remedies Code § 63.001 *et seq.*, Plaintiff Highland Capital Management, L.P. ("Highland" or "Garnishor") applies to this Court for an order directing issuance of a writ of garnishment against Garnishee Highland Employee Retention Assets, LLC ("HERA" or "Garnishee"), and would respectfully show the Court as follows:

### I.        PARTIES

1.        Garnishor Highland Capital Management, L.P. is a Delaware limited partnership with its principal place of business located at 300 Crescent Ct #700, Dallas, TX 75201. It can be served through its counsel of record in this matter.

2.        Defendant Patrick Daugherty ("Mr. Daugherty" or "Judgment-Debtor"), is an individual residing in Texas who can be served at his home address of 3621 Cornell Avenue, Dallas, Texas 75205 pursuant to Texas Rule of Civil Procedure 663a.

3.      Garnishee Highland Employee Retention Assets, LLC is a Delaware limited liability company and may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## II.      BACKGROUND

4.      On July 14, 2014, Highland obtained a personal judgment against Mr. Daugherty in Cause No. DC-12-04005, *Highland Capital Management, L.P., et. al v. Patrick Daugherty*, in the 68th Judicial District Court in Dallas County, Texas (the "Final Judgment"). A copy of the Final Judgment is attached as **Exhibit A** and incorporated by reference. The Final Judgment awards Highland, as the judgment creditor, recovery of $2,800,000 plus post-judgment interest at the rate of 5% per annum, which through the filing of this application amounts to a total of approximately $3,129,095.89. The amount to be garnished should include all interest incurred through the date the Final Judgment is satisfied.

5.      The Final Judgment is in all things final, valid, and subsisting, and it is wholly unsatisfied. All appeals have concluded and the Dallas Court of Appeals has issued its mandate to the trial court.

## III.      REQUEST FOR WRIT OF GARNISHMENT

6.      Highland requests the issuance of a Writ of Garnishment based on the Final Judgment.

7.      Highland has reason to believe that Garnishee is indebted to Judgment-Debtor. Indeed, Garnishee is itself a judgment debtor to Mr. Daugherty under the Final Judgment in the amount of $2.6 million plus prejudgment and post-judgment interest. A copy of the Final Judgment is attached as **Exhibit A** and incorporated by reference evidencing the debt that HERA owes to Mr. Daugherty.

8.      Highland seeks to garnish all monies, sums, or debts which Garnishee may owe to Judgment-Debtor, up to and including the amount of the Final Judgment, plus interest, and any attorneys' fees said garnishment may require.

9.      Within Highland's knowledge, Mr. Daugherty does not have property within this State subject to execution which is sufficient to satisfy the above-described Judgment.

10.     The Garnishment is not sought to injure Mr. Daugherty or Garnishee, but rather to allow Highland to collect on Mr. Daugherty's debt under the Final Judgment.

11.     This application is supported by the affidavit of Scott Ellington, a person having knowledge of the relevant facts. Mr. Ellington's affidavit is attached as **Exhibit B** and incorporated by reference.

## IV.      PRAYER

12.     WHEREFORE, Highland requests that the Writ of Garnishment be issued, and that Highland have judgment against Garnishee to satisfy the Final Judgment as provided by law, together with all costs of court, and such other relief to which Highland may be justly entitled.

Respectfully submitted,

*/s/ Marc D. Katz*

Marc D. Katz
State Bar No. 00791002
marckatz@andrewskurth.com
Isabel A. Crosby
State Bar No. 24050266
isabelcrosby@andrewskurth.com
**ANDREWS KURTH KENYON LLP**
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

# EXHIBIT A

481 C

C0190

**CAUSE NO. 12-04005**

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiffs, | § § § | IN THE DISTRICT COURT OF |

HIGHLAND CAPITAL
MANAGEMENT, L.P.,
    Plaintiffs,

v.

PATRICK DAUGHERTY,

    Defendant and Counter-Plaintiff,

v.

SIERRA VERDE, LLC, HIGHLAND
EMPLOYEE RETENTION ASSETS
LLC, JAMES DONDERO, PATRICK
BOYCE, AND WILLIAM L. BRITAIN,

    Third-Party Defendants.

§ (repeated down the page)

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

68th JUDICIAL DISTRICT

**FINAL JUDGMENT**

On January 14, 2014, this case was called to trial. Plaintiff/Counter-Defendant Highland Capital Management, L.P. ("Highland"), and Third-Party Defendants Sierra Verde, LLC and James Dondero ("Dondero") appeared themselves and/or through their attorneys of record and announced ready for trial. Defendant/Counter-Plaintiff/Third-Party Plaintiff Patrick Daugherty ("Daugherty") appeared himself and through his attorneys of record and announced ready for trial. Highland Employee Retention Assets LLC ("HERA"), Patrick Boyce, and William L. Britain appeared themselves and/or through their attorneys of record and announced ready for trial.

After a jury was impaneled and sworn, it heard evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are attached as Exhibit 1 hereto and incorporated by reference.

FINAL JUDGMENT - Page 1
DAL:894638.4

The Court renders this Final Judgment under the jury verdict and the evidence heard at trial, as well as having considered any and all post-verdict motions and briefing submitted to the Court and arguments of counsel.

The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty owed to Highland, and after hearing evidence and considering the nature of the harm suffered by Highland as a result, finds and concludes that Highland is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from retaining, using, disclosing, publishing or disseminating Highland's (or its affiliates') confidential, proprietary, and/or privileged information, including but not limited to information concerning Highland's customers, clients, marketing, business and operational methods, contracts, financial data, technical data, e-mail, pricing, management methods, finances, strategies, systems, research, plans, reports, recommendations and conclusions, tear sheets, industry comparative analysis, Collateralized Loan Obligation (CLO) and other structured products, and names, arrangements with, or other information relating to Highland's (or its affiliates') customers, clients, suppliers, financiers, owners, and business prospects. Notwithstanding the foregoing, Daugherty may use or disclose the information described in this paragraph only as (i) required by law; or (ii) directed and authorized in writing by Highland.

The Court further ORDERS that Highland have and recover from Daugherty $2,800,000 for reasonable and necessary attorneys' fees rendered through trial.

It is further ORDERED that the total amount of the judgment here rendered for Highland against Daugherty will bear interest at the rate of 5% per annum from the date this judgment is signed until paid.

Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.

It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~

It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.

It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.

It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

Furthermore, the Court, after considering the jury's findings regarding the claims for breach of fiduciary duty asserted against Patrick Boyce and William L. Britain by Third-PartyCounter -Plaintiff Patrick Daugherty, suing individually and/or suing derivatively on behalf of Highland Employee Retention Assets LLC, finds that Boyce and Britain are entitled to a take-nothing judgment as to all claims asserted against them.

It is therefore further ORDERED that Third-Party Counter-Plaintiff Patrick Daugherty, suing individually and/or derivatively on behalf of Highland Employee Retention Assets LLC,

shall take nothing on the claims for breach of fiduciary duty against Patrick Boyce and William L. Britain.

This judgment disposes of all claims asserted against Patrick Boyce and William L. Britain in the above-captioned cause. All other relief that Daugherty seeks pertaining to Boyce and Britain not expressly granted in this judgment is denied.

It is further ORDERED that all Parties shall bear their own respective costs of Court.

All writs and processes for the enforcement and collection of the judgment may issue as necessary.

All relief requested and not expressly granted is denied. This judgment disposes of all parties and claims and is appealable.

FINAL JUDGMENT - Page 4
DAL:894638.4

SIGNED on _____ July 1-1 _____, 2014.

The Honorable Martin Hoffman

# EXHIBIT B

## AFFIDAVIT OF SCOTT ELLINGTON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

**BEFORE ME**, the undersigned authority, personally appeared Scott Ellington, who after being duly sworn, stated on his oath as follows:

1.      "My name is Scott Ellington. I am over the age of twenty-one years and of sound mind. I have never been convicted of a felony or any crime of moral turpitude. I am fully competent to testify to the matters set forth in this Affidavit. All the matters contained in this Affidavit are true and correct and based upon my personal knowledge.

2.      I am the General Counsel at Highland Capital Management, L.P. ("Highland"). In that capacity, I have overseen the litigation against Patrick Daugherty related to his employment at Highland. I have exercised this role for a number of years. It is through my oversight of that litigation and through my work as General Counsel at Highland that I gained personal knowledge of the facts set forth in this affidavit.

3.      On July 14, 2014, Highland obtained a personal judgment against Mr. Daugherty in Case No. DC-12-04005, *Highland Capital Management. L.P., et. al v. Patrick Daugherty*, in the 68th Judicial District Court in Dallas County, Texas (the "Final Judgment"). The Final Judgment awards Highland, as the judgment creditor, recovery of $2,800,000 plus post-judgment interest at the rate of 5% per annum, which through the filing of this application amounts to $3,129,095.89.

4.      In the Final Judgment, Highland Employee Retention Assets, LLC ("HERA") is itself a judgment debtor to Mr. Daugherty under the Final Judgment in the amount of

$2,600,000.00 plus prejudgment and post-judgment interest. The Final Judgment is valid and subsisting.

5.     Within Highland's knowledge, Defendant Patrick Daugherty does not possess property in Texas subject to execution sufficient to satisfy the Final Judgment.

*[Remainder of page left intentionally blank.]*

**FURTHER AFFIANT SAYETH NOT**.

_____

Scott Ellington
General Counsel
Highland Capital Management, L.P.

**SWORN TO AND SUBSCRIBED** before me on the 23ʳᵈ day of

November , 2016.

_____

Notary Public in and for the State of Texas

[Seal]

Printed Name: Sarah Bell

My commission expires: April 8 , 2019

SARAH ASHLEY BELL
Notary ID # 130183004
My Commission Expires
April 8, 2019

# PRICKETT, JONES & ELLIOTT
A PROFESSIONAL ASSOCIATION
## 1310 KING STREET, BOX 1328
### WILMINGTON, DELAWARE 19899
TEL: (302) 888-6500
FAX: (302) 658-8111
http://www.prickett.com

Writer's Direct Dial:
(302) 888-6532

Writer's E-Mail Address:
bcjameson@prickett.com

February 14, 2016

*Via email*

Kevin G. Abrams
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807

Re:   Highland Capital Management LP Escrow Agreement

Dear Kevin:

We have been retained as counsel to Patrick Daugherty.  I write to you in your capacity as escrow agent under the Escrow Agreement dated December 13, 2013 between Highland Capital Management LP and Abrams & Bayliss LLP.  Defined terms used in this letter are taken from the Escrow Agreement

We refer to Section 3(b) which specifies the circumstances under which you as escrow agent are to disburse the Escrow Funds.  This is not a notice under that section and we are not requesting transfer of the Escrow Funds at this time.

We advise you that the Daugherty Action has been litigated to conclusion.  As a result, Mr. Daugherty (who is a third-party beneficiary of the escrow agreement) now has all beneficial rights to the Deposit Assets.  Pending further instruction from Mr. Daugherty, please be advised that Mr. Daugherty will consider any distribution, transfer, reduction or other action taken with respect to the Deposit Assets to be inconsistent with his legal rights if such actions are taken without his consent.

If you receive any instructions from any party other than Mr. Daugherty, you should not take any action pursuant to such instructions.  All Deposit Assets should remain in escrow with you pending further notice from Mr. Daugherty.

Please contact me if you have any questions.

Kevin G. Abrams
February 14, 2016
Page 2

Very truly yours,

Bruce E. Jameson

BEJ:sej

0105

ABRAMS & BAYLISS LLP
20 MONTCHANIN ROAD, SUITE 200
WILMINGTON, DE  19807
MAIN:  302-778-1000
FAX:  302-778-1001

KEVIN G. ABRAMS

DIRECT DIAL NUMBER
302-778-1002
ABRAMS@ABRAMSBAYLISS.COM

February 16, 2017

**VIA EMAIL**

Bruce E. Jameson, Esq.
Prickett, Jones & Elliot, P.A.
1310 King Street, Box 1328
Wilmington, Delaware  19899

Re:    Highland Capital Management, L.P. Escrow Agreement

Dear Bruce:

I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement").  Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.

By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement.  By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately.  On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions.  Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

Please let me know if you have any questions.

Sincerely yours,

*/s/ Kevin G. Abrams*

Kevin G. Abrams

{A&B-00468163-}

Bruce E. Jameson, Esq.
February 16, 2017
Page 2


KGA/MLM

cc:    Scott Ellington, Esq. (by email)
       Isaac Leventon, Esq. (by email)
       Marc D. Katz, Esq. (by email)
       Matthew L. Miller, Esq. (by email)

EFiled: Dec 05 2019 09:55AM EST
Transaction ID 64489723
Case No. 2019-0956-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

     Plaintiff,

     v.

JAMES DONDERO, HIGHLAND
ERA MANAGEMENT LLC,
HIGHLAND EMPLOYEE
RETENTION ASSETS LLC,
HUNTON ANDREWS KURTH LLP,
MARC KATZ, MICHAEL HURST,
SCOTT ELLINGTON, THOMAS
SURGENT AND ISAAC
LEVENTON,

     Defendants.

C.A. No. 2019-

PUBLIC VERSION
FILED DECEMBER 5, 2019

## VERIFIED COMPLAINT

Patrick Daugherty brings this action against James Dondero, Highland

Employee Retention Assets LLC ("HERA"), Highland ERA Management

LLC ("HERA Management"), Hunton Andrews Kurth LLP ("Andrews

Kurth"), former Andrews Kurth attorney Marc Katz, former Gruber Hurst

Johansen Hail Shank LLP attorney Michael Hurst, and internal Highland

Capital Management L.P. ("Highland") attorneys Scott Ellington, Thomas

Surgent, and Isaac Leventon (collectively, "Defendants") to recover for

Defendants' wrongdoing, some of which was revealed only during the

course of related litigation in this Court, *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2017-0488-MTZ (the "Delaware Related Action"), which is stayed because of Highland's bankruptcy.

## Introduction

1.     On December 1, 2016, the Court of Appeals for the Fifth District of Texas at Dallas issued a mandate in the lawsuit captioned *Highland Capital Management, L.P. v. Daugherty*, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action"), concluding over four years of litigation between Highland, HERA, and Daugherty.  The appellate court affirmed the final judgment of the trial court.

2.     Under the final judgment, Daugherty was awarded $2.6 million in damages against HERA, plus pre- and post-judgment interest, as compensation for the diminution of value of Daugherty's HERA units based on HERA's breach of the implied covenant of good faith and fair dealing.

3.     HERA has failed to satisfy Daugherty's judgment.  During 2013 and 2014, after the Texas Action commenced, Dondero, HERA, HERA Management, Highland, Katz, Hurst, Ellington, Surgent, and Leventon engaged in fraud, a conspiracy to defraud Daugherty, and civil conspiracy with the goal of defrauding Daugherty and never paying him the

2

compensation he had earned.  The wrongdoing was consummated after the Texas appellate court issued its mandate on December 1, 2016.

4.     At that point, Defendants raided assets that they fraudulently told the Texas judge and jury and Daugherty that they had set aside in escrow in Delaware to satisfy his claims.  The fraudulent statements that the assets had been set aside for Daugherty's benefit in escrow in Delaware during the Texas Action and were not in the control of Highland were made to preclude Daugherty from bringing his claims related to such assets against Highland itself, among other fraudulent purposes.

5.     What Defendants and Highland intended, however, was a classic bait-and-switch fraud.  The scheme was to lie to the Texas judge and jury and Daugherty by telling them the assets were set aside for Daugherty in escrow in Delaware.  If the assets could be said to belong to any Highland affiliate, it would be HERA, not Highland itself, because HERA would receive the assets if Daugherty prevailed, they said.  This was the bait. Daugherty took the bait and the Texas judge and jury took it too.  Both Daugherty and the Texas judge and jury directed their attention to HERA instead of Highland to make Daugherty whole for what had been done to his HERA interests.

3

6.      After the appellate mandate was entered, Defendants and Highland executed the switch.  Dondero, through Ellington, Surgent, Leventon, and Katz, on whom he relied, pulled the assets out of the escrow in Delaware, declared that HERA had no ownership over the assets related to Daugherty's HERA interest that had been held in escrow in Delaware, and declared that HERA had no ability to cover its separate $2.6 million judgment in Daugherty's favor.

7.      In this action, Daugherty seeks recovery for Defendants' fraudulent scheme from the parties who were implicated as set forth below during the prosecution of the Delaware Related Action.[1]

### The Parties and Related Persons

8.      Daugherty resides in Dallas, Texas.  Daugherty was a partner and senior executive of Highland and certain of its affiliates from 1998 until 2011, when Daugherty resigned.

9.      Non-party Highland is a Delaware limited partnership with its principal place of business at 300 Crescent Court #700, Dallas, Texas 75201.

---

[1] Trial in the Delaware Related Action was scheduled for October 14-16, 2019.  The Court conducted the first two days of trial, but Highland declared bankruptcy on the morning of the third day.  The Delaware Related Action is currently stayed and Daugherty currently is not able to bring the causes of action set forth in this complaint against Highland outside of the bankruptcy proceedings.  The transcript of the trial proceedings is incorporated herein by reference.

4

Highland was co-founded by and is controlled by defendant Dondero and non-party Mark Okada, their affiliates, and various trusts for their benefit and the benefit of their immediate families. Okada announced his departure from Highland in September 2019. Highland declared bankruptcy on October 16, 2019.

10.     Defendant Dondero is Highland's co-founder and president. He is also the president of HERA Management, the ostensible manager of HERA. Dondero is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

11.     Defendant HERA is a Delaware limited liability company that was formed on June 23, 2009.

12.     Defendant HERA Management is a Delaware limited liability company that was formed on February 1, 2013. Dondero's testimony in the Delaware Related Action demonstrates that HERA and HERA Management have been mere instrumentalities and Dondero's alter egos since 2013.

13.     Andrews Kurth was a law firm based in Houston, Texas, prior to its merger with Hunton & Williams LLP in April 2018.[2] Defendant Hunton Andrews Kurth LLP is the successor to Andrews Kurth LLP and,

---

[2] In certain locations, Andrews Kurth also operated under the name Andrews Kurth Kenyon after hiring all attorneys of the firm Kenyon & Kenyon LLP in August 2016.

because the events at issue pre-date the merger, is referred to herein as "Andrews Kurth." Andrews Kurth is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

14. Defendant Katz is an attorney who represents Highland and was a partner of Andrews Kurth LLP from July 2009 to February 2018. In February 2018, Katz joined the firm DLA Piper. Katz is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

15. Defendant Hurst is an attorney who represents Highland and nominally represented HERA in the Texas Action. Until February 2016, Hurst was a partner of Gruber Hurst Johansen Hail Shank LLP, which was a law firm in Dallas, Texas, prior to its dissolution in April 2018. Hurst is now a partner of Lynn Pinker Cox & Hurst LLP, a law firm in Dallas, Texas. Hurst is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

16. Defendant Ellington is an in-house attorney at Highland. Ellington is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

17. Defendant Surgent is an in-house attorney at Highland. Surgent is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

18. Defendant Leventon is an in-house attorney at Highland. Leventon is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

## Daugherty's Interest in HERA

19.     Highland performed poorly during the 2008-2009 financial crisis. Late in 2008, Highland was viewed as a firm likely to default. It had very little cash and available assets for incentive-compensation purposes. Accordingly, HERA was created by Highland to curb employee resignations by offering employees a replacement of their previously received deferred compensation that was awarded on February 27, 2009.

20.     HERA was intended to be an independent (from Highland) standalone entity to retain, reward, and incentivize Highland's employees (excluding Dondero and Okada) by granting them equity-like awards in certain funds, and then distributing the proceeds of those interests to the employees in their capacity as unit holders of HERA.

21.     Under the Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated October 26, 2009, the purpose of HERA "shall be to receive and hold assets to be contributed by [Highland] and to distribute the proceeds of such assets from time to time to certain employees of [Highland] (or of affiliates of [Highland], as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing."

7

22. Daugherty became a member of HERA on October 26, 2009, subject to a vesting schedule requiring Daugherty to remain employed at Highland through May 15, 2011.

23. Daugherty was initially awarded 1,571.86 Series A Preferred Units and was the largest holder in HERA.

24. Daugherty's ownership percentage increased as other employees resigned from Highland prior to vesting. Daugherty remains a member of HERA and holds 1,909.69 vested Series A Preferred Units, representing a 19.0969% ownership share of HERA.

### The 2012 Amendment and Section 12.1

25. Daugherty resigned from Highland on September 28, 2011. At the time of his resignation, Daugherty was a director of HERA.

26. On February 16, 2012, all the directors of HERA except Daugherty removed Daugherty as a director. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (drafted by Surgent, Highland's assistant general counsel and chief compliance officer) (the "2012 Amendment").

27. The 2012 Amendment added a new Article 12, which included dispute-resolution and confidentiality provisions:

8

a.    Under Section 12.1, if any member of HERA, including a holder of Series A Preferred Units (i.e., Daugherty), "commences litigation" or "otherwise initiates any dispute or makes any claim ... related to HERA" against HERA, any of its directors, officers, or agents, or any HERA member, *including Highland*, or that does or could adversely impact the assets held by HERA, "then with the consent of 75% of the Board, all pending and future distributions to" that litigating member "shall be immediately suspended and held in escrow by HERA until the final, non-appealable resolution of the Dispute."

b.    If the litigating member does not prevail, the full costs of the litigation, including attorneys' fees, are deducted from the escrow account and the balance will be distributed to the litigating member. However, even if the litigating member prevails, the Board has sole discretion to withhold the escrowed funds to cover any diminution in value to HERA "resulting from or in connection with" the litigation, as determined by the Board in its sole discretion. Any withheld funds are to be reallocated to the other Preferred Unit holders on a pro-rata basis.

28.    Section 12.1 represented Defendants' first attempt to take Daugherty's compensation through fiat. The evolution of Defendants' positions with respect to Section 12.1 over time has been remarkable. The

9

only continuous thread is that Defendants' positions have changed to whatever they believed to be most convenient at the moment, without regard to coherence with previous positions taken.

### The Texas Action and Dondero's Takeover of HERA

29.     In 2012, after Daugherty participated in a Highland-sanctioned exit interview with concerned investors and after Daugherty testified under court order in Dondero's divorce proceeding, Highland commenced the Texas Action against Daugherty.  The Texas Action was filed just seven weeks after the 2012 Amendment.

30.     Daugherty responded in the Texas Action with counterclaims against Highland for breach of contract and defamation and third-party claims against HERA and others.  Daugherty alleged breach of contract and breach of the covenant of good faith and fair dealing against HERA and Highland based on the 2012 Amendment.

31.     During the Texas Action, Dondero sought to gain control of HERA by buying its units held by current and former employees of Highland and isolating Daugherty to punish him.  This was one of the first steps in the conspiracy to defraud Daugherty and Dondero relied on Ellington, Surgent, and Leventon, who were "coordinating a plethora of

10

external legal counsel," which, on information and belief, included Andrews Kurth, Katz, and Hurst.

32.     On December 26, 2012, Dondero schemed with Ted Dameris, then a board member of HERA and an employee of Highland, to "offer everyone except 1 a buyout offer at 100% cash and 40% discount on" non-cash assets of HERA.  Daugherty was offered nothing for his interest, the value of which Highland claimed was exceeded by the "costs, expenses and diminution of the assets."  In fact, Daugherty's value was set at $0 arbitrarily and in bad faith.  The "costs, expenses and diminution of the assets" tracked Section 12.1 of the 2012 Amendment, but Defendants stated more than a dozen times in the Texas Action that Section 12.1 was never employed. They presented that position to argue that there could be no damage to Daugherty since the provision had never been employed.

33.     Hurst argued in closing arguments to the Texas jury that Daugherty's claim of divestment of his interest through operation of Section 12.1 made no sense: "Divesting by Section 12.1, how can there be breach of contract for divesting by Section 12.1 when he still has his interest, all of it[?]"  The jury accepted that argument and did not find a breach of contract for divesting by operation of Section 12.1.  Defendants would later claim

11

that Highland was entitled to all of Daugherty's interest, but they kept this position secret during the Texas Action.

34.     In January 2013 Highland offered to all HERA unit holders—except Daugherty—to purchase their units for 100 percent of the value of their cash interests and 60 percent of the value of their non-cash interests. All offerees accepted the buyout offer. Dondero relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud, which was necessary to isolate Daugherty to set up the scheme presented in the Texas Action.

35.     Next, in January 2013 the HERA board collaborated with Dondero (who relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud) to transfer the management powers of HERA to HERA Management. This part of the scheme was necessary to give Dondero the appearance of legal authority to act on behalf of HERA to carry out the scheme presented in the Texas Action. At the time, HERA Management was not validly formed under Delaware law.

36.     On January 19, 2013, the HERA board members resigned after each received a buyout offer from Highland, and HERA Management

12

became the sole manager of HERA. At the time, HERA Management was not validly formed under Delaware law.

37. With Daugherty isolated as the only remaining equity holder of HERA, Defendants orchestrated a targeted effort to deprive him of the compensation he had earned in the form of HERA units.

38. Through a series of transactions in early 2013, HERA Management (controlled by Dondero) emptied HERA (controlled by Dondero) of all its underlying assets and transferred those assets to Highland (controlled by Dondero), which Dondero testified was done in reliance on the legal advice provided by Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud.

39. On February 1, 2013, the date that HERA Management was formed under Delaware law, Dondero purportedly executed the Third Amended and Restated Agreement of HERA (the "Third Amended and Restated HERA LLC Agreement") (again drafted by Surgent), which stripped virtually all the rights of HERA unit holders. It eliminated:

      a.    the purposes for which HERA was created;

      b.    the requirement of HERA to make cash distributions to unit holders to cover pass-through tax obligations attributable to HERA; and

      c.    members' rights to indemnification.

13

40.     The Third Amended and Restated HERA LLC Agreement no longer included a Section 12.1.  The Third Amended and Restated HERA LLC Agreement included a dispute-resolution provision at Section 11.1, but it had been changed materially from the prior agreement.  The 2012 Amendment provided a mechanism whereby a member's interest could be placed "in escrow" (what the agreement called the "Dispute Escrow").  The Dispute Escrow would be paid out to the prevailing party at the conclusion of the dispute subject to a determination by HERA's board that the value of assets held by the Company had been diminished by the dispute.  The 2012 Amendment expressly provides that costs **cannot** be offset against a prevailing party.

41.     The Third Amended and Restated HERA LLC Agreement provided no such mechanism.  Instead, Section 11.1 provided an even more arbitrary process.  It eliminated the concept of a Dispute Escrow altogether. Nothing would be placed in escrow, there was no recognition that a member who prevailed would be entitled to the interest, and Highland could cancel out all value attributable to the member's interest by fiat and impose costs as an "offset" against value even if the member prevailed.  A comparison of the two provisions is set forth below.

14

Section ~~12.1~~11.1 → Dispute Resolution. In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a ***"Disputing Party"***), is party to or commences litigation ~~or, solely with respect to persons who have not executed a separation agreement in favor of the Initial Member unless such action constitutes a breach of such separation agreement, or~~ otherwise is party to or initiates or has initiated any dispute or makes or has made any claim, or has taken or has taken any action that results in, has resulted in or could be expected to result in any third party making a claim, in each case involving or related to the Company, the Manager, the Initial member, or any of their respective members, officers, directors, agents, representatives, partners, employees, advised funds or accounts equity holders (collectively, ***"Relevant Parties"***) or the management or operation ~~thereof or~~ of any such entities or any of the assets held thereby (each, a ***"Dispute"***) ~~(i) against the Company, any Member thereof, any officer or director or other agent or representative or equity holder thereof (each, a "Company Party"), or (ii)~~ or that in any way does or could adversely impact any of the assets held by any of the ~~Company~~Relevant Parties, then ~~with~~in sole discretion of the ~~consent of 75% of the Board~~Manager, all pending and future distributions to the Disputing Party shall be immediately suspended ~~and held in escrow by the Company (the "Dispute Escrow")~~ until the Manager determines the total of the ~~final~~full losses, ~~non-appealable resolution of the Dispute, it being understood that the expiration of any applicable statute of limitations~~ costs and expenses (including ~~any applicable tolling periods with respect thereto) shall constitute such a resolution (any such resolution, a "Dispute Resolution Date"). The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full~~ costs and expenses ~~incurred by any Company Party in connection with such competent jurisdiction has ruled in favor of Disputing Party in a final non-appealable judgment~~of legal counsel) of the Relevant Parties, ~~and (B) plus~~ any diminution in value ~~to the~~of any Relevant Party's assets ~~held by the Company resulting from or~~ (including, without limitation, good will) incurred in connection with ~~such Dispute, as determined by the Board in~~each Dispute or a Member's disclosure of matters and information regarding any Relevant Party or its assets (except as required by law or directed and authorized in writing by the applicable Relevant Party) in each case as determined by the Manager in its sole discretion (such aggregate losses, costs and expenses, the ***"Damages"***). Once the Manager determines the Damages, it may in its sole discretion offset 100% of such Damages against the Capital Account of the Disputing Party and any and all amounts that would otherwise be payable or distributable by the Company to the Disputing Party. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated ~~pro rata to~~as determined by the ~~other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units~~Manager in its sole discretion, including without limitation, to any holder(s) of Common Units of the Company.¶

42.    In the Delaware Related Action, Leventon testified that Section 12.1, which was not in effect in December 2013 when Daugherty's assets were placed in escrow, discussed below, was an "important part of [his] understanding of why" the escrow was set up in December 2013. At the

15

time, Section 11.1, which provided for no escrow mechanism, was in effect. Leventon also testified that it was the "same language," "identical" in Section 11.1 and Section 12.1, but that was false as indicated above.

43.    Defendants have asserted whatever position with respect to Section 12.1 or Section 11.1 and their effect on Daugherty's right to his compensation that has been most convenient in the moment.  Their sole focus has been on depriving Daugherty of his compensation (and later the Texas judgment with respect to such compensation) through their fraud with no regard for determining whether their actions were legal.

44.    Also on February 1, 2013, Dondero executed an Expense Allocation Agreement on behalf of Highland and HERA drafted by Leventon under which the parties reallocated 93.4 percent of Highland's purported legal expenses related to the Texas Action to HERA.  Leventon and Dondero made and approved the calculation in bad faith.  Dondero testified in the Texas Action that the calculation was made by comparing the "claims against Highland [] for $199,000 of the LTIP, and the claims against HERA [] for somewhere between 2.5 and 3. 199,000, over 3 million is approximately 6 or 7 percent."

45.    Highland supposedly incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to $154,029 incurred

16

by HERA over the same time period.  Over the course of the dispute with

Daugherty, Defendants continued to allocate Highland expenses fraudulently

to HERA in a manner designed to harm Daugherty (the "Imposed

Liabilities").  As of December 31, 2018, the total Imposed Liabilities

Defendants had imposed were $9,617,989.32, which were in addition to the

amounts HERA had already paid.  This allocation was part of Defendants'

fraud and was used to improperly and fraudulently funnel assets and benefits

to Dondero, Andrews Kurth, Katz, and Hurst.

46.     All fees and expenses incurred by Highland for its counsel and

other expenses related to the Texas Action were funneled through the

Expense Allocation Agreement.  The largest portion of those expenses were

related to services provided by Andrews Kurth and Katz who knowingly

participated in the fraudulent scheme.

47.     On April 30, 2013, Dondero, relying on the legal advice

provided by Highland's in-house and external counsel who are Defendants

in this action to carry out this part of the fraud, executed an Assignment

Agreement on behalf of Highland and HERA (the "2013 Assignment

Agreement"), declaring that Highland held the "sole economic interest in

HERA" following the HERA unit-holder buyouts.

17

48.     The 2013 Assignment Agreement further resolved that "[Highland] and HERA have each determined that it is in their respective best interest" to transfer substantially all the assets of HERA as "in-kind distribution[s]" to Highland (then valued at approximately $9,700,000) to try to keep them from Daugherty as the sole rightful equity holder in HERA.

49.     This was the state of affairs one month before the Texas trial.

**Defendants Create the Sham Escrow**

50.     Although  Defendants committed fraud and told a different story at the Texas trial, Dondero, through HERA Management, was and is in full control of HERA and its assets.  It was fitting, therefore, in the Texas Action when Dondero described himself as "the man behind the curtain solving financial puzzles."

51.     As the Texas trial approached, Defendants conducted a mock trial.  After that exercise, in December 2013, approximately one month before trial in the Texas Action, Dondero, Leventon, Andrews Kurth, Katz, and Hurst formed an escrow for Daugherty's HERA assets (the "Escrow") so they could sell to the jury that they had not simply stolen Daugherty's HERA assets.  The notion that Defendants did nothing nefarious with Daugherty's assets and merely set them aside would become a theme of Defendants in the

18

Texas trial and was used to insulate Highland and Dondero from being directly liable for the theft through knowing misrepresentations.

52.     Daugherty's HERA interests, valued at the time at approximately $3.1 million, were put in the Escrow with the Delaware law firm Abrams & Bayliss LLP ("Abrams & Bayliss") as escrow agent. Defendants chose Abrams & Bayliss because they expected Abrams & Bayliss to do whatever Defendants requested.  Abrams & Bayliss was a firm that Highland used frequently when any Delaware law issues came up.

53.     Leventon sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day.

54.     The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Action provided that if Daugherty prevailed in the Texas Action, escrowed assets in the amount of the judgment "shall" be transferred to HERA.  The provision states in full:

> In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee Retention Assets, LLC ("HERA") by Patrick Daugherty, his successors, or assigns ("Daugherty") in the case *Highland Capital Management, L.P. and Cornerstone Healthcare Group Holding, Inc. v. Patrick Daugherty v. Sierra Verde, LLC, et al.*, Cause No. 12-04005 in the 68th Judicial District of Dallas County, Texas ("Daugherty Action"), Escrow Agent shall, within 10 Business Days, transfer to HERA Deposit Assets equivalent to the amount of such judgment,

19

> or if the judgment against HERA exceeds the
> amount of Deposit Assets, Escrow Agent shall
> transfer to HERA all Deposit Assets, including
> accumulated income, held by Escrow Agent.

The substantive design of the Escrow roughly tracked Section 12.1 of the

2012 Amendment.

55. Katz and Hurst both specifically signed off on the operative

§ 3(b)(i) of the Escrow Agreement.

56. The Deposit Assets were (1) $1,210,502.03 in cash; (2) a

limited partner interest in RCP with an asset value of $1,820,050.49 as of

September 30, 2013; and (3) 1088.42 shares of NexPoint Credit Strategies.

57. Three days after executing the Escrow Agreement, Highland

wanted to "slip sheet the Schedule 1 assets" in the Escrow Agreement.

Abrams & Bayliss simply swapped the pages as requested without following

the amendment procedures of the Escrow Agreement.

58. The version of Schedule 1 that would be presented to

Daugherty and the Texas judge and jury was:

### SCHEDULE 1

The following shall be the Deposit Assets:

| Asset | Amount |
| --- | --- |
| Cash (USD) | $ 1,210,502.03 |
| Highland Restoration Capital Partners, L.P. limited partner interest (USD as of 9/30/2013) | $ 1,820,050.49 |
| Cash equivalent of NexPoint Credit Strategies Deposit Assets (such amount to be updated at the end of each calendar month) | 1088.42 shares |

20

## The Texas Trial

59.     With the appearance of an escrow in place, Defendants falsely

presented themselves and Highland in the Texas trial not as thieves, but

rather protectors of Daugherty's interest who would respect Daugherty's

rights and the judicial process.  That is the story they spun in the Texas trial.

60.     Dondero testified under oath during the Texas trial as follows:

> Q.     We heard from -- from opposing
> counsel the other day about this -- well, there was
> money -- the interests were escrowed, if you will,
> the HERA interests of Mr. Daugherty.  Is that a
> true statement?
> A.     Yes.
> …
> Q.     Okay.  And [Daugherty's counsel],
> one of my very learned opposing counsel, they
> actually said – or showed an escrow agreement in
> the courthouse.  Did you see that?
> A.     Yes.
> …
> Q.     So why -- why did the escrow
> agreement not get signed until December of 2013?
> A.     My recollection is as follows: …
> So sometime in the April period, the assets
> were transferred to Highland, okay, post the -- the
> end of the year buyout.  Pat Daugherty's assets
> were always segregated at Highland Capital.  But
> to formalize the segregation, they were moved into
> an escrow.
> It took a while to get the escrow set up
> because they were moving illiquid assets that have
> all kinds of transfer delays and issues.  And it took
> until December to formally set up the escrow for
> the assets that were proportionate to Pat's share
> that were segregated at Highland.

21

61.     While Dondero testified that "moving illiquid assets" resulted in "transfer delays," that was just another falsehood that was convenient to tell at the time.

62.     During the Texas Action on January 23, 2014, Dondero also testified as follows during his prepared testimony with Hurst:

> Q.     Okay.  So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and HERA, **what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?**
> A.     **They go to him**.
> Q.     I'm sorry?
> A.     They go **to him** via to HERA and then **to him**.  (Emphasis added.)

63.     Dondero also testified that "Pat's share of all the assets including the cash is in escrow" and that the Escrow was "to protect Pat Daugherty" and that "[t]here's been nothing deducted or removed from Pat's account."  In closing argument, Hurst summed up Defendants' fraudulent pitch to the jury: "[I]f Pat Daugherty happens to prevail in his lawsuit against … HERA you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

64.     Defendants were adamant during the Texas Action that the procedure provided in Section 12.1 of the 2012 Amendment was never implemented.  Some examples include:

22

0129

a.      Hurst argued on summary judgment that "nothing happened with Mr. Daugherty's units" under Section 12.1 because "[t]he board has to vote to suspend escrow distributions. That never happened."

b.      Hurst further represented to the jury in the Texas Action that "[e]ven though you're going to hear a lot of testimony about Section 12.1, you're going to see what the section says, it was never used. … [T]he board never voted to use Section 12.1."

c.      Hurst also said, "[t]he board never took any action on Section 12.1."

d.      Hurst questioned Surgent, Highland in-house counsel and chief compliance officer, in prepared testimony, "[w]hen was Section 12.1 ever used by the HERA board? A. Never. Q. Never? A. Never.");

e.      Surgent confirmed on cross-examination that Section 12.1 was never implemented.

65.     In the Delaware Related Action, Defendants told the Court precisely the opposite and justified their actions against Daugherty by invoking Section 12.1.

**Daugherty's Judgment Against HERA**

66.     After a three-week trial in the Texas Action, the jury found that HERA breached the implied covenant of good faith and fair dealing by

23

adopting Section 12.1 in the 2012 Amendment. The jury awarded Daugherty damages of $2.6 million plus interest.

67.     The final judgment confirmed Daugherty's entitlement to damages and his HERA interest, which Defendants had promised they were protecting through the Escrow. The Texas judge's markup of the final order is below.

> Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.
>
> It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~
>
> It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.
>
> It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.
>
> It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

68.     The jury also found that Dondero and Highland defamed Daugherty with malice and that Daugherty breached contractual and fiduciary duties by retaining Highland information after his Highland employment, but awarded zero damages.  Highland was awarded attorneys' fees in the amount of $2.8 million plus interest.  All parties appealed.

### Throughout the Texas Appeal, Defendants Maintained That the Escrow Was for Daugherty's Benefit

69.     Defendants adhered to their position that the Escrow was for Daugherty's benefit while the Texas Action was on appeal.

70.     In September 2014, David Klos of Highland, expressly in his capacity as Senior Manager of Finance of Highland, represented to the Texas court as follows regarding the Escrow on behalf of HERA:

> [HERA holds a] contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets").  The Deposit Assets are not presently controlled by or available to HERA.  **Per the Escrow Agreement, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to HERA**.  (Emphasis added.)

71.     The filing also represented that HERA was insolvent and liable to Highland for legal expenses funded on its behalf in the amount of $7,459,568 and that only $2,555,071 was included in the net worth

25

computation because Highland had written off $4,904,497 of the liability as of December 31, 2013, because of "lack of collectability."

72.    HERA's opening appellate brief, filed by Hurst and dated May 20, 2015, posited that "it is undisputed that Daugherty continues to own an interest in HERA and assets representing his interest have been escrowed for his benefit[.]"  Hurst continued this theme.  "Highland acquired the interests of all the other members of HERA as a result of [the Buyout]. … Daugherty did not sell and still owns his interest in HERA today. … His interests were, however, moved into an escrow account, where they remain to this day."

73.    Meanwhile, in June 2016, as Daugherty attempted to obtain a loan from Highland-affiliate NexBank Capital and provided the bank with requested confidential details of his personal financial information, including his HERA interests held in escrow, Surgent arranged with NexBank's CEO (John Holt) and COO (Matt Siekielski) to receive the details of Daugherty's assets and liabilities as disclosed in the loan application.  On information and belief, Defendants used this information to target and strategize their effort to deprive Daugherty of his HERA interests and Texas judgment and inflict maximum financial pain on Daugherty upon the Texas judgment becoming final and nonappealable.

### The Mandate and the Stolen Escrow Assets

74.     On December 1, 2016, Daugherty's judgment against HERA, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate court's mandate.  The mandate was electronically served on the parties' counsel, including Katz and Hurst, on December 1, 2016, and Katz told Ellington about the mandate.  Defendants sprang into action to consummate the fraud they had set up during the pendency of the Texas Action.

75.     Defendants scrambled to unwind the Escrow.  Thirty-nine minutes after the mandate was distributed by the court, an Andrews Kurth associate sent Abrams & Bayliss an email, copying Katz, and saying, "[w]e need to have a call as early tomorrow as possible regarding the escrow arrangements."

76.     Defendants' acts over the next few days, which culminated in the seizure by Highland of Daugherty's escrow assets, were concealed from Daugherty.  Daugherty would not learn of Defendants' acts until February 2017 when Abrams & Bayliss disclosed them at a superficial level.

77.     On February 16, 2017, Abrams & Bayliss unveiled Defendants' fraudulent scheme to Daugherty:

> By letter dated December 2, 2016, Abrams
> & Bayliss notified Highland that it was resigning

27

as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

78. Highland encouraged Abrams & Bayliss to resign to terminate the Escrow. Highland's in-house and external counsel who are Defendants in this action were intimately involved in this part of the fraudulent scheme. The Abrams & Bayliss letter copied Ellington, Leventon, and Katz.

79. After Highland seized the Escrow assets, efforts to collect Daugherty's judgment have failed, as HERA claims to be insolvent.

80. On May 17, 2019, this Court in the Delaware Related Action found that the crime-fraud exception applied to otherwise-privileged advice sought from Abrams & Bayliss regarding the Escrow. The Court found that

28

there was a reasonable basis to believe that the legal advice was to enable or aid in the furtherance of a fraud.

### After Pillaging the Escrow, Highland Began
### Its Onslaught of Collection Efforts Against Daugherty

81.     While Defendants were secretly making good on their fraud and pocketing Daugherty's HERA assets and damages judgment in December 2016, they were simultaneously taking hyper-aggressive collection steps against him.  Daugherty, unaware of the concealed fraud, paid the Texas judgment against him in cash.

82.     On December 2, 2016, Katz requested a Writ of Execution against Daugherty.  On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

83.     On December 5, 2016, Katz filed a judgment lien on Daugherty's home on Highland's behalf.  On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

84.     On December 8, 2016, Katz requested a Writ of Garnishment to seize HERA' assets owed to Daugherty under the judgment.  The Writ of Garnishment was premised on HERA having a neutral or positive net worth in December 2016 such that when the Deposit Assets were returned to it, it

29

could pay Daugherty and he could then pay Highland. This was effectively a request for an offset of the judgments—Katz on behalf of Highland was seeking to collect the judgment in Highland's favor by garnishing Daugherty's judgment. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

85. On December 9, 2016, Highland was granted a second Writ of Execution requested by Katz. Also on December 9, 2016, Katz filed an Application for Turnover directing that Daugherty's interest in Highland affiliates NexBank and Trussway Holdings, Inc., be turned over to Highland. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

86. On December 14, 2016, nine days after Defendants swept the Escrow and after the onslaught of collection efforts against him, Daugherty paid the fee award against him. Defendants have caused HERA not to honor the Texas damages award and have never returned to Daugherty the HERA assets that the Texas final judgment made clear he still owns.

### The Fraudulent Allocations

87. In the Texas Action, Defendants produced invoices in connection with their request for attorneys' fees under two contracts. Those

invoices and Defendants' position regarding the fees attributable to those contract claims demonstrate that the liabilities imposed on HERA by Defendants (the "Imposed Liabilities") are fraudulent and that Highland was already reimbursed for Imposed Liabilities that nevertheless are counted as purported unpaid expenses owed to Highland.

88.     At trial in the Texas Action, Highland's expert opined that of the $3,417,015.71 in Andrews Kurth invoices through October 2013, "the amount of attorneys' fees attributable to the breach of contract claims (through October 2013) is at least $2,000,000." But, under the Expense Allocation Agreement, those Andrews Kurth invoices had already been charged to HERA on the contradictory premise that such proportion was related to Daugherty's claims for compensation from HERA, not Highland's affirmative contract claims.

89.     Until mid-2013, HERA was paying its fabricated share to Andrews Kurth directly. For example, in its January 2013 invoice, Andrews Kurth billed Highland for its work and HERA wired Andrews Kurth payment. After Defendants emptied HERA of its cash and other assets, it began fabricating the purportedly unpaid Imposed Liabilities.

90.     Costs Defendants represented in the Texas Action were costs attributable to Highland had actually been charged to and paid by HERA.

31

Defendants obtained a double recovery that damaged Daugherty and fraudulently represented liabilities as being owed by HERA. For example, under the Expense Allocation Agreement, four invoices from Robert Half Legal that were included in Highland's request for legal fees in the Texas Action were charged to, and paid by, HERA.

91.     On December 14, 2016, Daugherty paid his judgment, which represented "the reasonable fee for the necessary services of Highland's attorneys in this case." Although all expenses of Defendants related to the Texas Action were funneled through the Expense Allocation Agreement and imposed on HERA, Defendants did not reduce the amount of the Imposed Liabilities at HERA when Daugherty paid the judgment for attorneys' fees and expenses. For the $2.8 million of Highland's legal expenses recovered in the Texas Action to constitute 6.6% of the total legal expenses and be entirely allocable to Highland under the Expense Allocation Agreement, the total legal expenses would have to be approximately $39.6 million.

92.     The invoices that are available make clear the charges are a sham and not properly attributable to HERA and were attributed to HERA solely to harm Daugherty.

93.     When Highland declared bankruptcy on October 16, 2019, it listed DLA Piper, c/o Marc Katz, as a creditor of Highland that was owed

32

approximately $1 million for unpaid legal services. On information and belief, this unpaid liability related to services that Defendants represented in the Delaware Related Action had already been paid by Highland.

## Highland's Other Judgment Creditors

94.    Daugherty is not the only person with an uncollectable judgment against Highland or its affiliates. In a situation that Dondero has compared to the "Daugherty scenario," Highland rendered an entity insolvent to defeat a judgment for $8 million obtained by former Highland employee Josh Terry. The court made the "logical inference that the [Acis Entities] had … no intention of paying [Mr. Terry's judgment] any time soon based on their conduct after the Arbitration Award" and "found the testimony of almost all of the [Highland-affiliated] witnesses for the [Acis Entities] to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability."

95.    Other creditors have faced similar obstacles. One such case is *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/2009 (N.Y. Sup. Ct.), in which UBS claims that Highland fraudulently transferred certain assets from the counterparty affiliate to the Crusader Fund to make the counterparty judgment proof and to defraud UBS.

33

96.     Another involves the Highland Credit Strategies Fund, which went through a similar redemption and liquidation process as the Crusader Fund that began in 2008.  Highland was found to have engaged in various types of misconduct, including Dondero personally threatening the redeemer committee's personnel with retribution.  The most important aspect of the misconduct is that Highland effectively moved the assets to other Highland-controlled entities for far less than their actual value.  In fact, Highland paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties even those hired by Highland (up to $37 million).  Highland did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee.  An arbitration panel found that "Highland not only breached its obligations under the Plan [of liquidation], but engaged in willful misconduct in its sale of the Fund's Cornerstone equity."  The panel found Highland's explanations to excuse its conduct as "to put it mildly, far-fetched."

97.     The Crusader Fund obtained a $189 million arbitration judgment against Highland and, rather than pay it, Highland declared bankruptcy on October 16, 2019.

34

## Count One
### (Fraudulent Transfer)
### (Against Andrews Kurth, Katz, Hurst,
### Ellington, Surgent, and Leventon)

98.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

99.    One of the reasons that HERA has failed to satisfy Daugherty's judgment in the Texas Action is that the Defendants secretly caused the Escrow assets—reserved for a judgment in Daugherty's favor—to be transferred to Highland.  Now HERA claims to be insolvent.

100.    Dondero testified at trial in the Delaware Related Action that he was relying on the advice of counsel who are Defendants in this action with respect to the buyout of all HERA holders except Daugherty, the purported assignment of assets from HERA in 2013, and the taking of assets from HERA in December 2016, all of which formed part of the fraud that was consummated in December 2016.  Legal advice that Highland was permitted to take Daugherty's assets was not rendered in good faith.  Instead the legal advice was an integral part of the fraudulent bait-and-switch scheme Katz, Hurst, Leventon, Ellington, and Surgent had formulated to cheat Daugherty out of his compensation.

101.    Delaware has a potent fraudulent transfer statute enabling creditors, such as Daugherty, to challenge actions by parent companies

35

siphoning assets from subsidiaries. The statute also recognizes that attorneys are liable under the statute if they acted in bad faith as to a transfer.

102.    The transfer of HERA's funds reserved for Daugherty in the Escrow to Highland, achieved through the resignation of Abrams & Bayliss, constitutes a fraudulent transfer under Delaware law. It also contradicts sworn representations and counsel representations of the Defendants and their agents in the Texas Action regarding the Escrow.

103.    Defendants are liable to Daugherty for the assets fraudulently or otherwise wrongfully transferred to Highland by or on behalf of HERA.

### Count Two
### (Conspiracy to Commit Fraud)
### (Against all Defendants)

104.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

105.    Dondero, through HERA Management, exercises total control over HERA and treats its funds as his own, which is routine for Dondero.

106.    As an example, Josh Terry, a former Highland employee, asserted in a lawsuit:

> Okada, the co-founder of Highland, stated on February 10, 2016, "Dude are you aware Jim [Dondero] hasn't paid any taxes in the past year? And he took out a loan from NexBank to pay them but then he got caught up in one of the leverage situations he did with American [Airlines] and a

36

> couple of other stocks and he doesn't have the
> money until March 31 to actually do this. So he's
> put a lien on his assets…but if some clerk there
> decides to put the lien on, it would be a PR
> nightmare. I was just in his office yelling at him, 'I
> approved the loan at the bank so you could pay
> your taxes but you never paid your taxes.'"

107.    In this case, Dondero was not using money from his bank to pay his personal taxes, but was instead siphoning money from one of his subsidiaries.  HERA Management is nothing more than a mere instrumentality or alter ego of Dondero.  Dondero did not even know that he was president of HERA Management because he does not observe any actual distinction between his own interests and those of the entities under his control.  All acts of HERA Management advantaged Dondero and disadvantaged Daugherty.

108.    Dondero and the other Defendants personally participated in the conspiracy to defraud Daugherty of his compensation and damages awarded by the Texas jury as described herein.

109.    Defendants made and caused to be made false representations in the Texas Action that were designed to induce the Texas judge and jury and Daugherty to rely on those false representations.  Defendants knew the representations to be false at the time made because at all times Defendants

37

intended to take the assets they represented were set aside for Daugherty's benefit.

110.    Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty.

111.    Daugherty relied on Defendants' false representations by not bringing claims for his assets against Highland in the Texas Action because Defendants represented that Highland had no interest in the assets, by paying his judgment without seeking a remedy for Defendants secretly taking his assets for Highland and saying nothing as Daugherty paid the judgment against him.

112.    Daugherty was damaged by Defendants' fraudulent scheme in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

113.    The conspiracy to commit fraud involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit. All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

38

**Count Three**
**(Civil Conspiracy)**
**(Against All Defendants)**

114.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

115.    Dondero, through HERA Management, exercises total control over HERA and treats its funds as his own, which is routine for Dondero.

116.    Dondero and the other Defendants personally participated in the conspiracy to defraud Daugherty of his compensation and damages awarded by the Texas jury as described herein.

117.    Defendants made and caused to be made false representations in the Texas Action that were designed to induce the Texas judge and jury and Daugherty to rely on those false representations.  Defendants knew the representations to be false at the time made because at all times Defendants intended to take the assets they represented were set aside for Daugherty's benefit.

118.    Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty.  In effect, Defendants aided and abetted the unjust enrichment of Highland through the actions described herein.  These actions were part of the conspiracy to unjustly enrich Highland at the expense of

39

Daugherty. Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich Highland at the expense of Daugherty.

119. Highland was unjustly enriched by the taking of the assets in escrow that Defendants had misrepresented had been set aside for Daugherty. Defendants themselves benefited from Highland's unjust enrichment through the payment of their legal fees and salaries. Defendants took the actions described herein to aid and abet this unjust enrichment as part of a civil conspiracy to enrich Highland and impoverish Daugherty.

120. Daugherty was impoverished by Defendants' civil conspiracy in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

121. The civil conspiracy involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit. All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

* * *

WHEREFORE, Daugherty respectfully requests that the Court:

40

a. enter judgment in favor of Daugherty and against Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally;

b. order Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally, to return to HERA the equivalent of all the assets fraudulently or otherwise wrongfully caused to be transferred from HERA;

c. award Daugherty damages;

d. award Daugherty pre- and post-judgment interest;

e. award Daugherty his reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

f. grant such other relief that is just and proper.

/s/ Thomas A. Uebler
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Hayley M. Lenahan (#6174)
McCollom D'Emilio Smith
  Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960

*Attorneys for Patrick Daugherty*

December 1, 2019

41

THIS DOCUMENT IS A CONFIDENTIAL FILING. 0148
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.





600 N. King Street • Suite 400
P.O. Box 25130 • Wilmington, DE 19801
Zip Code For Deliveries 19801

Writer's Direct Access:
(302) 429-4232
Email: sbrauerman@bayardlaw.com

November 29, 2021

**By E-File and Hand Delivery**
The Honorable Vice Chancellor Morgan T. Zurn
Court of Chancery of the State of Delaware
Leonard L. Williams Justice Center, Suite 11400
500 North King Street
Wilmington, DE 19899

     Re:   *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ

Dear Vice Chancellor Zurn:

     I write on behalf of Defendants James Dondero, Highland ERA Management LLC, Highland Employee Retention Assets LLC, Scott Ellington, Thomas Surgent, and Isaac Leventon (collectively, the "Highland Defendants") to join in Mr. Katz's and Hunton Andrews Kurth LLP's (collectively, the "Katz Defendants") November 19, 2021 status letter concerning the status of the Highland Capital Management L.P. ("Highland") bankruptcy proceedings pending in the United States Bankruptcy Court for the Northern District of Texas (the "Highland Bankruptcy").

     As Your Honor may recall, this matter was stayed on April 10, 2021, after the Court concluded that a February 2, 2021 settlement (the "Bankruptcy Settlement")

0150



The Honorable Morgan T. Zurn
November 29, 2021

between Plaintiff Patrick Daugherty ("Plaintiff") and Highland could moot Plaintiffs' claims against the Defendants in this action. (D.I. 61.) The Plan of Reorganization entered in the Highland Bankruptcy took effect on August 11, 2021. The Highland Defendants understand that through the Bankruptcy Settlement effectuated by the now effective Plan of Reorganization, Plaintiff will receive a payment from Highland that will render this action moot. Consequently, the Highland Defendants join in the Katz Defendants' request that the Court lift the stay, or in the alternative, schedule a status conference to discuss this action.

In the event the Court does not find that the Bankruptcy Settlement moots Plaintiffs claims, when the stay is lifted the Highland Defendants intend to seek leave to supplement their pending motion to dismiss to add defenses based upon the attorney immunity doctrine. At the time Defendants were briefing their motions to dismiss, the attorney immunity doctrine did not apply outside of the litigation context. Subsequent to the completion of briefing, the Texas Supreme Court has clarified that the attorney immunity doctrine applies outside of the litigation context to claims, such as Plaintiff's here, brought by a non-client against an attorney "based on conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney *and* (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the non-client do not share the same

2

BAYARD

The Honorable Morgan T. Zurn
November 29, 2021

interests and therefore the non-client's reliance on the attorney's conduct is not justifiable." *Haynes & Boone, LLP v. NFTD, LLC*, 2021 WL 2021453, at *10 (Tex. May 21, 2021) (emphasis in original).

Based on the foregoing, the Highland Defendants respectfully request that the Court lift the stay and dismiss the action in light of the now effective Bankruptcy Settlement, or in the alternative schedule a status conference to discuss the supplemental briefing necessary for the Court to consider and act upon Defendants' pending motions to dismiss.

Should Your Honor have any questions about this development, counsel are available at the convenience of the Court.

Respectfully,

/s/ *Stephen B. Brauerman*

Stephen B. Brauerman (No. 4952)
**Words: 452**

cc:  Thomas Uebler, Esquire (by e-File)
     Kurt Heyman, Esquire (by eFile)
     Loren Barron, Esquire (by e-File)

3

0152



Thomas A. Uebler
(302) 468-5963
tuebler@mdsulaw.com

December 17, 2021

BY EFILING AND HAND DELIVERY

The Honorable Morgan T. Zurn
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street
Wilmington, DE 19801

    Re:   *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ

Dear Vice Chancellor Zurn:

On behalf of the plaintiff, Patrick Daugherty, this responds to the

defendants' letters dated November 19, 2021 (D.I. 66), November 29, 2021 (D.I.

67), and November 30, 2021 (D.I. 68).[1]

---

[1] Before its letter dated November 30, 2021, the Bayard Firm submitted a letter on November 29, 2021, purportedly on behalf of Highland Employee Retention Assets LLC ("HERA"), Highland ERA Management LLC ("ERA"), and Thomas Surgent, among other defendants. After the Bayard Firm was informed that it had no authority to speak on behalf of HERA, ERA, or Surgent (for reasons explained below), the letter was removed from the docket. Daugherty learned that Isaac Leventon authorized the filing of the original letter despite being terminated for cause by Highland Capital Management, L.P. ("Highland Capital") more than ten months before the letter was filed.

Little Falls Centre Two | 2751 Centerville Road, Suite 401 | Wilmington, Delaware 19808
M 302-468-5960 | F 302-691-6834 | mdsulaw.com

MDSU W0245698.v1

0153

The Honorable Morgan T. Zurn
December 17, 2021
Page 2

## 1. Settlement Agreement

On December 8, 2021, Highland Capital filed in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, a Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith (the "Settlement Motion"). The Settlement Motion is attached as Exhibit 1 and the settlement agreement between Daugherty and Highland Capital (the "Settlement Agreement") is attached as Exhibit 2.

The Settlement Agreement includes the following terms:

- Daugherty will receive an allowed general unsecured, non-priority Class 8 claim in the amount of $8.25 million;

- Daugherty will receive an allowed subordinated general unsecured, non-priority Class 9 claim in the amount of $3.75 million;

- Daugherty will receive a one-time lump sum payment of $750,000 to be paid within five business days of bankruptcy court approval of the Settlement Agreement;

- Releases between Daugherty and Highland Capital and affiliates (including Surgent);

- Daugherty will become the 100% owner of HERA and ERA; and

- Dismissal of litigation between Daugherty and Highland Capital.

The Settlement Agreement is subject to the approval of the bankruptcy court. Daugherty understands that, due to the court's schedule, the Settlement

The Honorable Morgan T. Zurn
December 17, 2021
Page 3

Motion and Settlement Agreement may not be presented to the court for approval

until around March 2022.

### 2.   This Action Should Remain Stayed Pending the Settlement Motion

Defendants have asked the Court to lift the stay in this action. Marc Katz and

Hunton Andrews Kurth request that the Court address their Texas attorney-

immunity defense, D.I. 66 at 4, a request that Michael Hurst joins. D.I. 67 at 1.

And James Dondero, Scott Ellington, and Leventon argue that the Settlement

Agreement moots this action and that Ellington and Leventon want to assert a new

attorney-immunity defense. D.I. 68 at 1-2.

Defendants' request to lift the stay should be denied because it is premature,

for several reasons. First, the Settlement Agreement will not moot Daugherty's

claims or relief in this action, but it is too soon for the Court even to consider that

argument. The Settlement Agreement may not be presented to the bankruptcy court

for approval for months, and even if the Settlement Agreement is approved, it is

unclear what Daugherty's actual recovery might be.

Daugherty's maximum potential recovery from the Settlement Agreement is

$12,750,000, but the reality is that he will likely recover less. Dondero recently

told Daugherty that he "will never get a penny." In a recent filing, Dondero

The Honorable Morgan T. Zurn
December 17, 2021
Page 4

discussed the erosion of Highland Capital's value and creditor claims were being

transferred for between 33% and 50% of their face value. Ex. 3, ¶¶ 18-20.[2]

Further, defendants ignore that a substantial amount of any recovery by

Daugherty under the Settlement Agreement will relate to unique claims he has

against Highland Capital and not against defendants, such as his claims for

indemnification and fees on fees. Roughly one-fourth of Daugherty's $40.7 million

bankruptcy claim was based on liability unique to Highland Capital that had

nothing to do with defendants. And in the original HERA action, Daugherty sought

damages of $8,573,934.69 apart from his indemnification-related claims against

Highland Capital. *Daugherty v. Highland Capital Mgmt., L.P.*, C.A. No. 2017-

0488-MTZ, Stipulated Joint Pre-Trial Order, ¶¶ 100-101 (Oct. 11, 2019).

For these reasons, it is premature for the Court to determine what portion of

Daugherty's recovery under the Settlement Agreement (if the Settlement

Agreement is approved and if Daugherty recovers under the Settlement

Agreement) could reduce Daugherty's damages in this action.

It is also premature to address defendants' Texas attorney-immunity defense.

As the Court knows, Daugherty disputes that Texas law applies at all to his claims

---

[2] This is a far cry from what defendants represented to this Court in March 2021, which was that "the $8.25 million general unsecured claim is worth at least 70 cents on the dollar, if not more" and "it's roughly 6 million and change that he's going to get there." Tr. at 16-17.

The Honorable Morgan T. Zurn
December 17, 2021
Page 5

relating to a Delaware escrow. D.I. 46 (Patrick Daugherty's Omnibus Brief in

Opposition to Defendants' Motions to Dismiss) at 33-35. But even if Texas law

could apply here, Daugherty has explained why defendants would be unable to

meet their burden of immunity because they cannot conclusively establish that

their conduct was within the scope of legal representation:

> On the other hand, "attorneys are not protected from
> liability to non-clients for their actions when they do not
> qualify as 'the kind of conduct in which an attorney
> engages when discharging ... duties to [a] client.'" For
> example, an attorney cannot avoid liability "for the
> damages caused by [the attorney's] participation in a
> fraudulent business scheme with [the] client, as 'such
> acts are entirely foreign to the duties of an attorney.'"
> Importantly, an attorney seeking dismissal based on
> attorney immunity bears the burden of establishing
> entitlement to the defense. To meet this burden, the
> attorney must "conclusively establish that [the] alleged
> conduct was within the scope of [the attorney's] legal
> representation of [the] client." Although Texas courts
> occasionally grant attorney immunity at the motion to
> dismiss stage, in those cases, the scope of the attorney's
> representation—and thus entitlement to the immunity—
> was apparent on the face of the complaint.

*Id.* at 36-37 (quoting *Kelly v. Nichamoff*, 868 F.3d 371, 374-75 (5th Cir. 2017)

(internal citations omitted)). For this issue, there remain disputed and unknown

facts, including the acts of the attorney defendants, in what capacity they acted, for

whose benefit they acted, at whose direction they acted, and what they received in

return for their acts.

The Honorable Morgan T. Zurn
December 17, 2021
Page 6

During the bankruptcy proceedings, many new facts were revealed about

how Dondero and his enablers defrauded Daugherty and others. Some of those

facts are recited in Highland Capital's pending claims against Dondero, Ellington,

and Leventon, among others. *See* Ex. 4. For example, Highland Capital itself now

acknowledges that "*Dondero*, through HCMLP, engaged in an asset-stripping

campaign designed to render HERA judgment-proof, further exposing HCMLP to

liability and unnecessary legal costs." *Id.*, ¶ 79 (emphasis added). New information

regarding the defendants' deficient discovery in the original HERA action (such as

hidden document servers and domains) also came to light.[3]

As Vice Chancellor Glasscock said in an earlier iteration of this dispute, "it's

clear to me that one thing that happened was this motion was made and then kind

of set aside, and the ground changed under all of us since that time." *Daugherty*,

C.A. No. 2017-0488-MTZ, Tr. at 7 (Sept. 18, 2018). The ground has changed

again. Given all the new facts that came to light in the bankruptcy proceedings, the

first step in resuming this action and the original HERA action should be

---

[3] *See, e.g.*, Ex. 2 at 3 ("Daugherty asserts that … the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case").

The Honorable Morgan T. Zurn
December 17, 2021
Page 7

supplementing the factual record. To start, if the Settlement Agreement is approved

and Daugherty becomes the 100% owner of HERA and ERA, Daugherty should

have the opportunity to obtain the client files of HERA and ERA from Hunton,

Abrams & Bayliss, Hurst, Cole Schotz, and DLA Piper, among other counsel.

For these reasons, this action should remain stayed at least until the

bankruptcy court decides whether to approve the Settlement Agreement, at which

time scheduling discussions in this action would be more productive.

Respectfully,

/s/ Thomas A. Uebler

Thomas A. Uebler (#5074)
Words: 1,386

Enclosures

cc:    Loren R. Barron, Esquire (by efiling)
       Kurt M. Heyman, Esquire (by efiling)
       Jamie L. Brown, Esquire (by efiling)
       Jason C. Jowers, Esquire (by efiling)
       Stephen B. Brauerman, Esquire (by efiling)
       Brett M. McCartney, Esquire (by efiling)
       Elizabeth A. Powers, Esquire (by efiling)

# Exhibit 1

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**REORGANIZED DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING**
**SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205)**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

# TABLE OF CONTENTS

**PAGE**

JURISDICTION ......................................................................................................................1

RELEVANT BACKGROUND ...............................................................................................2

      A.     Procedural Background.................................................................................2

      B.     Procedural Overview of Mr. Daugherty's Claim....................................2

      C.     Summary of Mr. Daugherty's Claim .......................................................6

      D.     The Parties Engage in Arm's-Length Settlement Discussions ...............8

      E.     Summary of Settlement Terms .................................................................9

BASIS FOR RELIEF REQUESTED ....................................................................................10

NO PRIOR REQUEST ........................................................................................................12

NOTICE................................................................................................................................12

i

# TABLE OF AUTHORITIES

## Cases

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*,
    68 F.3d 914 (5th Cir. 1995) ............................................................................... 11

*In re Age Ref. Inc.*,
    801 F.3d 530 (5th Cir. 2015) ..................................................................... 10, 11

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996) ............................................................................... 10

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*,
    119 F.3d 349 (5th Cir. 1997) ........................................................................... 11

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
    624 F.2d 599 (5th Cir. 1980) ........................................................................... 10

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
    725 F.2d 293 (5th Cir. 1984) ........................................................................... 10

0163

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

Highland Capital Management, L.P., the above-captioned reorganized debtor (the "Reorganized Debtor" or "Debtor," as applicable), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proof of claim filed by Patrick Hagaman Daugherty ("Mr. Daugherty").  In support of this Motion, the Reorganized Debtor represents as follows:

### JURISDICTION

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

## RELEVANT BACKGROUND

**A.     Procedural Background**

3.      On October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Court</u>").

4.      On October 29, 2019, the official committee of unsecured creditors (the "<u>Committee</u>") was appointed by the U.S. Trustee in the Delaware Court.

5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Court</u>").  [Docket No. 186].[3]

6.      On February 22, 2021, the Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "<u>Confirmation Order</u>") with respect to the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] (as subsequently modified, the "<u>Plan</u>").

7.      The Plan went effective on August 11, 2021 (the "<u>Effective Date</u>") and, on that same date, the Reorganized Debtor filed the *Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].  The Reorganized Debtor has commenced making distributions on certain allowed claims in accordance with the terms of the Plan.

**B.     Procedural Overview of Mr. Daugherty's Claim**

8.      Mr. Daugherty is a former employee and limited partner of the Debtor and previously served in other positions with affiliates and former affiliates of the Debtor.

---

[3] All docket numbers refer to the docket maintained by this Court.

2

9.     At the time of his resignation, Mr. Daugherty owned 19.1% of the preferred units of Highland Employee Retention Assets LLC ("HERA"), an employee deferred-compensation vehicle managed by the Debtor and Highland ERA Management, LLC ("ERA Management").  Mr. Daugherty contends that he owned or had the right to own all of the preferred units of HERA.

10.     In April 2012, following Mr. Daugherty's resignation and while under the control of James Dondero ("Mr. Dondero"), the Debtor commenced an action against Mr. Daugherty in Texas state court (the "Texas Action"), and Mr. Daugherty subsequently asserted (i) counterclaims for breach of contract and defamation, and (ii) third-party claims against HERA and others.

11.     After a three-week trial, (a) the Debtor obtained a verdict on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty and obtained an award of $2.8 million in attorney's fees; and (b) Mr. Daugherty obtained a verdict on his claims against the Debtor and Mr. Dondero for defamation with malice and a third-party claim against HERA and obtained an award of $2.6 million against HERA (the "HERA Judgment").  The HERA Judgment was affirmed on appeal on December 1, 2016.

12.     In July 2017, after being unable to collect on the HERA Judgment, Mr. Daugherty commenced an action against the Debtor, Mr. Dondero, HERA, and ERA Management in the Delaware Chancery Court (the "Chancery Court") in a case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for, among other claims, fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and "fees on fees" (the "Highland Chancery Case").

13.     In the spring of 2019, the Chancery Court in the Highland Chancery Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Chancery Court applied the "crime-fraud exception" to

3

the attorney-client privilege. Mr. Daugherty asserts that the defendants' failure to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Chancery Case.

14.     On October 14, 2019, the Highland Chancery Case proceeded to trial, but on October 16, 2019, before the trial was completed and before the Chancery Court ruled on Mr. Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy.

15.     On December 1, 2019, Mr. Daugherty filed a separate lawsuit in the Chancery Court captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Mr. Dondero, HERA, ERA Management, Hunton Andrews Kurth LLP, Marc Katz, Michael Hurst, the Debtor's then-chief compliance officer, and the Debtor's then in-house counsel, Isaac Leventon and Scott Ellington, for conspiracy to commit fraud among other claims (the "HERA Chancery Case" and together with the Highland Chancery Case, the "Chancery Cases").

16.     On April 1, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67").

17.     On April 6, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,483,876.59" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77").

18.     On August 31, 2020, the Debtor commenced an adversary proceeding against Mr. Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Mr. Daugherty's Claim pursuant to section 510(b) of the

4

Bankruptcy Code. *See* Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding").

19.     On September 29, 2020, Mr. Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer").

20.     On September 24, 2020, Mr. Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Comfort Motion") pursuant to which he sought to sever the Debtor from the Highland Chancery Case and then consolidate the remaining claims in the Highland Chancery Case into the HERA Chancery Case and proceed with one case against the non-debtors.[4]

21.     On October 23, 2020, Mr. Daugherty filed a motion seeking leave to amend his Proof of Claim [Docket No. 1280] (the "POC Amendment Motion"). The amended proof of claim attached to the POC Amendment Motion increased Mr. Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,710,819.42" and sought to supersede Proof of Claim No. 67 and Claim No. 77.

22.     On October 23, 2020, Mr. Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion* seeking for his Claim to be temporarily allowed for voting purposes in the amount of $40,710,819.42 [Docket No. 1281] (the "3018 Motion").

23.     On November 9, 2020, the Debtor filed its *Objection to Patrick Hagaman Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion* [Docket No. 1349] (the "3018 Objection").

---

[4] On October 8, 2020, the Debtor commenced a second adversary proceeding against Mr. Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Chancery Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1]. On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

24.     After conducting an evidentiary hearing with respect to the 3018 Motion, the Court entered an order temporarily allowing Mr. Daugherty's Claim for voting purposes in the amount of $9,134,019 [Docket No. 1474] (the "Rule 3018 Order").

25.     On November 3, 2020, the Court granted the Comfort Motion [Docket No. 1327].

26.     On December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion permitting Mr. Daugherty to amend his proof of claim. On December 23, 2020, Mr. Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 increased the amount of the Daugherty Claim to $40,710,819.42.

27.     On November 30, 2020, Mr. Daugherty filed his *Motion to Lift the Automatic Stay* (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Chancery Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612].

28.     Except with respect to the Reserved Claim (as defined in the Settlement Agreement), the Parties have agreed to settle and resolve all claims and disputes between them, including the Daugherty Claim, on the terms set forth in the Settlement Agreement.

## C.     Summary of Mr. Daugherty's Claim

29.     As generally described above, prior to the Petition Date, Mr. Daugherty on the one hand, and the Debtor, Mr. Dondero, other entities controlled by Mr. Dondero, and individuals then employed by the Debtor or otherwise associated with Mr. Dondero on the other hand, were embroiled in more than nine (9) years of highly contentious litigation involving a multitude of claims and counterclaims (the "Pre-Petition Litigation").

6

30.     The Pre-Petition Litigation played out in front of a jury in Texas state court and wound its way through the state appellate courts.  Thereafter, Mr. Daugherty opened a new front by commencing the Highland Chancery Case in the Chancery Court where he sought to hold the defendants to account for leaving HERA "judgment proof" and unable to satisfy the HERA Judgment that Mr. Daugherty had obtained.

31.     While Mr. Dondero's decision to sue Mr. Daugherty in the Texas Action was questionable, his decisions to (a) continue fighting the HERA Judgment rather than accepting the net economic benefits awarded, and (b) fraudulently transfer HERA's assets leaving it "judgment proof" proved to be a disaster because it cost millions of dollars in legal fees and left the Debtor and related entities exposed to claims and liability for substantial wrongdoing.

32.     The Daugherty Claim attaches and incorporates his operative complaint in the Highland Chancery Case and other voluminous documentation.  The Daugherty Claim has the following components:

- Enforcement of the HERA Judgment against the Debtor, pursuant to unjust enrichment, promissory estoppel and fraudulent transfer claims, in the amount of $2.6 million plus prepetition interest of $1.22 million.  (Mr. Daugherty contends that interest has continued to accrue post-petition);

- The estimated value of the HERA assets transferred to the Debtor on the theory that Daugherty owns 100% of HERA because the Debtor was not permitted to acquire the interests that it purchased from the former members and Daugherty was the last remaining interest holder.  This allegedly leaves Mr. Daugherty by default as the 100% owner of the HERA Assets, which Mr. Daugherty asserts are worth at least $26.2 million as a whole;

- Indemnification for attorneys' fees, expenses, and interest of approximately $5.4 million incurred in the Texas Action under the Debtor's partnership agreement for actions Daugherty contends were taken in furtherance of his obligations to investors and funds under the Investment Advisors Act of 1940;

- Compensation as a former employee of the Debtor that Daugherty contends is contingent on the outcome of an audit of the Debtor's 2008/2009 tax returns and related expenses.  Mr. Daugherty estimates this claim at approximately $2.7 million;

7

- Fee shifting and fees on fees that Daugherty contends are due to the bad faith actions of the Debtor, its officers, and agents in the Chancery Court. Daugherty estimates this claim at approximately $2.5 million; and

- Other related claims described in the Daugherty Claim for approximately $0.2 million.

33.    The Debtor previously informed the Court that it does not object to Mr. Daugherty's claims related to the HERA Judgment ($2.6 Million, plus interest calculated at approximately $1.22 million as of about a year ago).

34.    For a recitation of the Debtor's defenses to Daugherty's Claim, the Debtor incorporates by reference its 3018 Objection.

## D.    The Parties Engage in Arm's-Length Settlement Discussions

35.    Although counsel for the Parties argued over the merits of, and the defenses to, the Daugherty Claim throughout the fall, they began discussing a possible resolution of Daugherty's Claim after the Court entered the 3018 Order.

36.    In the days leading up to the Confirmation Hearing, those discussions evolved into substantive negotiations, and counsel for the parties exchanged various proposals and counterproposals in an effort to reach an agreement.

37.    With the advice of counsel, James P. Seery, Jr., the Debtor's Chief Executive Officer, took the lead in the negotiations (directly and through counsel) and briefed the Independent Board on the progress.

38.    The negotiations bore fruit. On February 2, 2021, at the commencement of the Confirmation Hearing, and with the unanimous approval of the Independent Board, Debtor's counsel announced that it had reached an agreement with Mr. Daugherty (subject to the execution of definitive documentation and Court approval) and read the principal terms into the record.

39.    For a variety of reasons, documenting the agreement took more time than expected. For example, in the weeks and months that followed, (1) the principals and their counsel

addressed the implications of the Sentinel Disclosures (as that term is defined below); (2) the tasks related to getting to the Effective Date took a higher priority; (3) the Reorganized Debtor had to educate the newly appointed Oversight Board on the background and litigation concerning, and the proposed resolution of, the Daugherty Claim; (4) the parties exchanged numerous iterations of the Settlement Agreement and ancillary documents; and (5) frankly, it was difficult to get Mr. Daugherty to say "yes" as he sought very hard to improve the economic and non-economic terms of the deal based on certain revelations in the ensuing months (which, of course, was his right).

**E.  Summary of Settlement Terms**

40.  The Settlement Agreement contains the following material terms, among others:

- Mr. Daugherty shall receive an allowed general unsecured, non-priority Class 8 claim in the amount of $8.25 million;

- Mr. Daugherty shall receive an allowed subordinated general unsecured, non-priority Class 9 claim in the amount of $3.75 million;

- Mr. Daugherty shall receive a one-time lump sum payment in the amount of $750,000 to be paid within five business days of Bankruptcy Court approval of this Settlement Agreement;

- Releases shall be exchanged as provided for in paragraphs 3 through 6 of the Settlement Agreement;

- The Reorganized Debtor shall transfer its interests in HERA and ERA to Mr. Daugherty in accordance with paragraph 6 of the Settlement Agreement;

- The Parties shall cooperate to terminate all litigation in accordance with paragraphs 9 and 10 of the Settlement Agreement; and

- The Parties shall adhere to certain other non-economic matters agreed to by them as specifically set forth in the Settlement Agreement.

*See generally* Morris Dec. Exhibit 1.[5]

---

[5] With two exceptions, these settlement terms are materially the same as those announced on the record on February 2, 2021 in connection with the confirmation hearing on the Debtor's Plan. The two exceptions are that (a) the Class 9 claim was increased by $1 million, and (b) the Reorganized Debtor agreed to transfer its interests in HERA and ERA to Mr. Daugherty. The former change was intended to take into account the increased risk to the Debtor arising from

9

DOCS_NY:44641.3 36027/003

0172

## BASIS FOR RELIEF REQUESTED

41. Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

42. Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

43. In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-part test "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*,

---

the post-confirmation discovery and disclosures related to Sentinel (the "Sentinel Disclosures"). *See UBS Secs. LLC v. Highland Capital Mgmt., L.P.*, Adv. Pro. No. 21-03020. The latter concerned Mr. Daugherty's final demand that the Debtor agreed to because (i) Mr. Daugherty continues to retain his claims against HERA and ERA and their respective officers, directors, and agents; (ii) HERA and ERA no longer have any tangible assets; (iii) the HERA Releasing Parties are confirming that they have no claims against and are releasing the HCMLP Released Parties pursuant to the HERA and ERA Release; and (iv) Mr. Daugherty insisted on this final term which, in the overall package, was not material under the Debtor's Plan or otherwise.

10

624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

44.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

45.     First, although the Reorganized Debtor believes that it has valid defenses to the Daugherty Claim, there is no guarantee that the Reorganized Debtor would succeed in its litigation with Daugherty. Indeed, to establish its defenses, the Reorganized Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, the events giving rise to Mr. Daugherty's claims arose over five years ago, raising considerable questions about the reliability of those witnesses' recollection.

46.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the Daugherty Claim—including the Texas Action and the Highland Chancery Case—proceeded *for years* and have already cost the Debtor's estate millions of dollars in legal

11

fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive issues including, among other things, the conduct of Mr. Dondero and the other defendants in the pending Chancery Actions.

47. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Reorganized Debtor to: (a) avoid incurring substantial litigation costs; and (b) avoid the litigation risk associated with Daugherty's $40 million claim. Notably, as set forth in its 3018 Objection, and regardless of whether this settlement is approved, the Debtor has already conceded liability of almost $4 million in connection with the HERA Judgment, making the risk/reward analysis compelling.

48. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Reorganized Debtor's business judgment made after due deliberation of the facts and circumstances concerning Daugherty's Claim.

### NO PRIOR REQUEST

49. No previous request for the relief sought herein has been made to this, or any other, Court.

### NOTICE

50. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for Mr. Daugherty; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; and (d) parties requesting notice pursuant to Bankruptcy Rule 2002. The Reorganized Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Reorganized Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: December 8, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com
      hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

13

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## ORDER GRANTING REORGANIZED DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Docket No. _____] (the "Motion")[2] filed by Highland Capital Management, L.P., the above-captioned reorganized debtor (the "Reorganized Debtor" or "Debtor", as applicable); and this Court having considered (a) the Motion; (b) the *Declaration of*

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined in this order shall have the meanings ascribed to them in the Motion.

0178

*John A. Morris in Support of the Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Docket No. _____] (the "<u>Morris Declaration</u>") and the exhibits annexed thereto, including the Settlement Agreement attached as Exhibit 1 (the "<u>Settlement Agreement</u>"); and (c) the arguments and law cited in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views; and (ii) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and all other documents filed in support of the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Settlement Agreement attached hereto as **<u>Exhibit 1</u>** is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.      The Reorganized Debtor, Mr. Daugherty, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

# Exhibit 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF THE REORGANIZED DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

I, John A. Morris, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declare as follows:

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. (the "Reorganized Debtor" or "Debtor", as appropriate), and I submit this Declaration in support of the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* (the "Motion") being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of that certain *Settlement Agreement* (the "Settlement Agreement") by and between the Reorganized Debtor and Patrick Hagaman Daugherty.

Dated: December 8, 2021.                    */s/ John A. Morris*
                                            John A. Morris

# EXHIBIT 1

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero") for defamation with malice and a third-party claim against HERA and was awarded damages of $2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

2

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

3

0187

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code. Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1]. On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

5

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

AGREEMENT

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1.  Allowed Claims: In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2.  Recovery: The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3.  Observation Access: As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest. Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

6

Claimant Trust Oversight Board.

4. <u>RCP Track Record</u>: HCMLP shall use reasonable efforts to provide Daugherty with data constituting the investment performance track record of RCP during Daugherty's tenure at HCMLP. Daugherty shall not be entitled to any compensation with respect to the performance of RCP. HCMLP makes no representations or warranties regarding such data and takes no responsibility with respect to the use of such data for any purposes.

5. <u>Daugherty Releases</u>: Except as specifically provided in this paragraph 5, and to the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in each such category to include their respective advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, and designees) (collectively, the "<u>Daugherty Additional Release Parties</u>" and together with Daugherty, the "<u>Daugherty Released Parties</u>"), in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof (collectively, the "<u>HCMLP Released Claims</u>"); provided, however, that such release shall not

7

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's obligations under this Settlement. For the avoidance of doubt, the HCMLP Released Claims include all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

6.    <u>HCMLP Releases</u>: Except as specifically provided in this paragraph 6, and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds, managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "<u>HCMLP Entities</u>"), and (b) with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning employed in their respective roles as of the date hereof) advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the

HCMLP Entities, the "<u>HCMLP Released Parties</u>"),[4] in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the "<u>Daugherty Released Claims</u>"); <u>provided, however</u>, that such release shall not apply with respect to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or HCMLP's obligations under this Settlement. This release expressly applies to all current employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as such. For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

7.    <u>Reservation of Daugherty Rights</u>: Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors, or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "<u>Additional Released Parties</u>."

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j) Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the date hereof) of the HCMLP Released Parties.

8. <u>HERA and ERA</u>: The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to satisfy any liability the Debtor may have in connection with the HERA Judgment. To facilitate recovery of such potential claims – which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties -- HCMLP will transfer its interests in HERA and ERA to Daugherty. Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type; including, for the avoidance of doubt, without any representation or warranty as to the merits of the potential claims or the efficacy of the transfer of the potential claims. Such transfer will be without any liability or material cost to HCMLP or its affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a "<u>Disposition</u>"). In connection with the transfer, HERA and ERA have expressly released the HCMLP Released Parties from any and all claims, including any claims actions or remedies related

10

0194

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9. <u>IRS Compensation Claim</u>: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

11

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims; provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS without the written consent of the Debtor until March 31, 2022.

10. Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto are currently employed by the Debtor are HCMLP Released Parties. By executing a copy of this Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue, attempt to sue, or threaten or work with or assist any entity or person to sue, attempt to sue, or threaten any Daugherty Released Party on or in connection with any claim or cause of action arising prior to the date of this Settlement.

11. Dismissal and Motions in Other Actions. Within ten business days after approval of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

0196

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file the foregoing motions and withdrawals substantially in the form of the documents annexed hereto as **Exhibit B**.

12. <u>Additional Third Party Claims Discovery</u>: The Debtor (a) shall accept service of any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP Entities and HCMLP Parties to defend the requested production, if any.

13. <u>Settlement of Third Party Claims</u>: Daugherty shall not settle any claims or causes of action against any current or former director, officer, employee, agent or representative of HCMLP or Strand Advisors Inc. (collectively, the "<u>Potentially Indemnified Parties</u>") to the extent such claims have been brought or could have been brought against any Potentially Indemnified Parties, if any such settlement designates, defines or describes the settled claims as arising out of or relating to simple negligence or as having otherwise been within the scope of employment of the Potentially Indemnified Party.

14. <u>Claims Register</u>: As soon as practicable after the Settlement Effective Date, HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register in accordance with this Settlement.

15. <u>Daugherty Representations</u>: Daugherty represents and warrants to each of the HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

0197

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Daugherty.

16.     HCMLP Representations: Each of HCMLP and each HCMLP Released Party who has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Released Party personally has against Daugherty.

17.     Additional HCMLP Representations: HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such assistance would require HCMLP to expend material amounts of time or money.  HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP Entities.  The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

18.     HCMLP Covenant:  HCMLP and the HCMLP Entities covenant and agree that they will not pursue or seek to enforce any injunctions entered in the Texas Action against

14

0198

Daugherty.

19.    Entire Agreement; Modification: This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties.  This Settlement may not be modified other than by a signed writing executed by the Parties.

20.    Bankruptcy Court Approval: Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement.  HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "Motion").  The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

21.    Counterparts:  This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

22.    Governing Law; Jurisdiction: This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

0199

23.     <u>Headings</u>: Paragraph headings included herein are for convenience and shall have no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

0200

In witness whereof, the parties hereto, intending to be legally bound, have executed this

Settlement as of the day and year set forth below:

Dated: _11-21-21_

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

HIGHLAND CLAIMANT TRUST

By: _____

Name: James P. Seery, Jr.

Title: Claimant Trustee

PATRICK HAGAMAN DAUGHERTY

Dated: _11/22/21_

By: _____

Name: Patrick Hagaman Daugherty

# EXHIBIT A

HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankrupty and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

      1.     Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

     2.     This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

In witness whereof, the parties hereto, intending to be legally bound, have executed this

HERA Release Agreement as of the date set forth above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By: _____

Name: Patrick Hagaman Daugherty

HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management. LP

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

HIGHLAND ERA MANAGEMENT, LLC

By: _____

Name: James P. Seery, Jr.

Title: Authorized Signatory

# EXHIBIT B



CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| Defendant and Counter-Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "Motion"), and respectfully show the following:

1.     On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2.     The Judgment was amended on March 23, and June 23, 2017.

3.     On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5
4851-6473-6986.4

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758. Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.      Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.      Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction. Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.      Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

a.  The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b.  The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c.  The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d.  The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.  Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction. Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment. Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment. To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 3 OF 5**
4851-6473-6986.4

8.      Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.      Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

Respectfully submitted,

GRAY REED & McGRAW LLP

By: _/s/ Sonya D. Reddy_____
    ANDREW K. YORK
    State Bar No. 24051554
    E-mail: dyork@grayreed.com
    SONYA D. REDDY
    State Bar No. 24079188
    E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

### CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

| | |
|---|---|
| Marc D. Katz | Michael K. Hurst |
| Crystal J. Woods | A. Shonn Brown |
| DLA PIPER LLP (US) | Jonathan Childers |
| 1717 Main St., Suite 3700 | LYNN PINKER COX HURST, LLP |
| Dallas, Texas 75201 | 2100 Ross Ave., Suite 2700 |
| 214-743-4545 (Fax) | Dallas, Texas 75201 |
| marc.katz@dlapiper.com | (214) 981-3839 (Fax) |
| crystal.woods@dlapiper.com | mhurst@lynnllp.com |
| | sbrown@lynnllp.com |
| Attorneys for Highland Capital | jchilders@lynnllp.com |
| Management, L.P. | |
| | Attorneys for Third-Party Defendants HERA, Patrick Boyce, and William Britain |

_/s/ Sonya D. Reddy_____
SONYA D. REDDY

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 5 OF 5**
4851-6473-6986.4

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

0213

# Exhibit 3

Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

– and –

Michael M. Eidelman (*pro hac vice* pending)
Douglas J. Lipke (*pro hac vice* pending)
Thomas P. Cimino, Jr. (*pro hac vice* pending)
William W. Thorsness (*pro hac vice* pending)
David L. Kane (*pro hac vice* pending)
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 telephone
(312) 609-5005 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER
## (I) COMPELLING MEDIATION AND (II) GRANTING RELATED RELIEF

James Dondero ("Mr. Dondero"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, pursuant to Section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019-2(a) of the Local Bankruptcy Rules for the Northern District of Texas (the "Local Rules"), 28 U.S.C. § 651, Rule 16 of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rules 7016 and 9014 of the Federal Rules of

1934054210801000000000001

Bankruptcy Procedure (the "Bankruptcy Rules"), hereby files this *Motion for Entry of an Order Compelling Mediation and Granting Related Relief* (the "Motion"). In support thereof, Mr. Dondero states as follows:

## I. PRELIMINARY STATEMENT

1.    Mr. Dondero comes before the Court to respectfully request the Court direct decision-making representatives from the key constituents to participate in a global mediation in an effort to reach a comprehensive resolution and bring a celebrated end to this contentious case.

2.    It should come as no shock that Mr. Dondero has strongly disagreed with the direction this case has taken following the creation of the Independent Board in January 2020. When Mr. Dondero relinquished control of the Debtor, Mr. Dondero fully expected to participate in a collaborative restructuring to sustain the Debtor's thriving business. Instead, most of the Debtor's employees were terminated, and under the confirmed plan that will immediately go effective, the Debtor will be liquidating all of its holdings and other assets in short order.

3.    Any observer can see that this bankruptcy case has generated dozens of value-destructive litigations and appeals, many of which remain pending. Moreover, as promoted in their 40-page *Motion for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (Dkt. 2620, the "2004 Motion") filed on July 29, 2021, the Official Committee of Unsecured Creditors (the "Committee") and the Litigation Advisor are now seeking discovery from thirty-four (34) separate entities and individuals—meaning that many more adversary proceedings are on the horizon. However one views the merits of these pending and promised disputes, no one can deny the war drums are beating, further delaying distributions and causing millions of dollars in estate assets that would otherwise be available to creditors to be paid to professionals. This is perhaps why three of the

largest creditors in the case (Acis, HarbourVest and Redeemer) chose to accept a discounted buy-out from a hedge fund (Farallon Capital Management ("Farallon")) rather than wait years for these proceedings (and the likely appeals) to end.[1]

4.     Against this backdrop, and as more fully discussed below, Mr. Dondero submits that ordering the key constituents to mediation in an attempt at a global resolution is the prudent course. Mr. Dondero also appreciates that some may question the timing, sincerity and motivation for this Motion. To mitigate such concerns, as a condition of mediation, Mr. Dondero is willing to enter into a tolling agreement with respect to the two-year deadline for the Litigation Trustee to pursue Chapter 5 causes of action.[2]  Moreover, Mr. Dondero also will agree not to seek a stay of any pending contested matter, adversary proceeding or appeal, other than a limited stay of the 2004 Motion until conclusion of the mediation. Recently, Mr. Dondero retained the law firm of Vedder Price P.C. to effect a resolution of this case.  Vedder Price and its lead counsel are well known to the Debtor's and Committee's professionals, having worked together, successfully, on a variety of matters for decades.

5.     In addition, Mr. Dondero submits a Court-ordered mediation should be required given the substantial benefits to the estate, and the absence of any harm based upon Mr. Dondero's willingness to toll any proximate limitations periods. In the event a resolution is reached:

---

[1] Among the claims acquired by Farallon were claims previously held by two members of the Official Committee of Unsecured Creditors (Acis and Redeemer), notwithstanding that the United States Trustee's Office issues guidelines to prospective committee members stating "**Creditors wishing to serve as fiduciaries on an official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the debtor while they are committee members absent an order of the court on application of the creditor.**" (emphasis in original). See the *Information Sheet* attached to the *Notice of Formation Meeting for Official Committee of Unsecured Creditors*, a copy of which is attached hereto as Exhibit A.

[2] Mr. Dondero also agrees that a mediation would need to include many of the entities the Committee identified as potential litigation targets in the 2004 Motion.  Undersigned counsel understands, based upon discussions with counsel for certain of these entities, that they will also agree to a similar tolling agreement as a condition of mediation.

(i) creditor recoveries will be expedited, (ii) the parties and the Court will avoid having to participate in protracted litigation in a case with a variety of unique complexities, (iii) the Debtor's remaining assets, operations and investments may be transferred (rather than liquidated in short order) and (iv) jobs may be saved.

6.      Mr. Dondero proposes that the following parties participate in the mediation: (i) the Debtor and its successors (namely the Reorganized Debtor and Claimant Trust), (ii) the Committee and its successors (namely the Litigation Sub-Trust), (iii) the Claimant Trust Oversight Board, (iv) UBS and (v) Farallon and its affiliates (as the current holder of the Redeemer, Acis, and HarbourVest claims). While Mr. Dondero is open to suggestions from this Court and other parties for potential mediators, he suggests the Honorable Harlin D. Hale or, alternatively, the Honorable Leif Clark act as mediator if either of them is available and willing to serve.

## II.      RELEVANT BACKGROUND

7.      As the Court knows, Mr. Dondero co-founded the Debtor in 1993. After nearly 30 years of successful operations, Mr. Dondero decided that a court-approved restructuring of Debtor's business was in its best interest.

8.      In order to avoid litigation and to facilitate this restructuring, Mr. Dondero agreed in the early stages of the bankruptcy to resign as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"), on the condition that he would be replaced by three independent directors focused on the reorganization of the Debtor's business.[3] Mr. Dondero's expectation was that the Independent Board would work to restructure the Debtor's business so it could continue operating (and emerge) as a going concern. This expectation would not only rightfully preserve

---

[3] An independent board of directors for Strand was appointed on January 9, 2020 (the "Independent Board"). The members of the Independent Board were, and remain, James P. Seery, Jr., John S. Dubel, and Russell F. Nelms. Mr. Seery was later retained as the Debtor's Chief Executive Officer.

the "Highland" name—one well known in Dallas—but preserve jobs and various charitable causes the Debtor and Mr. Dondero funds. Mr. Dondero's expectation was also based upon his substantial industry experience and demonstrated investment success for over 30 years, which he believed would measurably aid the Independent Board in advancing a successful restructuring.

9. These expectations did not materialize. Rather, it became clear to Mr. Dondero that Strand's and the Debtor's governance was, in fact, dominated by one, James Seery. After Mr. Seery was appointed as the Debtor's CEO in July 2020, the Debtor—rather than attempt to work constructively with Mr. Dondero—froze him out entirely, to the detriment of (i) the Debtor's business operations, (ii) the terminated employees and, ultimately, (iii) the estate.

**PRIOR MEDIATION AND MR. DONDERO'S RESIGNATION**

10. Commencing in August 2020 and continuing through September, various parties, including the Debtor, the Committee, Redeemer, Acis, UBS and Mr. Dondero, participated in a court-directed mediation. *See* Docket No. 912. The mediation was administered by the American Arbitration Association. Retired Judge Allan Gropper and Sylvia Mayer were appointed to serve as co-mediators.

11. After several mediation sessions, the Debtor reached settlements with both Acis and Redeemer. As this Court knows, Mr. Dondero and others questioned the prudence and economics of these settlements, though the Court ultimately agreed that the settlements satisfied applicable approval standards.[4]

---

[4] As an example, Mr. Seery agreed that notwithstanding his prior acknowledgment that the Acis claims were worth no more than $3 million, Acis achieved almost ten-fold more. Acis was (i) granted an allowed $23 million claim, (ii) provided a cash payment of $900,000 and (iii) released from $3.5 million in liabilities (including administrative claims) owed to the Debtor. In addition, Redeemer was able to extract approximately 200% more than the maximum value of its claims, including through the Debtor's agreement to release Crusader's cornerstone shares, and deferred fees, which interests were worth more than $100,000,000. Notably, UBS objected to the Redeemer settlement on the basis the Redeemer claims were worth between $75 million and $128 million, but withdrew its objection after it was

12.     Mr. Dondero raises these points not to rehash prior disagreements, but, instead, to state their consequence and Mr. Dondero's mindset as a result. In other words, to convey to the Court Mr. Dondero's views on how the parties have arrived at the place they occupy today.

13.     In particular, the Debtor appeared to not appreciate Mr. Dondero's expression of disapproval after Mr. Dondero was forced to publicly challenge the Debtor's business judgment. In response, the Debtor escalated the conflict by demanding Mr. Dondero's resignation as an unpaid employee and portfolio manager.[5]   This resignation removed Mr. Dondero from the Debtor's operations, thereby losing Mr. Dondero's unique knowledge of the business, its assets, and the value of the asserted claims against the estate. Capitalizing on what he viewed as this Court's perception of Mr. Dondero, the Debtor spun the resignation as a *fait accompli*.

## THE DEBTOR'S PLAN AND MR. DONDERO'S PRIOR ATTEMPTS TO REACH RESOLUTION

14.     In August 2020, the Debtor filed its plan, disclosing its intentions to terminate substantially all employees by the end of 2020 and liquidate the Debtor's assets by 2022.

15.     Unsurprisingly, Mr. Dondero did not respond favorably to the proposal to terminate employees and liquidate the company he co-founded and successfully managed for 30 years, and to the resulting loss of investor confidence. Accordingly, Mr. Dondero attempted to resolve the ongoing disputes through numerous overtures to the Debtor and the Committee.   Indeed, Mr. Dondero made over thirty offers to resolve the bankruptcy case, including a purchase of the remaining assets and a transition of the business and employees. For example, prior to the confirmation hearing, Mr. Dondero *increased his settlement offer to 130% of the Debtor's*

---

awarded Class 8 and Class 9 claims totaling $125 million, $18.5 million in cash, and the Debtor's agreement to assist UBS in continuing to pursue claims against Mr. Dondero and others.

[5] On or about October 2, 2020, Mr. Seery demanded Mr. Dondero's resignation. Mr. Dondero resigned effective October 9, 2020.

*projected expected plan recovery value*. Despite these efforts, Mr. Dondero never received a specific, written counteroffer.[6]

16.      Instead, the Debtor pursued injunctive relief against Mr. Dondero. This had the desired effect of preventing Mr. Dondero from communicating directly with any member of the Independent Board (and the Debtor's employees) to advocate for a different path for the Debtor. Regrettably, while certain of Mr. Dondero's comments directed toward the Debtor and Mr. Seery may have been emotionally charged, they were acutely driven by his being shut out of the process and business he built, and Mr. Dondero's inability to obtain any transparency concerning the sales of the Debtor's assets.[7]

17.      Despite Mr. Dondero's vast experience in the investment management industry and his successful management of the Debtor, he was given little say in the process and his opinions were not sincerely considered. While Mr. Dondero understands the Court's observations regarding his standing in the traditional sense, his interest here goes far beyond mere dollars. Highland's existence was at stake.

18.      Hindsight serves limited utility. Yet Mr. Dondero continues to hold firm in his belief that had he been allowed to participate, all creditors would have received 100% payouts, and equity would still be in the money, while retaining Highland as a going concern (together with its employees). Instead, the Debtor's profile at case inception suggested $450 million in assets (excluding the value of $150 million in disputed promissory notes) against expected claims of

---

[6] Two days after Mr. Dondero provided this offer, Mr. Dondero's counsel (former Judge Lynn) received a verbal counteroffer from the Committee's counsel that required a significant premium over what creditors could likely expect under the plan and did not provide for any releases for the contemplated parties who would fund such plan.

[7] The record reflects that the Debtor did not solicit competitive bids from Mr. Dondero, notwithstanding his familiarity with such assets, willingness to make a significantly higher bid on substantially the same terms as any prospective purchaser and Mr. Dondero's ability to timely close.

$110 million. Filed operating reports illustrate that the Debtor's estate lost approximately $237 million in value as of December 31, 2020.[8] And allowed claims have increased threefold over their initial estimated values.

19.     After the Debtor sold significant estate assets for what Mr. Dondero believed was significantly less than fair value (namely the Debtor's interests in life settlement policies, OmniMax, and Structural Steel Products), Mr. Dondero sought relief from the Court to obtain transparency and notice for any similar, future sales.[9]  Mr. Dondero, with his intimate knowledge of these assets and over thirty years of investment management experience, was uniquely able to determine whether these assets were being properly marketed and sold. The Debtor, however, refused to let him be involved in any aspect of this process, including as a bidder in various "As-Is, Where-Is" sales.

**FARALLON'S ACQUISITION OF THE ACIS, REDEEMER, AND HARBOURVEST CLAIMS**

20.     Approximately two months after the Debtor's plan was confirmed, both Acis and Redeemer—two of the four members of the Committee—filed notices that they had transferred their claims to third parties.[10] HarbourVest filed a similar notice thereafter.[11] The new holders of the Acis, Redeemer, and HarbourVest claims are entities owned and/or controlled by Farallon, a San Francisco-based hedge fund[12] which apparently invests in, among other things, "late stage bankruptcy claims" whereby the investor acquires—at a steep discount—bankruptcy claims that

---

[8] *See, e.g.* Dkts. 497, 1493, 2030. No. January No.

[9] Mr. Dondero agreed to withdraw this motion when it was made clear it would not be granted.

[10] See Docket Nos. 2215 and 2261. Mr. Dondero does not know when the agreements to purchase these claims were executed.

[11] *See* Docket No. 2263 (indicating transfer of claim to Muck Holdings, LLC).

[12] The Acis and HarbourVest claims were transferred to an entity called Muck Holdings, LLC and the Redeemer claim was transferred to an entity called Jessup Holdings, LLC. *See* Docket Nos. 2215, 2261.

will be paid from proceeds of post-confirmation litigation. Upon information and belief, Farallon acquired the Acis, Redeemer and HarbourVest claims for between 33% - 50% of their face value.[13] As a sophisticated investor seeking only a monetary return on the claims it purchased, Mr. Dondero believes Farallon's presence at the mediation is necessary.

21. To be clear, Mr. Dondero does not intend the foregoing to be construed as a threat against Mr. Seery or Farallon. Rather, the Court should be aware that the Oversight Board—charged with overseeing the contemplated litigation against Mr. Dondero and others—will likely no longer consist of four of the Debtor's creditors seeking a rational economic recovery; it will likely be populated by two members, UBS and Farallon, the latter being a hedge fund seeking a return on its litigation investment. Predictably, these demographics may escalate existing animus, prompting additional disputes and further drain of resources.

22. At present, the case is more than five months after confirmation and the plan still has not gone effective. The appeal of the confirmation order is pending before the U.S. Court of Appeals for the Fifth Circuit. There are many other pending adversary proceedings, contested matters, and appeals.

23. Again, Mr. Dondero recounts the above history to alert the Court that, from his vantage point, the Debtor's current management ultimately created greater divides among the various constituents, rather than narrowing issues that might drive this case toward consensual resolution. These facts have set the stage for numerous future lawsuits that will take years and tens of millions of dollars in lawyers' fees to resolve, all to the creditors' detriment. It is against this backdrop that Mr. Dondero believes that the parties should make another, serious and good-faith

---

[13] Upon information and belief, Mr. Serry has extensive ties with principals at Farallon (based upon, among other things, his prior involvement as Global Head of Fixed Income Loans at Lehman Brothers) and was involved in the process of Farallon's acquisition of the Acis, Redeemer, and HarbourVest claims.

attempt at a global resolution. Doing so will alleviate the need for further, substantial court time and years of lengthy and complex litigation between the various parties. Further, while the animosity in this case is palpable, mediation can often produce seemingly miraculous results by getting parties with divergent interests to ultimately settle hotly-contested litigation.[14]

### III.  RELIEF REQUESTED

24.  By this Motion, Mr. Dondero seeks entry of an order compelling mediation and staying ruling on the 2004 Motion until such mediation is resolved. Numerous authorities indicate that this Court has the authority and jurisdiction to issue an order compelling mediation, including Section 105(a) of the Bankruptcy Code, 28 U.S.C. § 651, Local Rule 9019-2(a), Federal Rule 16 and Bankruptcy Rules 7016 and 9014.

25.  Mediation is justified here given the unique circumstances in this case, the posture between the parties, and the substantial amount of litigation that is occurring, which is certain to increase given the pending 2004 Motion. Absent a global resolution this Court's time will continue to be consumed by adversary proceedings and contested matters, and related appeals, for years to come. Mr. Dondero submits that a mediation will be in the best interests of the estate and its creditors and serve the interests of judicial economy.

### IV.  ARGUMENT AND AUTHORITIES

26.  This Court has the authority to enter an order compelling mediation. First, under 28 U.S.C. § 651 each district court shall provide access to mediation by local rule.[15] The Local Rules

---

[14] *See* Order Confirming Fifth Amended Plan of Reorganization [Docket No. 1943] ("As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation.").

[15] Authority for a bankruptcy court's use of ADR procedures may also be found in 28 U.S.C. § 157. From that referral power of the district court, the district court, having the power to use ADR, may have the same power to authorize

provide for alternative dispute resolution procedures. Under Local Rule 9019, the Court may issue a mediation order either *sua sponte* or upon the motion of any party or party in interest. LR 9019-2(a) ("The Presiding Judge, either *sua sponte* or upon the motion of any party or party in interest, may order parties to participate in mediation and may order the parties to bear expenses in such proportion as the Presiding Judge finds appropriate").[16]

27.     In addition, Federal Rule 16(c) provides additional authority for a bankruptcy court to compel mediation. Under Bankruptcy Rule 7016, Federal Rule 16 applies in adversary proceedings. Although Rule 7016 does not make Federal Rule 16 presumptively applicable in contested matters, Bankruptcy Rule 9014 provides a bankruptcy court with discretion to order that Federal Rule 16(c) applies to such matters.  Accordingly, utilizing its discretion, a bankruptcy court can refer a contested matter to mediation. *See* 8 Norton Bankr. L. & Prac. 3d§ 168:2.

28.     Moreover, Section 105(a) of the Bankruptcy Code also provides authority for the Court to order alternative dispute resolution procedures, such as mediation. Indeed, this Court relied upon Section 105 when it first ordered the parties to mediation in this case. *See, e.g.*, Dkt. No. 912 (ordering mediation pursuant to 11 U.S.C. § 105(a) and the Court's inherent authority to regulate its docket). *See also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995); *In re Sargeant Farms, Inc.*, 224 B.R. 842, 846-47 (Bankr. M.D. Fla. 1998) ("While general reliance of court authority to mandate ADR based on the court's inherent power to control its docket has been debated, rule and statutory authority is now the foundation.") (internal citations and quotations omitted). Accordingly, "it is quite apparent the bankruptcy court

---

bankruptcy courts to employ non-binding ADR procedures, either through the bankruptcy court's own rules or those of the district court. *See* 8 Norton Bankr. L. & Prac. 3d § 168:2.

[16] Subsection (b) of Local Rule 9019 provides for the availability of other alternative dispute resolution methods, including binding arbitration, early neutral evaluation or mini-trial.

has the authority and power to promulgate rules associated with court-annexed mediation and, where necessary, to require the parties to participate in same." *Id.* (citing *Burr, Building Reform From the Bottom Up: Formulating Local Rules for Bankruptcy Court-Annexed Mediation*, 12 Ohio St. J. on Disp. Res. 311 (1997)).

## A. Mediation is in the Best Interests of the Estate

29.     Mediation at this juncture is in the best interests of the estate in several ways.

30.     *First*, mediation has the potential to reduce or eliminate completely the variety of litigation and motion practice that is pending before this Court. There are currently ten (10) related adversary proceedings, and several appeals.

31.     *Second*, mediation has the potential to foster a resolution of what no one can dispute is a complex case. This Court has acknowledged these complexities during various hearings. Moreover, not only does the Debtor engage in a complex business, its management and ownership structure are also complex. The implications of this complex relationship extend further in this chapter 11 case, where the interests of numerous non-debtor third parties are implicated by the Debtor's restructuring, such as third-party investors in the funds managed by the Debtor.

32.     *Third and finally*, mediation has the potential to benefit creditors and other stakeholders. If mediation is successful, creditor recoveries will be expedited. In addition, mediation also has the potential to see the Debtor's business survive in some form, thereby creating jobs for many of those who were previously terminated by the Debtor.

## B. Mediation Will Serve Judicial Economy

33.     Mediation is also justified in the interest of judicial economy.

34.     The Court has frequently (and rightly) commented on the strain of this case on the Court's time and resources. Mr. Dondero certainly understands these concerns. Mr. Dondero and

various entities affiliated with him had a substantial amount of pre-petition involvement with the Debtor. With the abrupt change of management, direction of the Debtor's business, and confirmed plan, these entities have been forced to assert various rights and remedies to protect their interests.

35.     With the number of adversary proceedings, contested matters, and related appeals pending before this Court and others, as well as the sheer number of entities and attorneys involved, there can be no question that a global mediation between the key constituents in this case would serve the interest of judicial economy.

36.     Indeed, the Court has stated that it continues to be "frustrated" "about unproductive ways we all spend our time."[17] During the June 8, 2021 hearing, this Court expressed frustration with the continued intransigence of the parties and the enormous amount of time and burden imposed by the litigation occurring in this case:

> I am going to spend I don't know how many more hours drafting another ruling on a contempt motion, and attorney's fees are through the roof. And, you know, I dangled out there a question I couldn't resist about MGM.
>
> And I will tell you, I mean, someone mentioned about their stomach aching. Personal story, I could hardly sleep the night it became public about the Amazon purchase, because, silly me, maybe, I'm thinking game-changer. This is such potentially a windfall, an economic windfall. Maybe this could be the impetus to make everyone get in a room and say look, we've got this wonderful windfall of money. I don't know how much is owned directly or indirectly by the Debtor of MGM stock. I don't know how much the Debtor manages. I don't know how much, you know, some other entity. I know it's probably spread out in many different entities. But I know, I know because I listen, that one or more of the Highland-managed CLOs has some of this, and I think I read -- remember that HCLOF, which now Highland owns more than 50 percent of, has some of this stock. Right?
>
> *     *     *
>
> I just hoped that there might be something there to change the dynamic of, you know, lawsuit, lawsuit, lawsuit, lawsuit, motion for contempt, motion

---

[17] Tr. of June 8, 2021 hearing, p. 290:11-13.

for contempt.

Tr. of June 8, 2021 Proceedings, pp. 290:11-291:7, 294:4-6.

37.     Mr. Dondero is proposing a mediation in the hope of breaking the cycle of litigation
and motion practice. In his view, Mr. Dondero made multiple, reasonable settlement offers prior
to confirmation, which offers were effectively ignored. With the composition of the Committee
and holders of the majority of the claims now reshuffled,[18] Mr. Dondero contends that another
attempt at mediation is ripe.  While the plan is about to go effective, the Litigation Trust is
preparing to investigate and/or sue each and every "Non Debtor Dondero Related Entity,"
incurring substantial costs along the way.  Before these additional, threatened litigations and
discovery practice get past the point of "no return," Mr. Dondero believes it is reasonable to
attempt mediation once more.

## **CONCLUSION**

For the foregoing reasons, Movant respectfully requests that the Court enter an order
(i) granting this Motion, (ii) compelling mediation as requested herein, (iii) continuing the hearing
on the 2004 Motion and (iv) granting Mr. Dondero such other and further relief to which he may
be justly entitled.

---

[18] The timing and circumstances of Farallon's purchase of the claims, including information that may have been
transmitted in furtherance of such purchases, potentially raise a host of material issues that are not properly addressed
in this pleading.

Dated: August 1, 2021                     Respectfully submitted,


*/s/ Clay M. Taylor*
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

- and -

Michael M. Eidelman (*pro hac vice* pending)
Douglas J. Lipke (*pro hac vice* pending)
Thomas P. Cimino, Jr. (*pro hac vice* pending)
William W. Thorsness (*pro hac vice* pending)
David L. Kane (*pro hac vice* pending)
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 telephone
(312) 609-5005 facsimile
Email: meidelman@vedderprice.com
Email: dlipke@vedderprice.com
Email: tcimino@vedderprice.com
Email: wthorsness@vedderprice.com
Email: dkane@vedderprice.com

**ATTORNEYS FOR JAMES DONDERO**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on August 1, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.


*/s/ Clay M. Taylor*
Clay M. Taylor

# Exhibit 4

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert Loigman (*pro hac vice* pending)
Benjamin I. Finestone (admitted *pro hac vice*)
Jordan Harap (admitted *pro hac vice*)
Alexandre J. Tschumi (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; FRANK WATERHOUSE; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA | Adv. Pro. No. _____<br><br>COMPLAINT AND OBJECTION TO CLAIMS |

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.


1934054211016000000000001
0292

OKADA FAMILY TRUST – EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; SAS ASSET RECOVERY, LTD.; AND CPCM, LLC,

Defendants.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION .................................................................................................1

II.     PARTIES ...........................................................................................................4

III.    JURISDICTION AND VENUE ........................................................................12

IV.   FACTUAL ALLEGATIONS ...........................................................................13

       A.    Dondero Creates HCMLP .....................................................................13

       B.    HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages .........14

       C.    In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ................................................................17

             1.     NexPoint ...................................................................................18

             2.     HCMFA .....................................................................................21

       D.    Dondero Causes HCMLP To Engage In Misconduct That Exposes It To Additional Liability .............................................................................24

             1.     Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry ................................................24

             2.     Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest .....................27

             3.     Dondero And His Accomplices Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS ......................................29

             4.     Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty .............................................30

       E.    Dondero Causes HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ...........................................................................32

       F.    Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP .........................................................................................35

             1.     HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ................................35

             2.     HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ............................................................................................37

             3.     HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ......................38

i

G.     HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ...................40

H.     At All Time Relevant To This Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ...................41

      1.     Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ...................41

      2.     Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ...................42

I.     Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ...................49

      1.     Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ...................49

          (a)     The Fraudulent CLO Holdco Transaction ...................50

          (b)     Fraudulent Distributions ...................53

          (c)     Fraudulent Transfers To Massand ...................59

J.     Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ...................60

K.     Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ...................61

V.     CAUSES OF ACTION ...................62

PRAYER FOR RELIEF ...................129

0235

Plaintiff Marc S. Kirschner (the "<u>Litigation Trustee</u>"), as Litigation Trustee of the Litigation Sub-Trust (the "<u>Trust</u>") established pursuant to the Fifth Amended Plan of Reorganization (the "<u>Plan</u>") of Highland Capital Management L.P. ("<u>HCMLP</u>" or the "<u>Reorganized Debtor</u>") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I.     INTRODUCTION[2]

1.     The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "<u>Dondero Entities</u>"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2.     HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading.  Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities.  The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3.     HCMLP was at the center of Dondero's web:  it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities.  Even when HCMLP's full role was

---

[2]  Capitalized terms not defined in this section are defined later in the Complaint.

hidden—either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4.      In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession.  The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5.      Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized.  The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation.  The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services.  The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6.      In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment.  Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

2

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, and used the proceeds to support yet other Dondero Entities;

- Caused the fraudulent transfer of assets worth at least $100 million out of two HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7.    Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8.    In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9.      In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10.      HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II.      **PARTIES**

11.      Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan. Under the Plan, the Trust was established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, which are defined to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing [excluding] any estate claim or cause of action against any then-current employee of [HCMLP] other than Mr. Dondero." On October 8, 2021, the Claimant

4

Trust established under the Plan confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Complaint.

12. Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his resignation on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October 16, 2019 when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership of, or control over the owners of, HCMLP's limited partnership interests. As set forth below, Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within the Highland web, including the dozens of Dondero Entities referenced herein.

13. Defendant Mark A. Okada is an individual who, upon information and belief, at all times relevant to this Complaint was residing in Dallas, Texas. Okada is the co-founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after which he assumed an advisory role through the end of that year. After Dondero, Okada was the next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited partners. Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14. Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP. At all times relevant to this Complaint, Strand's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

15. Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited partnership. NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited

5

0240

partner. NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the remaining 0.1%. NexPoint and NexPoint GP were both formed on March 20, 2012. NexPoint concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint GP's sole member and president. At all times relevant to this Complaint, NexPoint's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

16.     Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy"). Dugaboy is a grantor trust established under the laws of the state of Delaware. Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees. Dondero is Dugaboy's primary beneficiary. Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees. Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee. In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy. Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9% economic interest in NexPoint. Dugaboy filed multiple proofs of claim in HCMLP's bankruptcy case, which were submitted by Scott in his capacity as trustee of Dugaboy. At all times relevant to this Complaint, Dugaboy's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

6

0241

17.     Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3]  HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest).   Dondero controls, and is the sole stockholder and director of, Strand Advisors XVI, Inc.  Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5]  HCMFA has acknowledged that it is controlled by Dondero.  At all times relevant to this Complaint, HCMFA's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

18.     Defendant Scott is an individual who currently resides in North Carolina.  At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities:  he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd.  Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding.  Scott has testified under oath that Dondero is his "closest friend."  Dondero personally selected Scott as his successor to run the Charitable DAF Fund.  Dondero

---

[3]   HCMFA was originally created by Dondero on February 9, 2009 as Highland Funds Asset Management, L.P. ("HFAM").   On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4]   Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

[5]   Dondero is the Director and President of Highland Capital Management Services, Inc.  Scott Ellington is its Secretary and Frank Waterhouse is its Treasurer.

7

also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. Scott is also the executor of Dondero's will. Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date. Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

19.    Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. At all times relevant to this Complaint, Ellington was a Texas resident.

20.    Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests. At all times relevant to this Complaint, Leventon was a Texas resident.

21.    Defendant Frank Waterhouse ("Waterhouse") was the Chief Financial Officer of HCMLP, and was an HCMLP partner and the Treasurer of HCMLP's general partner, Strand. At all times relevant to this Complaint, Waterhouse was a Texas resident.

22.    Defendant CPCM, LLC ("CPCM") is a Texas limited liability company created in February 2021. Upon information and belief, CPCM was created and owned by Ellington, Leventon, and/or Waterhouse.

8

23.     Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands.  Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021.  At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021.  According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

24.     Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands.  At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director.  DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

25.     Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010.  CLO Holdco is a wholly-owned subsidiary of the DAF.  CLO Holdco filed two proofs of claim in HCMLP's bankruptcy case, which were signed by Scott in his capacity as CLO Holdco's sole director.[6] CLO Holdco has no employees or officers.  According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract).  Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco,

_____

[6] Scott served in that capacity at all times relevant to this proceeding.

9

0244

which would then be rubber-stamped by Scott. At all times relevant to this Complaint, CLO

Holdco's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

26.     As of December 31, 2020, CLO Holdco and the DAF collectively controlled

approximately $260 million in assets. Dondero has testified under oath that he was unaware of

a single investment decision that HCMLP ever recommended to Scott regarding the DAF that

Scott rejected. Likewise, Dondero was unaware of any investment Scott made on behalf of the

DAF that did not originate with HCMLP.

27.     Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a

Delaware nonprofit, nonstock corporation. The directors of Highland Dallas at the time of the

events relevant to this proceeding were Dondero, Scott, and Mary Jalonick. Dondero also acted

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal

office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

28.     Defendant Scott, in addition to being named above in his individual capacity, is

named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the

State of Delaware. According to Get Good's July 9, 2021 disclosure to this Court, Get Good

consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get

Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is

the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's

trustee at all times relevant to this Complaint. Get Good filed a proof of claim in HCMLP's

bankruptcy case, which was submitted by Scott in his capacity as trustee of Get Good.

29.     Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a

statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed

on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from

HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015 and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. Hunter Mountain filed multiple proofs of claim in HCMLP's bankruptcy case, including a proof of claim in the amount of $60,298,739, in connection with alleged setoff rights under a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

30.     Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

31.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas. Okada controls MAP #1, which he created for the benefit of his children.

32.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas. Okada controls MAP #2, which he created for the benefit of his siblings.

11

33.     Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation
that was created in 2002.  Defendant Massand Capital, LLC ("Massand LLC") is a Delaware
limited liability company created in 2014, pursuant to a certificate of incorporation signed by
Leventon.  Massand Inc. received payments from HCMLP between February 4, 2014 and
January 7, 2015.  Massand LLC received payments from HCMLP between February 25, 2015
and August 1, 2019.  Massand Inc. and Massand LLC are referred to collectively herein as
"Massand Capital".

34.     Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created
in 2012, whose principal place of business is Dallas, Texas.  Upon information and belief, SAS
is a litigation funding and management business created by Dondero and Ellington in 2012 and
operated out of HCMLP's headquarters.  SAS, along with its direct and indirect subsidiaries, is
owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic
interests in SAS, respectively.  Upon information and belief, Ellington is the Chief Executive
Officer of SAS.

### III.     JURISDICTION AND VENUE

35.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157
and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition
filed by HCMLP under Chapter 11 of the United States Bankruptcy Code.  *See In re Highland
Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.).  This is a core proceeding
pursuant to 28 U.S.C. § 157(b).

36.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

37.     This Court has personal jurisdiction over the defendants because each of the
Defendants:  (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter
ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business

12

0247

presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

## IV.     FACTUAL ALLEGATIONS

### A.     Dondero Creates HCMLP

38.     HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada.  The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

39.     By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.  As of the Petition Date, HCMLP had three primary business lines:  (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

40.     Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP.  HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management.  Dondero

13

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

41.     As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[7] At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[8]

## B.     HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages

42.     Around 2008, HCMLP's business began to falter, as the financial crisis began to set in. The funds that HCMLP managed faced large losses, followed by substantial redemptions. In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

43.     At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages. In March 2008, HCMLP and its managed funds Highland CDO

---

[7]   A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans. A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations. A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940. A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security. A separately-managed account ("SMA") is a managed investment vehicle that has only one investor. A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries. A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[8]   At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[9] had entered into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The governing agreements required the Fund Counterparties to post collateral based on the mark-to-market value of certain collateralized debt obligations. The value of these assets dropped by more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and claimed that it was owed 100% of its losses—which UBS alleged was as much as $745 million—from HCMLP and the Fund Counterparties.

44.     On February 24, 2009, UBS commenced an action against HCMLP and the Fund Counterparties in New York state court. As amended and consolidated, UBS asserted claims against HCMLP for actual and constructive fraudulent transfer and breach of the implied covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009, HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March 2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

---

[9]   The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and its general partner and as a member of HFP's monitoring committee. HFP's general partner is a wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

45.     Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi.  Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral.   The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi.  On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls.  On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to:  (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

46.     In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action").  The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day.  Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

16

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

47.     Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

**C.     In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

48.     In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

49.     It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

17

0252

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge fund, private equity fund, and retail funds;

- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;

- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and

- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as health care equity advisor.

### 1. NexPoint

50.    NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

51.    Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

52. For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low fee payments. NexPoint continued to reap the vast majority of the generated fees, however.

18

NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**



53. Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-market, and had few to no covenants. NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period. At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

54. Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement. According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]" By May 2017, NexPoint owed HCMLP more than $30 million. Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period. Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

55. Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity with a low coupon rate, no covenants, and no security. HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

56. Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan. *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D.Tex. Jan. 22, 2021). NexPoint has raised a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of

20

0255

Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue.

57. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

### 2. HCMFA

58. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

59. On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[10] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund),

---

[10] On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint. Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF." The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA. HCMLP received no consideration for the transfer. Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed. Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services. Thus, the effect of the transfer was to insert a new sham entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

60.     HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV"). Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA. And HCMLP received no fee in respect of the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds. Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees. If HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

22

0257

**Figure 2.**



61.     Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively).   Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021.   As of the Petition Date, $6.3 million was outstanding on the notes subject to the forbearance agreement.   In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

62.     Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP.   On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy

23

Court to collect on the debt. HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error. As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014 and February 26, 2016, and interest and fees continue to accrue.

### D. Dondero Causes HCMLP To Engage In Misconduct That Exposes It To Additional Liability

63. As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero engaged in other actions that meaningfully harmed HCMLP. This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, HCMLP's Chief Legal Officer and General Counsel Scott Ellington, but conferred no benefit on HCMLP. As described above, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements requiring it to pay hundreds of millions of dollars.

### 1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

64. In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP"). Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions. Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis.

24

Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs. HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees. Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors. In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities. As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

65. By 2016, tensions between Dondero and Terry hit a boiling point. Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs. Terry was the investment manager for the CLOs, and opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

66. On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his

25

0260

contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

67. Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions.

68. Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United State Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland"). Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management

26

0261

contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

69. Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate. Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[11]

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

70. Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively,

---

[11] Dondero's litigation crusade against Terry and Acis continues to date. On May 13, 2021, NexPoint caused one of its managed retail funds, NHF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged. NHF then filed an action in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization. The bankruptcy court declined to issue the order requested by NHF and held that NHF must amend its complaint to comply with the plan injunction. NHF then filed a motion asking the Bankruptcy Court to reconsider its ruling.

"HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington, HCMLP's Chief Legal Officer and General Counsel, were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[12] In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[13]

71. In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

72. Moreover, unbeknownst to HarbourVest, Dondero caused CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned

---

[12] CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

[13] HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees. Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

0263

entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### 3. Dondero And His Accomplices Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS

73. In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties, and its fraudulent transfer claims against HCMLP, could proceed to trial.[14] Shortly thereafter, Dondero and Ellington took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[15] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[16] In or around August 2017, Dondero and Ellington orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of more than $100 million—to Sentinel.

74. The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the first $100 million of liability to UBS. That justification, however, hid the real goal: to drain the Fund Counterparties' assets (but keep them within the control of Dondero and Ellington) and render the Fund Counterparties (and certain related entities) judgment-proof.

---

[14]  UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

[15]  Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies. Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

[16]  In September 2017, Ellington caused Dilip Massand to be appointed as a director of Sentinel.

75.    Moreover, the existence of this purported insurance policy was actively concealed from the Independent Board by Ellington, Leventon, Sevilla, Lucas, and DiOrio.   This concealment caused HCMLP to make factually inaccurate statements to the Bankruptcy Court and incur millions of dollars in additional fees litigating (rather than settling) with UBS.   After the policy was uncovered through the diligence of the Independent Board, CDO Fund made a claim on the policy in March 2021.   Despite CDO Fund's efforts to collect on the policy, Sentinel has refused to make any payments to HCMLP or the Fund Counterparties.   This purported insurance policy was the only such policy Sentinel had issued during its existence.

76.    On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79.   Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

### 4.    Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty

77.    HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees.   After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees.   With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis.   HCMLP contributed assets to HERA, which then distributed

30

0265

proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

78. Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

79. Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs. In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to HERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

80. When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

81. Daugherty then sued HCMLP, HERA, HERA Management, and Dondero in the Delaware Chancery Court. A Vice Chancellor concluded that HCMLP, Dondero, and the other

31

defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

82.     In total, HCMLP suffered approximately $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

**E.     Dondero Causes HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

83.     Dondero also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

32

0267

84.     The peace would not last, however.  On July 5, 2016, the Redeemer Committee
(i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery
Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer
Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had
forfeited any right to indemnification as a result of its failure to distribute proceeds to investors
of various funds; and (iii) commenced an arbitration proceeding (the "<u>Redeemer Arbitration</u>")
against HCMLP alleging that it had engaged in various forms of misconduct in its role as
investment advisor.  After two years of arbitration proceedings, the Redeemer Arbitration
culminated in a nine-day evidentiary hearing in September 2018 that included testimony from
eleven fact witnesses and four expert witnesses.  On March 6, 2019, the arbitration panel issued
an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8
million and total damages (including interest) of $190.8 million.  Ultimately, the panel awarded
ten forms of damages:  (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim
($22,922,608);  (3)  the  Taking  of  Plan  Claims  ($3,277,991);  (4)  the  CLO  Trades  Claim
($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the
Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850);
and (9) the Portfolio Company Award:  ($71,894,891).

85.     The claims that were asserted against HCMLP by the Redeemer Committee
stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero caused
HCMLP to commit.  For example, the "Barclays Claim"—which gave rise to over $30 million
in liability for HCMLP—arose out of Dondero causing HCMLP to transfer Barclays' limited
partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after
the Redeemer Committee had already refused to approve that transfer.  In so doing, Dondero

33

0268

caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

86.     Dondero's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company"). Some of the Portfolio Company's stock was owned by the Crusader Funds. Dondero caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that he controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in Portfolio Company as his fiduciary duties required. Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and also to pay pre-judgment interest, which brought the total claim to $71,894,891.

87.     Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts in early 2016. The arbitration panel ruled that as a consequence of Dondero's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

0269

88. The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019. HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

## F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP

89. As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP. As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

90. Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct. HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

### 1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct

91. On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[17] The UBS claim sought "damages arising from HCMLP's breach of the

---

[17] The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

35

0270

implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

92.    In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting. In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076. Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

93.    Subsequently, HCMLP and UBS engaged in settlement discussions and mediation. Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing. This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP. But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

94.    While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring. Acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets. The Independent

36

Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

95.     When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS.  As a result, the parties reopened settlement discussions.  Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim.  In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer.  The Bankruptcy Court approved the UBS settlement on May 27, 2021.

## 2.     HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct

96.     On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue."  Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees.  Faced with this potential liability, HCMLP entered into a settlement whereby, among other things:  (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had

37

determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[18] The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

97.     Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets. Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account. The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP. Pursuant to that settlement, Acis received a $23 million allowed claim

---

[18] Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award. Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[19] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

98.     On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "HarbourVest Proofs of Claim") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP:  (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

99.     HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million.  Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim.  These value of the HCLOF interests

---

[19]    Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

### G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy

100.    The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy.  But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued.  As Dondero himself has acknowledged under oath, the economic recession of 2008, and the litigation commenced against HCMLP shortly thereafter, left HCMLP in an insolvent state from which HCMLP was still struggling to emerge in 2012. Indeed, valuations based on contemporaneous projections prepared on HCMLP's behalf and conservative valuations of HCMLP's contingent litigation liabilities show that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in 2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value.

101.    The creation of the lifeboats and the subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise.  HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company.  HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation.  While HCMLP's financial condition began to improve in 2013 due largely to successful proprietary trading and overall improving market conditions, those gains were largely dissipated in 2015 due to Dondero's reckless trading.

40

102.     However, by 2015, the company was again firmly insolvent, inadequately capitalized and/or unable to pay its debts as they came due, in large part because its CLOs were generating diminishing returns, and the company was earning only minimal fees for servicing other Dondero Entities rather than generating new business of its own, while continuing to bear significant employee expenses.  HCMLP's financial condition deteriorated further between 2016 and 2019, as additional litigation claims were levied against the company, and it was forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

## H.     At All Time Relevant To This Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit

103.     At all times relevant to this Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes.  Dondero treated the elaborate corporate web he had created as a series of integrated entities that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

### 1.     Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand

104.     Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker.  Dondero made every material business, operational, management, and financial decision for HCMLP.  Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled.  Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020.  For eight years he was also its secretary and only officer.

0276

105. Strand did not even attempt to maintain the pretenses of observing corporate formalities. As an initial matter, Strand did not hold regular board meetings. Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date. This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

106. Although Strand's bylaws require annual meetings of stockholders, based on the Litigation Trustee's review of materials available to him, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005. The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

107. Dondero was the only officer of Strand between 1993 and 2001. Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance." Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

## 2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form

108. As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was directly or indirectly operated and controlled by Dondero for his own personal benefit. Dondero

42

0277

directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[20] to carry out his will. As high-level HCMLP employees have testified under oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

109. Dondero managed the entities as a single integrated unit. Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made. Indeed, as far back as 2011, company projections provided to the valuation advisor CBiz Valuation Group projected negative operating income for HCMLP.

110. Dondero also pillaged HCMLP for the benefit of other entities he created or controlled. In or around 2013, the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland Capital Brasil Gestora de Recursos). With Dondero's approval, HCM AG acquired Brasilinvest Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016.

---

[20] *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

43

However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or Dugaboy.

111.    Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year.  At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests.  For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper.  Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good.

112.    Indeed, notwithstanding the fact that Schroth was nominally an HCMLP employee, she subordinated the interests of HCMLP to Dondero's personal interests.  For example, following the commencement of HCMLP's bankruptcy, Schroth instructed Dondero's sister, Nancy, to send a letter in her capacity as a trustee of Dugaboy instructing a Swiss entity, Highland Capital AG, to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf.  Schroth even ghost-wrote a letter for Nancy Dondero to send to Highland Capital AG authorizing this theft.

113.    Schroth was not an anomaly.  Several other professionals on HCMLP's payroll dedicated material amounts of their working time to performing work in connection with Dondero's personal businesses, investments, and homes.  Likewise, Dondero frequently instructed HCMLP's legal department to perform legal services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

114.    Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web.  Employees shared the same office space in HCMLP's headquarters.  Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.  Moreover, when employees of HCMLP performed services for other Dondero entities, they sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand.  In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all.  For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[21]  Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

115.    Additionally, Dondero would delegate authority to his loyalists irrespective of their titles or roles.  For example, Dondero delegated decision-making authority for Acis to

---

[21]    Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS. SAS did not compensate any of these HCMLP employees for their work for SAS. Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated:  "Thank you for calling SAS Asset Recovery.  For reception press 0.  For Scott [Ellington], press 1.  For Dilip [Massand], press 2. For JP [Sevilla], press 3.  For Tabor [Pittman, former HCMLP Associate GC], press 4.  For Katie [Irving], press 5.  For Isaac [Leventon], press 6.  Thanks and have a good day."

0280

Ellington, notwithstanding that he was not an officer, director, or employee of Acis. And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

116. Dondero would also use HCMLP as his own personal piggy-bank (in addition to using HCMLP as NexPoint's and HCMFA's piggy-bank, as described above). For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes. Dondero remains obligated on three of the demand notes and maintains an outstanding principal balance of approximately $9 million. HCMLP has demanded payment on all of the outstanding demand notes, but to date, Dondero has failed to make any repayments on that debt.[22]

117. Dondero also effectively paid himself and Okada distributions from HCMLP through other Dondero Entities, including HCMS. Between 2013 and 2017, HCMS issued dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between May 2017 through 2020, HCMS issued four additional promissory demand notes with an aggregate face amount of $900,000. Frequently, these notes functioned as disguised distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by a "loan" from HCMS to Dondero and Okada. As with other intercompany notes between HCMLP and other Dondero Entities, these notes had minimal covenants. Moreover, Dondero caused HCMLP to issue these loans to HCMS with minimal interest.

---

[22] On January 1, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on these notes. *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj (Bankr. N.D. Tex. Jan. 22, 2021). Dondero has raised a series of frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's sister—agreed to forgive the notes as part of Dondero's compensation. As of December 3, 2020, Dondero owed $9,004,013 in past-due principal and interest on the notes.

118.    To take yet another example, Dondero exploited HCMLP's employees and capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade HCMLP's creditors.[23]   HCRE pursued financial and real estate investments, failing to pay HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment.   As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

119.    As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA.   Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust.   CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid.   The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats.   An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA managed funds and

---

[23]   HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by Ellington).

entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

120.    Dondero did not bother to distinguish between himself and HCMLP. After Dondero resigned from HCMLP, he continued using his HCMLP email account and continued working out of HCMLP's headquarters until December 2020. When the Court entered an order restraining Dondero from communicating with HCMLP employees, Dondero flouted the order, including by communicating with Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-related document production requests, even though those documents were always kept on HCMLP's computer system. Likewise, a temporary restraining order entered by this Court prohibited Dondero from participating in, or encouraging others to participate in, any action that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery ("Seery"), regarding the disposition of HCMLP assets. Nevertheless, Dondero did so multiple times, including by contacting various employees and instructing them to act in a manner that was inconsistent with Seery's directions.

121.    Dondero evinced no respect for HCMLP as an entity separate and apart from himself. Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to pursue claims benefitting HCMLP. In addition, Dondero interfered with document productions of HCMLP and trespassed on HCMLP's property.

122.    Separately, in Court orders entered in January 2020 and July 2020, the Court included "gatekeeper" provisions that prevented parties from suing the Independent Board, Seery, and their agents (among others), unless they sought permission from the bankruptcy court. Dondero and his affiliated entities flouted this order, too, and this Court subsequently

48

held Dondero, the DAF, CLO Holdco, Mark Patrick, and Sbaiti & Co. (counsel to the DAF and CLO Holdco) in contempt. As this Court observed, Dondero "sparked th[e] fire" to bring actions in the district court in violation of the Bankruptcy Court's order.

123. Dondero also used HCMLP and its employees for the benefit of his personal trusts. For example, as the control person for HCMLP, Dugaboy, and Get Good, Dondero treated HCMLP, its employees, and its resources as available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved in creating, managing, and accounting for Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources. And, Dondero is now causing Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Nancy Dondero, caused HCMLP to forgive the notes owed to HCMLP by various Dondero Entities as compensation to Dondero.

## I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP

### 1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities

124. Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves. As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

49

(a)     The Fraudulent CLO Holdco Transaction

125.     On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets through a series of related assignments worth approximately $24 million or potentially more (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

126.     Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach.  Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction.  Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation.  Accordingly, Dondero caused Get Good to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did.  Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco.  The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

127.     The Transferred CLO Holdco Assets consisted of:   (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-

50

0285

managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer were collectively valued at $12,625,395.44 and worth potentially more (the "Crusader Interests"). The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good. Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

128.    Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note. While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets. The interest rate on the Dugaboy Note was a paltry 2.75%. There was no security interest provided in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections. No payments of principal or interest were required on the note until 2036. And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between

51

0286

Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

129. Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation by Scott in his capacity as trustee of Get Good. Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation. Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this document as managing member of DAF GP. As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the requisite consent documents on behalf of each entity, in his capacities as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good, DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without performing any independent analysis.

130. The structure of the CLO Holdco Transaction is set forth below in Figure 3.

0287

**Figure 3.**



(b)     <u>Fraudulent Distributions</u>

131.    Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between 2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the detriment of HCMLP's creditors.  These distributions were made at a time when HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

132.    Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions.  Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through

53

certain trusts. Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests. As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand. The distributions made after February 28, 2015 were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

133.    Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2. As such, the distributions made to Okada between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2. The distributions to Okada made after February 28, 2015 were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

134.    On or around April 9, 2010, HCMLP made "distributions" to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and $405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").

135.    On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

136.    On or around May 3, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 3, 2011 Distributions").

0289

137.     On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

138.     On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

139.     On or around February 23, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 23, 2012 Distributions").

140.     On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

141.      On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

142.     On or around April 30, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 30, 2013 Distributions").

143.     On or around February 28, 2015, HCMLP made distributions to Dondero in the amount of $2,850,000, and to or for the benefit of Okada, MAP #1, and MAP #2,[24] in the

---

[24]  At the time of these distributions, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children held economic interests in HCMLP.  HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

amounts of $738,217.40, $148,247.82, and $63,534.78, respectively (the "February 28, 2015 Distributions").

144.    On or around September 30, 2015, HCMLP made distributions to Dugaboy and Strand in the amounts of $16,005,159 and $119,820, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $4,176,762, $838,780, and $359,480, respectively (the "September 30, 2015 Distributions").

145.    On or around December 8, 2015, HCMLP made in-kind distributions of shares of the company Ocean Rig UDW, Inc. (ORIG), which had a value of $1.51 per share at the time of the distribution.  These in-kind distributions were made to Dugaboy in the amount of 4,813,132 shares valued at $7,267,829.32, and to or for the benefit of Okada, MAP #1, and MAP #2 in the amounts of 1,246,710 shares valued at $1,882,532.10; 250,336 shares valued at $378,052.66; and 107,301 shares valued at $162,024.51, respectively (the "December 8, 2015 In-Kind Distributions").

146.    On or around December 31, 2015, HCMLP made distributions to Dugaboy and Strand in the amounts of $16,005,159 and $119,820, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $4,176,762, $838,780, and $359,480, respectively (the "December 31, 2015 Distributions").

147.    On or around July 31, 2016, HCMLP made distributions to Hunter Mountain,[25] Dugaboy, and Strand in the amounts of $1,600,000, $3,001, and $4,033, respectively, and to or

---

[25]    In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction").  The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain.  Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance

56

for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $783, $158, and $68, respectively (the "July 31, 2016 Distributions").

148.    On or around December 31, 2016, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 31, 2016 Distributions").

149.    On or around January 31, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $5,401, $1,087, and $466, respectively (the "January 31, 2017 Distributions").

150.    On or around February 28, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 28, 2017 Distributions").

151.    On or around June 30, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 30, 2017 Distributions").

152.    On or around December 31, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16,

---

accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

0292

respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 31, 2017 Distributions").

153.    On or around March 31, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 31, 2018 Distributions").

154.    On or around December 31, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 31, 2018 Distributions").

155.    On or around March 31, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55, and $156.66, respectively (the "March 31, 2019 Distributions,"  and together with the April 9, 2010 Distributions, April 13, 2011 Distributions, May 3, 2011 Distributions, September 13, 2011 Distributions, November 25, 2011 Distributions, February 23, 2012 Distributions, February 29, 2021 Distributions, April 10, 2012 Distributions, April 30, 2013 Distributions, February 28, 2015 Distributions, September 30, 2015 Distributions, December 8, 2015 In-Kind Distributions, December 31, 2015 Distributions, July 31, 2016 Distributions, December 31, 2016 Distributions, January 31, 2017 Distributions, June 30, 2017 Distributions, December 31, 2017 Distributions, March 31, 2018 Distributions, December 31, 2018 Distributions, March 31, 2019 Distributions, the "HCMLP Distributions").

58

156.     All of these distributions were made at a time when HCMLP was insolvent and as part of a scheme to, transfer HCMLP's value to Dondero and Okada and divert value away from HCMLP's current and potential future creditors.  The March 31, 2019 Distributions, which were made shortly after the arbitration panel awarded the Redeemer Committee over $190 million, were the final distributions made by HCMLP.  The distributions ceased at that time— the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c)     Fraudulent Transfers To Massand

157.     HCMLP also made payments of at least $519,000 per year to Massand Capital from November 2014 through 2019.  On January 1, 2014, HCMLP entered into a one-year consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses.  Then, on January 5, 2015, HCMLP entered into a consulting agreement (together, the "Massand Consulting Agreements") on the same terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses.  In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

158.     Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP.  Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

0294

159.    The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman.  Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

160.    Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero.  The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[26]  As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

161.    Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

J.    **Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

162.    HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232").  In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona for

---

[26]    In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

$8,687,245.15. The proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

163. On March 2, 2018, Wick Phillips disbursed $4,510,000 to HCMLP out of the escrow account, $2,977,245.15 less than HCMLP was due. On information and belief, Dondero and Ellington directed Wick Phillips to withhold these proceeds in a scheme to funnel the money to themselves through shell companies they owned in the Cayman Islands. Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder to Maple FS, a so-called fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

## K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction

164. HCMLP employees other than Dondero also engaged in self-interested transactions and schemes involving HCMLP.

165. In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank, DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement"). The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington, Leventon, and Waterhouse, loyal to Dondero during the bankruptcy.

166. Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington, Leventon, and Waterhouse would receive approximately $17 million through pass-

through entities that they created and owned over the course of two years. When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Waterhouse's and Leventon's pass-through entities, FHCT Consulting, LLC ("FHCT") (owned and controlled by Waterhouse) and Clairmont Holdings, LLC ("Clairmont") (owned and controlled by Leventon). Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and FHCT.

167. After the Petition Date, Dondero and Waterhouse surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon. These payments were made to compensate Waterhouse, Ellington, and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Indeed, Waterhouse, Ellington, and Leventon did not disclose these payments to the Independent Board.[27]

## V.    CAUSES OF ACTION

### COUNT I
**Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

168. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

---

[27] On September 21, 2021, HCMLP filed a motion under 11 U.S.C. §§ 105(a) and 502(j) seeking to disallow in its entirety Waterhouse's claim that was previously resolved pursuant to that *Senior Employee Stipulation and Tolling Agreement Extending Statutes of Limitation*, dated as of January 20, 2021 (Docket No. 1811-13) based on, among other things, these payments. *See Motion of the Reorganized Debtor to Disallow Claim of Frank Waterhouse Pursuant to Bankruptcy Code Section 502* (Docket No. 2857) (the "Waterhouse Motion").

169.    As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 3, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 23, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 30, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| February 28, 2015 Distributions | $2,850,000.00 | N/A | N/A | $950,000.00 | | | N/A |
| September 30, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| December 8, 2015 In-Kind Distributions | N/A | N/A | $7,267,829.32 | $1,882,532.10 | $378,052.66 | $162,024.51 | N/A |
| December 31, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| July 31, 2016 Distributions | N/A | $1,600,000.00 | $3,001.00 | $783.00 | $158.00 | $68.00 | $4,033.00 |
| December 31, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |
| January 31, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |

0298

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| February 28, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 30, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 31, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 31, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 31, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 31, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $57,553,053.88 | $36,032,322.97 | $39,345,721.84 | $32,266,078.94 | | | $330,428.08 |

170.    At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

171.    HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above.  Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

172.    Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith.  To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered

64

balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due. Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

173. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

174. Each HCMLP Distribution is voidable as a constructively fraudulent transfer. Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT II
### Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

175. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

176. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

0300

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 3, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 23, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 30, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| February 28, 2015 Distributions | $2,850,000.00 | N/A | N/A | $950,000.00 | | | N/A |
| September 30, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| December 8, 2015 In-Kind Distributions | N/A | N/A | $7,267,829.32 | $1,882,532.10 | $378,052.66 | $162,024.51 | N/A |
| December 31, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| July 31, 2016 Distributions | N/A | $1,600,000.00 | $3,001.00 | $783.00 | $158.00 | $68.00 | $4,033.00 |
| December 31, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |
| January 31, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 28, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| June 30, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 31, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 31, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 31, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 31, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $57,553,053.88 | $36,032,322.97 | $39,345,721.84 | $32,266,078.94 | | | $330,428.08 |

177.     Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

178.     To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     Dondero and Okada were insiders of HCMLP;

(b)     before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

67

0302

(c)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d)     HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e)     at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f)     The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g)     Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h)     Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

68

179. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

180. Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT III
### Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act
#### *(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

181. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

182. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

183. Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and  who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

184. As set forth below, between December 31, 2016 and the Petition Date, HCMLP made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal Distributions").

69

| | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |

185.     Strand, Hunter Mountain, and Dugaboy knew that HCMLP made the Illegal Distributions at a time that its liabilities exceeded the fair value of its assets. As set forth herein and in the counts below, each of Strand, Hunter Mountain, and Dugaboy were the alter egos of Dondero. Even if Strand, Hunter Mountain, or Dugaboy were not the alter egos of Dondero, they would be imputed with Dondero's knowledge. Dondero was the sole owner of Strand. Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy trust (among others). Through Hunter Mountain, Dondero continued to receive the economic benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

186.     Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

70

## COUNT IV
## Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme
*(Against Dondero and Strand)*

187.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188.    During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner.  Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

189.    Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA.  Pursuant to the scheme, the lifeboats utilized HCMLP's employees to perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly.  As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services.  The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

190.    Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

191.    Strand was dominated and controlled by its sole owner, Dondero.  Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled.  As such, Dondero appeared on both sides of the agreements

71

0306

and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

192.    The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date.  Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

193.    HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared services and other agreements.  Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits.  Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

194.    Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law.  Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

## COUNT V
### Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities
*(Against Dondero, Strand, Ellington, and Leventon)*

195.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

0307

196.     During all periods relevant to the allegations set forth herein:  (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

197.     Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP.  In total, these breaches resulted in more than $350 million in allowed claims against HCMLP.  But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts.

198.     **Liabilities to UBS.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS.  Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion.  Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

199.     Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Dondero and Ellington caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount

73

0308

of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington. Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

200. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

201. **Liabilities to Acis.** Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry. As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP. When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

202. Dondero then embarked on a crusade to ensure Terry would not collect from Acis. In connection therewith, Dondero acted through HCMLP to, among other things: (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the

retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

203.    In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

204.    Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award.  The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role.  Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a

75

scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

205.  **Liabilities to HarbourVest.**  Dondero also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest.  Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO HoldCo for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that he was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment.  In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead surreptitiously caused CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash.  Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP.  But for Dondero's conduct, HCMLP would not have incurred the foregoing liabilities.  As a result of Dondero's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

206.  **Liabilities to Crusader Funds.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.  Among other things, Dondero, Ellington, and Leventon caused HCMLP to:  (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that

76

transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (3) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

207.    Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Strand, Ellington, and Leventon. For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's, and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy. To date, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy. But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

0312

208.    In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

### COUNT VI
### Declaratory Judgment That Strand Is Liable For HCMLP's Debts
### In Its Capacity As HCMLP's General Partner
*(Against Strand)*

209.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

210.    Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners."  Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners."  *Id.*

211.    Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

212.    During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP.  Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

213.    Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

## COUNT VII
## Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego
### *(Against Dondero)*

214.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

215.    Between the formation of Strand and the Petition Date, Dondero dominated and controlled Strand and was its sole equity owner.  Dondero was the only officer of Strand between 1993 and 2001.  Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero.  Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance."  Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

216.    Strand did not observe corporate formalities.  Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting.  Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

217.    Strand did not comply with its own bylaws, which require annual meetings of stockholders.

218.    Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action.  Based on the Litigation Trustee's review of documents, between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

79

0314

219.     Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero was able to dominate and control HCMLP, while seeking to insulate from HCMLP's liabilities, which were frequently the direct result of Dondero's own wrongdoing. As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

### COUNT VIII
### Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts In Their Capacities As HCMLP's Alter Ego
#### *(Against Dondero and Strand)*

220.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

221.     Dondero, both through Strand and as an officer of HCMLP, dominated and exercised total control over HCMLP from its formation through the Petition Date. Dondero had total decision-making authority and governed HCMLP by decree—notwithstanding the existence of Strand (itself a sham entity) and the terms and obligations imposed by HCMLP's limited partnership agreement. HCMLP was a mere instrumentality of Dondero, and HCMLP had no independence and could not exercise any business discretion separate and apart from Dondero.

222.     Strand, like myriad entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

223.     Dondero failed to observe corporate formalities with regard to HCMLP. Indeed, he did not distinguish between HCMLP and his personal interests and businesses. Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP. For example, Dondero caused HCMLP to employ individuals notwithstanding that their role was to

80

serve Dondero personally. Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

224. Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

225. Dondero caused HCMLP's employees and resources to be used for his lifeboat businesses as part of his fraudulent scheme to siphon value from HCMLP to other entities he owned and controlled. In connection with these schemes, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates. In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees. The purpose and effect of this scheme was to cause HCMLP to provide the employees and infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

226. Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero Entities other than HCMLP.

227. Dondero, both through Strand and as HCMLP's President and CEO, caused HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars

0316

in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

228.    By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP and other Dondero Entities "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own contractual and fiduciary obligations resulted in multiple adverse awards, including the $190 million arbitration award that caused HCMLP to file for bankruptcy.

229.    Dondero wielded his control over his web of entities to orchestrate intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer $24 million or potentially more worth of assets through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

230.    As the alter egos of HCMLP, Dondero and Strand should be held liable for the full amount of HCMLP's obligations.

## COUNT IX
### Declaratory Judgment That NexPoint and HCMFA Are Liable For The Debts Of HCMLP, Strand, And Dondero As Their Alter Egos
*(Against NexPoint and HCMFA)*

231.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

232.    NexPoint and HCMFA were created as facades of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled. Pursuant to the scheme, Dondero sought to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

233.   NexPoint was owned and controlled by Dondero through Dugaboy and NexPoint GP.   Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP.   NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.

234.   For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees.   Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

235.   Dondero used HCMLP's resources to establish NexPoint and perpetrate his scheme to extract value from HCMLP.   Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its owner, Dugaboy.   Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy.   Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.   Meanwhile, as of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero following a payment default that occurred January 2021.   Dondero exercised complete control over the terms of the note and whether it would be repaid, and caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief.

236.    Likewise, HCMFA was owned by Dondero and Okada through a series of entities owned and controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which was wholly-owned by Dondero.   HCMFA was effectively a shell entity that was created to replace HCMLP as the new investment manager for open-ended retail investment funds.  To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

237.    Dondero used HCMLP's resources to support HCMFA as well.  Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million and entered into multiple forbearances on HCMFA's debts, and in May 2019 HCMFA borrowed an additional $7.4 million from HCMLP that it failed to repay.  Dondero was on both sides of those agreements, and used HCMLP in order to establish HCMFA as a successor to HCMLP.

238.    As such, NexPoint and HCMFA are the alter egos of each of HCMLP, Dondero, and Strand, and the Court should pierce the corporate veil to hold NexPoint and HCMFA liable for the debts of each of HCMLP, Dondero, and Strand.

### COUNT X
### Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero In Their Capacities As Dondero's Alter Ego
*(Against Dugaboy)*

239.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240.    Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and HCMLP.  Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP.  Dondero used HCMLP

employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data.

241.     Dondero dominated and controlled Dugaboy.  Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

242.     Under the terms of Dugaboy's trust agreement, Dondero also has the power to remove trustees without cause—leverage that allowed him to control what transactions Dugaboy was involved in.

243.     As such, Dugaboy is the alter ego of Dondero, and the Court should pierce the corporate veil to hold Dugaboy liable for the debts of each of HCMLP, Dondero, and Strand.

**COUNT XI**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

244.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

245.     On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds").  Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

246.     HCMLP received less than reasonably equivalent value in connection with the novation agreement.  Prior to the transfer, HCMLP received management and advisory fees in

85

return for the services that its employees performed for the Transferred Funds. After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

247.    At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

248.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

249.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XII
### Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law
*(Against HCMFA and NexPoint)*

250.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

0321

251.   On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds.  Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

252.   Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)   Dondero was an insider of HCMLP and HCMFA;

(b)   before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)   HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d)   at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)   Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in

87

0322

order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

(f)     HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

253.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

254.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XIII
### Successor Liability
*(Against HCMFA and NexPoint)*

255.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

256.    HCMFA and NexPoint each were mere continuations of HCMLP.  Dondero caused each of HCMFA and NexPoint to perform the same investment and advisory services as HCMLP, using HCMLP's employees, in order to service HCMLP's managed funds. HCMFA and NexPoint were dependent on HCMLP employees and personnel.

257. HCMLP, HCMFA, and NexPoint were each dominated and controlled by Dondero. Under his common direction, there was continuity of management, personnel, physical location, assets, and general business operations between HCMLP, on one hand, and HCMFA and NexPoint, on the other hand. After HCMFA and NexPoint were created, HCMLP ceased launching any new RIC or real estate investment funds. HCMFA and NexPoint took over these aspects of HCMLP's business such that there was uninterrupted continuation of normal business operations, including new fund launches, generating substantial fee income and AUM growth.

258. As such, HCMFA and NexPoint are liable for HCMLP's debts as the successors to HCMLP.

## COUNT XIV
### Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes
*(Against Dondero, Strand, Ellington, and Okada)*

259. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

260. Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned. Likewise, Dondero and Ellington oversaw and approved the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

261. Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return

89

0324

for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

262.    Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

263.    As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at a time that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

264.    Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

265.    By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

**COUNT XV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing**
**Participation in Breach of Fiduciary Duty under Texas Law**
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco,*
*DAF Holdco, DAF, Get Good, Highland Dallas)*

266.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

267.    NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand.  NexPoint and HCMFA were each dominated and controlled by Dondero.  As such, each of NexPoint and HCMFA knowingly participated in their breaches

90

of their fiduciary duties to HCMLP.  NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

268.    SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers.  SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers.  SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP.  The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

269.    Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas— knowingly participated in the scheme to transfer $24 million or potentially more of assets to CLO Holdco in exchange for a note worth significantly less than the transferred assets.  Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction.  Moreover, Scott dutifully executed the necessary documentation in order to cause

91

the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

**COUNT XVI**
**Civil Conspiracy to Breach Fiduciary Duties Under Texas Law**
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

270.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

271.    Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors.

272.    Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled.  NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP.  SAS received valuable services from Massand while HCMLP bore the expense.  Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

273.    Ellington and Leventon understood that their conduct was directed at enriching Dondero at the expense of HCMLP, and each of them were compensated by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation. NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise

92

0327

understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities. Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

274. In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

    (a)    Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties. NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

    (b)    Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from

the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c)     Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO HoldCo for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—consciously participated in the scheme to transfer $24 million or potentially more of assets to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

275.    Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions. The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with

94

0329

Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

## COUNT XVII
### Tortious Interference with Prospective Business Relations
*(Against Dondero, NexPoint, and HCMFA)*

276.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

277.     Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero.  The "lifeboats," which included NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

278.     But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

279.     By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP.  In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA.  NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

280.     Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by

NexPoint and HCMFA. Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

281. HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

**COUNT XVIII**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets
as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550
and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good,
and Highland Dallas Foundation)*

282. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

283. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were worth approximately $24 million or potentially more. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

284. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

285. Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

0331

286.    Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

287.    Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco.  Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco.  Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

288.    Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction.  Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

289.    At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

0332

290. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

291. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

292. The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIX**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets**
**as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550**
**and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good,*
*and Highland Dallas Foundation)*

293. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

294. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were worth $24 million or potentially more. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

295. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO

Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

296.    After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco. Dondero effected each transfer through his direct or indirect control of each of these entities.

297.    Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP;

(b)    Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c)    before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d)    at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

99

0334

(f)     The purported consideration for the Transferred CLO Holdco Assets, the

Dugaboy Note, was worth less than the reasonably equivalent value of the

Transferred CLO Holdco Assets, and replaced HCMLP's liquid or

liquidating assets with an illiquid, private loan on below-market terms, the

repayment of which was subject to Dondero's control.

298.    None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably

equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO

Holdco Assets in good faith.

299.    At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO

Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO

Holdco for less than reasonably equivalent value.

300.    The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer.

Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred

CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and

Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose

benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively**
**Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

301.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

302.    On January 5, 2015, HCMLP entered into a consulting agreement with Massand

LLC.  Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands

of dollars per month.

100

303.     HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value).  Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

304.     At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

305.     HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

**COUNT XXI**
**Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital)*

306.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

307.     On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc.  On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

308.     Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

    (a)     Dondero was an insider of HCMLP;

    (b)     Dondero was an insider of SAS;

101

(c)    Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d)    before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(e)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f)    at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g)    Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

309.    HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

# COUNT XXII

## Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law
### *(Against Massand Capital, SAS, Dondero, and Ellington)*

310.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

311.     HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 7, 2015 | $38,054 | May 1, 2017 | $57,861 |
| February 25, 2015 | $47,748 | June 1, 2017 | $60,814 |
| March 3, 2015 | $54,954 | July 3, 2017 | $51,974 |
| March 31, 2015 | $53,261 | August 1, 2017 | $58,074 |
| May 5, 2015 | $47,531 | September 5, 2017 | $50,371 |
| June 2, 2015 | $51,328 | October 2, 2017 | $53,016 |
| June 30, 2015 | $48,532 | November 1, 2017 | $59,971 |
| August 5, 2015 | $59,856 | December 1, 2017 | $56,031 |
| September 1, 2015 | $57,776 | January 2, 2018 | $52,894 |
| September 29, 2015 | $48,376 | February 1, 2018 | $51,378 |
| November 2, 2015 | $50,890 | March 1, 2018 | $54,396 |
| December 1, 2015 | $48,671 | April 3, 2018 | $54,538 |
| January 4, 2016 | $57,197 | May 1, 2018 | $55,852 |
| February 1, 2016 | $51,343 | June 1, 2018 | $55,093 |
| March 1, 2016 | $61,857 | July 2, 2018 | $64,516 |
| April 1, 2016 | $50,081 | August 1, 2018 | $56,539 |
| May 2, 2016 | $47,801 | September 4, 2018 | $53,749 |
| May 10, 2016 | $6 | October 1, 2018 | $52,537 |

103

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| June 2, 2016 | $52,970 | November 1, 2018 | $53,278 |
| July 1, 2016 | $60,029 | December 3, 2018 | $52,219 |
| August 2, 2016 | $47,402 | January 2, 2019 | $47,812 |
| September 1, 2016 | $50,457 | February 1, 2019 | $51,437 |
| October 4, 2016 | $55,668 | March 1, 2019 | $51,156 |
| November 1, 2016 | $53,199 | April 2, 2019 | $54,063 |
| December 1, 2016 | $51,901 | May 1, 2019 | $55,359 |
| January 3, 2017 | $49,644 | June 3, 2019 | $56,470 |
| February 1, 2017 | $55,691 | July 1, 2019 | $54,878 |
| March 3, 2017 | $47,929 | August 1, 2019 | $54,979 |
| April 3, 2017 | $57,563 | | |
| | | Total | $2,988,970 |

312.    HCMLP did not receive any consideration in exchange for its payments to Massand Capital.  The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

313.    Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero.  As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

314.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

315.    At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or

0339

reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

316.    The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXIII
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

317.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

318.    On January 5, 2015, HCMLP entered into a fraudulent consulting agreement, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| January 7, 2015 | $38,054 | May 1, 2017 | $57,861 |
| February 25, 2015 | $47,748 | June 1, 2017 | $60,814 |
| March 3, 2015 | $54,954 | July 3, 2017 | $51,974 |
| March 31, 2015 | $53,261 | August 1, 2017 | $58,074 |
| May 5, 2015 | $47,531 | September 5, 2017 | $50,371 |
| June 2, 2015 | $51,328 | October 2, 2017 | $53,016 |
| June 30, 2015 | $48,532 | November 1, 2017 | $59,971 |
| August 5, 2015 | $59,856 | December 1, 2017 | $56,031 |
| September 1, 2015 | $57,776 | January 2, 2018 | $52,894 |
| September 29, 2015 | $48,376 | February 1, 2018 | $51,378 |

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| November 2, 2015 | $50,890 | March 1, 2018 | $54,396 |
| December 1, 2015 | $48,671 | April 3, 2018 | $54,538 |
| January 4, 2016 | $57,197 | May 1, 2018 | $55,852 |
| February 1, 2016 | $51,343 | June 1, 2018 | $55,093 |
| March 1, 2016 | $61,857 | July 2, 2018 | $64,516 |
| April 1, 2016 | $50,081 | August 1, 2018 | $56,539 |
| May 2, 2016 | $47,801 | September 4, 2018 | $53,749 |
| May 10, 2016 | $6 | October 1, 2018 | $52,537 |
| June 2, 2016 | $52,970 | November 1, 2018 | $53,278 |
| July 1, 2016 | $60,029 | December 3, 2018 | $52,219 |
| August 2, 2016 | $47,402 | January 2, 2019 | $47,812 |
| September 1, 2016 | $50,457 | February 1, 2019 | $51,437 |
| October 4, 2016 | $55,668 | March 1, 2019 | $51,156 |
| November 1, 2016 | $53,199 | April 2, 2019 | $54,063 |
| December 1, 2016 | $51,901 | May 1, 2019 | $55,359 |
| January 3, 2017 | $49,644 | June 3, 2019 | $56,470 |
| February 1, 2017 | $55,691 | July 1, 2019 | $54,878 |
| March 3, 2017 | $47,929 | August 1, 2019 | $54,979 |
| April 3, 2017 | $57,563 | | |
| | | Total | $2,988,970 |

319. Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

    (a)    Dondero was an insider of HCMLP and Massand Capital;

    (b)    before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d) at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

(f) The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

320. The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

0342

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*(Against Hunter Mountain and Rand)*

321.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

322.    On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

323.    Rand is a guarantor on the Hunter Mountain Note.

324.    Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

325.    Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

326.    On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain Note are immediately due and payable.  As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

327.    The Hunter Mountain Note is currently in default.  Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

## COUNT XXV
### Conversion
*(Against Dondero and Ellington)*

328.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

329.    In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

330.    On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account.  The Remaining HE Capital 232 Proceeds, worth approximately $2.98, were never disbursed to HCMLP.

331.    HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

332.    The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

333.    Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands.  Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to Maple FS, a so-called fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

334.    Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

## COUNT XXVI
### Unjust Enrichment
*(Against Dondero)*

335.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336.    As set forth above, Dondero caused HCMLP to enter into myriad intercompany note transactions with other Dondero Entities in order to, among other things:  (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits.  Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

337.    Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP.  Dondero orchestrated myriad transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to:  (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP money in order to seed business activities and investments that would accrue to his own personal benefit.  Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

338.  Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

339.  Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

340.  Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

## COUNT XXVII
### Unjust Enrichment
*(Against Ellington and Leventon)*

341.  Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

342.  Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation.  However, each of them understood and performed their duties as functionaries for Dondero.  As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP.  Portions of Ellington's and Leventon's compensation was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

343.  Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

344.  Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP.  Among other things, Ellington

111

and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

345.    Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXVIII
## Unjust Enrichment
### *(Against NexPoint and HCMFA)*

346.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

347.    The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

348.    HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of note agreements.  Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

349.    NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

350.    Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

351. Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXIX
## Unjust Enrichment
### *(Against Massand Capital and SAS)*

352. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

353. Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements. Nevertheless, Massand Capital was aware that it was not performing any services on behalf of HCMLP. Rather, Massand Capital was performing services on behalf of SAS. HCMLP received no benefit under the Massand Consulting Agreements.

354. HCMLP employees performed work for SAS. Indeed, at least four HCMLP even receiving SAS email addresses. SAS did not compensate HCMLP for these services.

355. SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

356. Plaintiff seeks restitution from Massand Capital and SAS and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXX
## Unjust Enrichment
### *(Against CLO Holdco)*

357. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

0348

358.     Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest. HCMLP received no benefit from the HarbourVest investment.  Nevertheless, HarbourVest filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment, and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP.  As a result of Dondero's conduct, however, the HCLOF interests were then worth significantly less than the face amount of HarbourVest's allowed claim.

359.     Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

## COUNT XXXI
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*(Against Dondero and Ellington)*

360.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

361.     Dondero and Ellington are insiders of HCMLP.

362.     As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,755,2017 and payments to Ellington of $326,225 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

114

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |
| November 15, 2018 | Dondero | $65,078 |
| November 15, 2018 | Ellington | $1,296 |
| December 14, 2018 | Dondero | $115,481 |
| December 31, 2018 | Dondero | $548 |
| December 31, 2018 | Ellington | $5,150 |
| January 15, 2019 | Dondero | $96,786 |
| January 15, 2019 | Ellington | $60 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 15, 2019 | Ellington | $102 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| March 29, 2019 | Ellington | $60 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| April 30, 2019 | Ellington | $60 |
| May 15, 2019 | Dondero | $89,257 |
| May 15, 2019 | Ellington | $365 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| June 28, 2019 | Ellington | $60 |
| July 15, 2019 | Dondero | $47,006 |
| July 15, 2019 | Ellington | $60 |
| July 31, 2019 | Dondero | $748 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| September 30, 2019 | Ellington | $60 |
| October 15, 2019 | Dondero | $32,977 |

| October 15, 2019 | Ellington | $60 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,755,207 |
| Total | Ellington | $326,226 |

363.    The One-Year Transfers were made on account of antecedent debt.

364.    HCMLP was insolvent when each One-Year Transfer was made.

365.    Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

366.    Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

367.    Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

## COUNT XXXII
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

368.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

369.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

370.    At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or

116

reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

371.    HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers.  Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

372.    Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer.  Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIII**
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

373.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

374.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

375.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.   Dondero exercised complete control over HCMLP, and Ellington

117

0352

acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

376.    To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero and Ellington were insiders of HCMLP;

(b)    although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

(c)    before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f)　HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g)　at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h)　Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

377.　Each Alleged Expense Transfer is voidable as an intentionally fraudulent transfer. Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIV**
**Disallowance of Claims Under Sections 502(b), 502(d), and 502(e) of the Bankruptcy Code**
*(Against Dondero, Ellington, Leventon, Waterhouse, and CPCM)*

378.　Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379.　Each of Dondero, Ellington, Leventon, and Waterhouse filed multiple proofs of claim in HCMLP's bankruptcy case. Moreover, Ellington, Leventon, and Waterhouse

119

0354

transferred certain of their alleged claims against HCMLP to CPCM.  The claims that Dondero, Ellington, Leventon, Waterhouse, and CPCM currently have outstanding against HCMLP are set forth below (collectively, the "Proofs of Claim").

| Claim No. | Filed By | Description | Amount |
|---|---|---|---|
| 138 | Dondero | • Expense reimbursement for expenses paid for HCMLP and "various related entities" | Not less than $100,000 |
| 142 | Dondero | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP. | Undisclosed |
| 188 | Dondero | • Contingent claim related to possible efforts to collect on various promissory notes.  In the event collection efforts are made, Dondero asserts the notes were issued by him for funds in lieu of compensation. | Notes total $69,471,056.08 |
| 214 | Leventon | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP;<br>• Damages for wrongful termination. | Undisclosed |
| 216 | CPCM (transferred by Leventon) | • Performance bonuses for 2018;<br>• Deferred performance awards for 2016 through 2018. | $687,594.79 (as of January 30, 2021) |
| 217 | CPCM (transferred by Waterhouse) | • Performance bonuses for 2018;<br>• Deferred performance awards (2016 through 2018);<br>• Compensation in accordance with the terms of the Senior Employee Stipulation (as defined in claim). | $1,514,105.57 (as of January 30, 2021) |
| 218 | Waterhouse | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP;<br>• Vacation and paid time off. | $24,676.92 (liquidated) plus undisclosed amount for indemnification |
| 244 | CPCM (transferred by Ellington) | • Performance bonuses for 2018;<br>• Deferred performance awards for 2015 through 2018. | $3,074,408.16 (as of January 30, 2021) |
| 255 | Ellington | • Vacation and paid time off. | $38,900.40 (liquidated) |

120

0355

380.    Dondero, Ellington, and Waterhouse owed fiduciary duties to HCMLP in their capacities as officers of HCMLP.  Leventon owed fiduciary duties to HCMLP in his capacity as counsel to HCMLP.

381.    The Proofs of Claim are all subject to disallowance under Section 502(b).  As set forth above, Dondero, Ellington, Leventon, and Waterhouse have committed multiple breaches of their fiduciary duties to HCMLP, including in connection with the SAS, Massand, Sentinel, Acis, and Crusader schemes.  Ultimately, Dondero, Ellington and Leventon were terminated on account of their conduct.  Because of this misconduct and their repeated breaches of fiduciary duty, Dondero, Ellington, Leventon, and Waterhouse are no longer entitled to their compensation-related claims, including any claims for vacation, paid time off, or bonuses or similar awards, whether individually held or transferred to CPCM.

382.    Moreover, pursuant to the Tall Pine scheme, each of Ellington, Leventon, and Waterhouse received surreptitious payments from various Dondero Entities.  Ellington, Leventon, and Waterhouse did not perform any services in exchange for these fees; rather, the payments were on account of deferred compensation that is currently requested in the Proofs of Claim.  Therefore, Ellington's and Leventon's Proofs of Claim for compensation-related payments should, at a minimum, be reduced by the amount of the payments these individuals received from the Dondero- and Ellington-controlled payments as part of the Tall Pine scheme.[28]

---

[28]  Waterhouse's proof of claim should also be reduced in an amount equal to what Waterhouse received in the Tall Pine scheme; however, HCMLP is seeking a reduction of Waterhouse's claim pursuant to the Waterhouse Motion.

383. For these same reasons, Leventon's claim for wrongful termination should be disallowed, as he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests.

384. HCMLP's Code of Ethics required all employees of HCMLP to "devote their full time and efforts to the business of the Company;" "adhere to the highest standards of ethical conduct," and "disclose any activities that may create an actual or potential conflict of interest between the Employee, the Company and/or any Client." Indeed, the Code required employees to submit a required disclosure form and receive approval from the Chief Compliance Officer prior to: (1) serving as a director, officer, general partner or trustee of, or as a consultant to, any business, corporation or partnership, including family owned businesses and charitable, non-profit and political organizations; (2) accepting a second job or part time job of any kind or engaging in any other business outside of the HCMLP; or (3) receiving compensation of any nature, directly or indirectly, from any person, firm, corporation, estate, trust or association, other than HCMLP, whether as a fee, commission, bonus or other consideration such as stock, options or warrants. Upon information and belief, no such form was submitted by Ellington, Leventon, or Waterhouse in connection with the Tall Pine scheme.

385. Further, any Proof of Claim transferred or assigned to CPCM should be disallowed under Section 502(b) because Ellington's, Leventon's, and Waterhouse's: (1) performance bonuses are non-transferable under the terms of HCMLP's annual bonus plan; (2) deferred performance awards are non-transferable under the terms of HCMLP's deferred incentive plan; and (3) deferred performance awards are non-transferable under their respective Contingent Bonus Award Agreements. Pursuant to those agreements governing payment of

performance bonuses and deferred performance awards, any transfer of such awards to CPCM are null and void and create no obligation or liability of HCMLP.

386.    To the extent CPCM's Proofs of Claim seek payment for any deferred performance awards or annual bonus awards allegedly payable to Ellington, Leventon, and Waterhouse, those claims should be disallowed because (i) all amounts due and owing under such awards have already been paid, (ii) such amounts are subject to offset as set forth above, or (iii) Ellington's, Leventon's, and Waterhouse's employment with HCMLP was terminated prior to the vesting date of those awards.  Any such awards were automatically forfeited at the end of their respective employments.

387.    To the extent the Proofs of Claim seek payment for indemnification, those claims should similarly be disallowed.  Dondero, Waterhouse, and Leventon claim they are generally entitled to indemnification for "all acts performed or omitted to be performed on behalf of or in connection with [HCMLP]'s business" pursuant to Article 4.1(h) of the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "Previous LPA") and the Resolution of the Board of Directors of Strand Advisor, Inc., dated May 12, 2020 (the "Resolution").  The Previous LPA ceased to be operative upon the effective date of the Plan.  The Plan required entry into the current limited partnership agreement (which did not include any indemnification for Dondero, Leventon, or Waterhouse) and also expressly disclaimed any prior indemnification claims.  Further, under the terms of the Previous LPA and the Resolution, HCMLP has no obligation to indemnify Dondero, Leventon, or Waterhouse for any conduct that constitutes gross negligence or willful or wanton misconduct.  Therefore, to the extent that the indemnification claims arose from conduct constituting gross negligence or

0358

willful or wanton misconduct (whether detailed in this Complaint or not) such claims should be disallowed.

388.    As set forth above, Dondero is a transferee of transfers avoidable under sections 544 and 548 of the Bankruptcy Code, and property is recoverable from Dondero under section 550 of the Bankruptcy Code.  Accordingly, pursuant to section 502(d), all claims asserted by Dondero should be disallowed unless and until Dondero pays to Plaintiff the value of any transfer avoided pursuant to this Complaint.

389.    Dondero's, Leventon's, Ellington's, and Waterhouse's claims for indemnification should be similarly disallowed pursuant to Section 502(e)(1)(B).  Until such liabilities are established, the claims for indemnification are contingent.  And because the purported claims for indemnification are for actions made on behalf of HCMLP, HCMLP could be co-liable.  Therefore, these contingent claims for indemnification should be disallowed on that basis pursuant to Section 502(e)(1)(B).

390.    The Proofs of Claim should be disallowed and expunged in their entirety pursuant to section 502 of the Bankruptcy Code.

391.    Plaintiff expressly reserves its right to supplement or amend this objection to the Proofs of Claim and any other proof of claim.  Plaintiff hereby reserves all objections and defenses to the Proofs of Claim and any other proof of claim filed in the bankruptcy proceeding.

## COUNT XXXV
### Disallowance or Subordination of Claims Under
### Section 502 and 510 of the Bankruptcy Code
*(Against Dondero, Dugaboy, Get Good, Okada, MAP #1, MAP #2, and Hunter Mountain)*

392.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

0359

393.    Each of Dondero, Dugaboy, Get Good, Okada, MAP #1, MAP #2, and Hunter
Mountain filed unripe proofs of claim in HCMLP's bankruptcy case arising from a tax audit
currently being conducted by the Internal Revenue Service (the "<u>IRS</u>").  The claims that
Dondero, Dugaboy, Get Good, Okada, MAP #1, MAP #2, and Hunter Mountain currently have
outstanding against HCMLP are set forth below (collectively, the "<u>Unripe Proofs of Claim</u>").

| Claim No. | Filed By | Description | Amount |
|---|---|---|---|
| 70 | Hunter Mountain | • Indemnification for obligations related to a secured promissory note | $60,298,739 |
| 113 | Dugaboy[29] | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 120 | Get Good | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 128 | Get Good Non Exempt Trust No. 1 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 129 | Get Good Non Exempt Trust No. 2 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its | Undisclosed |

---

[29]    Dugaboy has two other proofs of claim on file (Claim Nos. 131 and 177).  HCMLP previously objected to these claims [Docket Nos. 2796, 2819] and they are subject to a separate proceeding.

| | | | |
|---|---|---|---|
| | | limited partners for certain years between 2004 and 2018. | |
| 135 | Okada | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br><br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 137 | MAP #1 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br><br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 139 | MAP #2 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br><br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 141 | Dondero | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br><br>• Potential claims against HCMLP via Dondero's trusts related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 145 | Dondero | • Potential claims against HCMLP as successor-in-interest to The Canis Major Trust, a limited partner of HCMLP, related to HCMLP's 2008 tax return, which is being audited.<br><br>• Potential claims against HCMLP as successor-in-interest to The Canis Major Trust, a limited partner of HCMLP, related to HCMLP's failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |

394.     The Unripe Proofs of Claim are contingent on the IRS assessing tax liability against HCMLP's former limited partners and may never materialize against HCMLP.  For example, Strand is currently defending an IRS audit and a determination as to the limited partners' tax liability is expected prior to year end.  If the tax audit determines that there is no tax exposure, the Unripe Proofs of Claim will be moot.  However, to the extent these Unripe Proofs of Claim mature into claims against HCMLP, they should be disallowed or subordinated pursuant to Section 502 or Section 510.

395.     Further, Hunter Mountain's Proof of Claim should be disallowed.  Hunter Mountain amended its Proof of Claim on April 8, 2020.  Hunter Mountain later entered into a settlement agreement and withdrew its amended Proof of Claim in connection with that settlement.  Although its original Proof of Claim remains on the ledger, Hunter Mountain's amended Proof of Claim superseded the original Proof of Claim and was withdrawn.  The original Proof of Claim, accordingly, should be disallowed.

396.     Plaintiff expressly reserves its right to supplement or amend this objection to the Unripe Proofs of Claim and any other proof of claim.  Plaintiff hereby reserves all objections and defenses to the Unripe Proofs of Claim and any other proof of claim filed in the bankruptcy proceeding.

### COUNT XXXVI
### Disallowance or Subordination of Claims Under
### Section 502 and 510 of the Bankruptcy Code
*(Against CLO Holdco)*

397.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

0362

398.    On April 8, 2020, CLO HoldCo filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim").  The basis of the CLO HoldCo Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

399.    HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme.  HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee.  Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim.  In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

400.    Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim.  Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request.  Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

0363

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.      awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B.      setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C.      setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D.      setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E.      setting aside, avoiding, and granting recovery of the Massand Transfers;

F.      setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G.      setting aside, avoiding, and granting recovery of the One-Year Transfers;

H.      disallowing or subordinating the Proofs of Claim and, to the extent applicable, the Unripe Proofs of Claim and the CLO Holdco Claim;

I.      awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J.      awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K.      awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: October 15, 2021
Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (*pro hac vice* pending)
Benjamin I. Finestone (admitted *pro hac vice*)
Jordan Harap (admitted *pro hac vice*)
Alexander J. Tschumi (*pro hac vice* pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone: (212) 849-7000

*Counsel for the Litigation Trustee*

0365

FILED
1/1/2022 6:09 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kayla Buckley DEPUTY

DC-22-00304

NO. _____

| | | |
|---|---|---|
| **SCOTT BYRON ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | 101st |
| **v.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

---

### PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

---

Comes Now, Scott Byron Ellington, Plaintiff herein, and files this *Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* against Defendant Patrick Daugherty, and in support thereof, would respectfully show the Court the following:

#### Dallas County LR 1.08 Disclosure

Dallas County Local Rule 1.08 provides that the attorneys of record for the parties in any case within the categories of Local Rule 1.07 must notify the judges of the respective courts in which the earlier and later cases are assigned of the pendency of the latter case. The attorney filing a case that is so related to another previously filed case shall disclose in the original pleading or in a separate simultaneous filing that the case is so related and identify by style, cause number, and court of the related case. Accordingly, and pursuant to L.R. 1.08, the undersigned hereby notifies the Court that this case, in part, arises out of the same transaction or occurrence which is the subject of *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. 12-04005, in the 68th Judicial District Court of Dallas County, Texas. Hence, the undersigned believes that this case is subject to transfer under L.R. 1.07(a) or otherwise pursuant to L.R. 106 because the transfer would "facilitate orderly and efficient disposition of the litigation."

---

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                                                    Page 1

0366

## I.  Discovery Control Plan

1.      Pursuant to TEXAS RULE OF CIVIL PROCEDURE 190.3, Plaintiff requests a Level 2 discovery control plan.

## II.  Parties & Service

2.      Plaintiff Scott Byron Ellington, an individual, is a resident of the state of Texas.

3.      Defendant Patrick Daugherty is an individual and resident of Dallas County, Texas. Defendant may be served at his residence located at 3621 Cornell Ave, Dallas, Texas 75205, or wherever he may be found.

## III. Rule 47(c) Disclosure

4.      Plaintiff seeks damages within the jurisdictional limits of the Court. Specifically, Plaintiff seeks monetary relief over $1,000,000 and non-monetary relief.

## IV. Jurisdiction & Venue

5.      The Court has jurisdiction over Defendant because he resides in Texas, has done business in Texas, committed torts, in whole or in part, in Texas, has continuing contacts with Texas, and is amenable to service by a Texas Court.

6.      Venue in Dallas County is proper in this case under Sections 15.002(a)(1) and (a)(3) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE because this is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred and it is the county where Defendant resides.

## V.  Facts

7.      Plaintiff Scott Ellington ("Plaintiff" or "Ellington") was, until January of 2021, the general counsel of Highland Capital Management ("Highland").

8.     Defendant Daugherty ("<u>Defendant</u>" or "<u>Daugherty</u>") previously worked for Highland.

9.     In 2012, Highland sued Daugherty. In response, Daugherty filed counterclaims against Highland then sued its affiliate, Highland Employee Retention Assets LLC ("<u>HERA</u>"), and three Highland executives. A jury ultimately determined that Daugherty breached his employment agreement and fiduciary duties. It also found that HERA breached the implied duty of good faith and fair dealing, but also found that the executives subject to the counter-claim were not liable to Daugherty. The jury awarded Highland $2,800,000 in attorney's fees and injunctive relief; and awarded Daugherty $2,600,000 in damages against HERA.

10.     Since the 2012 lawsuit's filing, Daugherty and Highland—or Highland related entities and individuals—engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal is to "get" the founder and former CEO of Highland, Jim Dondero, and its former general counsel, Ellington. As part of this campaign, Daugherty personally sued Ellington in December 2019 in Delaware Chancery Court. Ellington's motion to dismiss currently pends in that matter.

11.     While Daugherty's previously limited his vendetta to the courtroom, he began a campaign of harassment against Ellington and his family starting in January 2021 that continues to this day. *See* **<u>Exhibit A</u>** (Declaration of Gregory Allen Brandstatter, the personal security guard of Scott Ellington) (detailing Daugherty's harassment and stalking of Ellington, his family, and loved ones); **<u>Exhibit B</u>** (Declaration of Scott Byron Ellington).

12.     Specifically, Daugherty has been observed outside Ellington's office, his residence, the residence of his long-time girlfriend, Stephanie Archer, his sister's residence, and his father's residence no less than **<u>143 times</u>**, often taking photographs and video recordings while either

parked or driving slowly by. Indeed, on April 21, 2021, Daugherty was observed driving by Ellington's office nine (9) times that day alone.

13.    Daugherty most recently was confirmed taking video or photo recordings outside of Ellington's residence on December 11, 2021. For reasons set forth in the Brandstatter Declaration, attached herein at **Exhibit A**, Daugherty likely stalked Ellington and his loved ones more recently than the latest confirmed date.

14.    Daugherty's harassing conduct is "textbook" behavior that precedes a physical attack that a reasonable person would consider a threat to their safety as well as that of their family and property. Indeed, Ellington has been forced to hire personal security, and his family are in fear for their personal and physical safety.

15.    As evidenced by the over 143 times Daugherty has been observed stalking Ellington and his family, he has the apparent ability to carry out this threat of continued harassment and violence.

16.    Both Mr. Ellington's sister and girlfriend have both demanded to Mr. Daugherty that he stop his harassment. Despite this clear demand for Daugherty to stop engaging in this harassing behavior, he refuses to stop and continues to harass Ellington and his family.

17.    Daugherty's constant stalking and harassment of Ellington and his family reasonably cause them to fear for their safety.

18.    Ellington reported Daugherty's harassing and disturbing behavior to the police.

**VI. Causes of Action**

**A.  Count One: Stalking.**

19.    All facts alleged above, herein, and below are hereby incorporated by reference.

---

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                                                                 Page 4

0369

20.     Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 85.002, a defendant is liable to a claimant for damages arising from stalking of the claimant by the defendant.

21.     A claimant proves stalking against a defendant by showing:

(1) on more than one occasion the defendant engaged in harassing behavior;
(2) as a result of the harassing behavior, the claimant reasonably feared for the claimant's safety or the safety of a member of the claimant's family; and
(3) the defendant violated a restraining order prohibiting harassing behavior or:

(A) the defendant, while engaged in harassing behavior, by acts or words threatened to inflict bodily injury on the claimant or to commit an offense against the claimant, a member of the claimant's family, or the claimant's property;

(B) the defendant had the apparent ability to carry out the threat;

(C) the defendant's apparent ability to carry out the threat caused the claimant to reasonably fear for the claimant's safety or the safety of a family member;

(D) the claimant at least once clearly demanded that the defendant stop the defendant's harassing behavior;

(E) after the demand to stop by the claimant, the defendant continued the harassing behavior; and

(F) the harassing behavior has been reported to the police as a stalking offense.

22.     "Harassing behavior" is defined by the statute as "conduct by the defendant directed specifically toward the claimant, including following the claimant, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the claimant." TEX. CIV. PRAC. & REM. CODE § 85.001(4).

23.     First, Defendant has engaged in harassing behavior toward the Plaintiff and his family in the above-described manner. Second, because of the harassing behavior, Plaintiff reasonably feared for his safety and the safety of his family. Third, Defendant, while engaging in the harassing behavior, by acts or words threatened to inflict bodily injury on the Plaintiff or to commit an offense against the Plaintiff, his family, or his property. Specifically, Defendant's

conduct is consistent with behavior leading up to a physical attack and is, therefore, an inherent threat of physical violence. Defendant had the apparent ability to carry out the threat, the Defendant's apparent ability to carry out the threat caused Plaintiff to reasonably fear for his safety or the safety of a family member, the Plaintiff (or his representative) at least once clearly demanded that the Defendant stop his harassing behavior, after the demand to stop by the Plaintiff, the Defendant continued the harassing behavior, and the harassing behavior has been reported to the police as a stalking offense.

24.     Plaintiff seeks recovery of his actual damages caused by Defendant's stalking, exemplary damages, and injunctive relief.

**B. Count Two: Invasion of Privacy by Intrusion.**

25.     All facts alleged above, herein, and below are hereby incorporated by reference.

26.     A claim of invasion of privacy by intrusion has the following elements: (1) an intentional intrusion, (2) upon the seclusion, solitude, or private affairs of another, (3) that would be highly offensive to a reasonable person.

27.     Here, Defendant has intentionally intruded upon the seclusion, solitude, and private affairs of Plaintiff by regularly appearing at his office, his residence, his girlfriend's residence, his father's residence, and his sister's residence, and taking photographs and other recordings of Ellington and his loved ones at these residences. The appearances are unsolicited, uninvited, and constant. These unwanted "visits" by Defendant are highly offensive to a reasonable person.

28.     Plaintiff seeks recovery of his actual damages caused by Defendant's conduct alleged herein, exemplary damages, and injunctive relief.

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                                    Page 6

0371

## VII. Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

### A. Elements for Injunctive Relief.

29. All facts alleged above, herein, and below are hereby incorporated by reference.

30. In light of the above-described facts, Plaintiff seeks recovery from Defendant.

31. Plaintiff is likely to succeed on the merits of this lawsuit because Defendant has been stalking Plaintiff and his family and has been engaged in otherwise harassing conduct.

32. Unless this Honorable Court immediately restrains the Defendant and his agents the Plaintiff and his family will suffer immediate and irreparable injury, for which there is no adequate remedy at law to give Plaintiff complete, final and equal relief. More specifically, Plaintiff will show the court the following:

   a. The harm to Plaintiff and his family is imminent and ongoing as Defendant has harassed and stalked Plaintiff and his family, including his father, his sister, and girlfriend, almost constantly this entire year.

   b. The imminent harm will cause Plaintiff irreparable injury as the harassment will continue if not restrained. Further, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities. *See, e.g., Quinn v. Harris*, 03-98-00117-CV, 1999 WL 125470, at *11 (Tex. App.—Austin Mar. 11, 1999, pet. denied) ("[I]njunctions designed to prevent harassment are permissible."); *Kramer v. Downey*, 680 S.W.2d 524, 525 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ("Further, this right to be left alone from unwanted attention may be protected, in a proper case, by injunctive relief."); and

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

Page 7

0372

c. There is no adequate remedy at law which will give Plaintiff complete, final and equal relief because the imminent harm is irreparable. *See e.g., Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) ("Issues one (no evidence of inadequate remedy at law) and two (no evidence of irreparable injury) are intertwined under Texas case law.").

**B. Bond.**

33.     Plaintiff is willing to post a reasonable temporary restraining order and temporary injunction bond and requests the Court to set such bond.

**C. Remedy.**

34.     Plaintiff met his burden by establishing each element which must be present before injunctive relief can be granted by this Court. Thus, Plaintiff is entitled to the requested temporary injunction, and upon a successful trial on the merits, for the temporary injunction to be made permanent.

35.     Plaintiff requests that, while the temporary injunction is in effect, the Court to restrain Defendant and his agents from:

a. Being within 500 feet of Ellington;

b. Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

c. Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

d. Being within 500 feet of Stephanie Archer;

e. Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

    f.    Being within 500 feet of Marcia Maslow;

    g.    Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

    h.    Being within 500 feet of Byron Ellington;

    i.    Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct., Parker, Texas 75094;

    j.    Photographing, videorecording, or audio recording Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington;

    k.    Photographing or videorecording the residences or places of business of Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington; and

    l.    Directing any communications toward Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington.

## VIII.   Exemplary Damages

36.    The conduct of Defendant described above constitutes malice and, therefore, Plaintiff is entitled to, and hereby seeks, an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(1).

## IX. Conditions Precedent

37.    All conditions precedent to Plaintiff's suit have occurred or have been performed.

## X.  Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

    a.    Defendant be cited to appear and answer;

    b.    The Court determine any issue of fact and, upon final hearing of this cause, the Court award to Plaintiff:

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction    Page 9

0374

       i.   Actual damages;

       ii.   Exemplary damages;

      iii.   A temporary restraining order;

      iv.   A temporary injunction;

       v.   A permanent injunction; and

      vi.   Court costs;

c.   The Court grant any other relief to which Plaintiff may be entitled.

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                    Page 10

0375

Respectfully submitted,

*/s/ Julie Pettit*
Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
**THE PETTIT LAW FIRM**
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
mnix@lynnllp.com
Nathaniel A. Plemons
State Bar No. 24121059
nplemons@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN,
LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR PLAINTIFF**

**EXHIBIT**

**A**

---

## DECLARATION OF GREGORY ALLEN BRANDSTATTER

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Gregory Allen Brandstatter declares as follows:

1.      My name is Gregory Allen Brandstatter. I am over 21 years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this declaration.

2.      I am able to swear, and hereby do swear under penalty of perjury, that the facts stated in this declaration are true and correct and within my personal knowledge.

3.      I am a Licensed Texas Master Peace Officer with fifteen (15) years of experience, a U.S. Government Contractor with over twelve (12) years of experience in the areas of high threat protection, counterterrorism, and counternarcotics, and I am also a licensed private investigator and security consultant.

4.      On Feb 3, 2021, Scott Ellington ("Scott") called, advising me that he believed someone was stalking himself and his girlfriend Stephanie Archer ("Stephanie"). The day prior to his calling me (Feb 2, 2021), Stephanie had been followed to 120 Cole Street, Dallas, Texas, where Scott has an office. Stephanie stated that for the past month or so she had noticed a large Black SUV possibly following her. On Feb 2, 2021, she noticed that the person in the Black SUV was actively taking pictures of her, and she attempted to confront the individual while she simultaneously took pictures of the Black SUV and its driver. Her picture shows the vehicle Make and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding

up a cell phone as if taking pictures. A true and correct copy of this photograph is attached hereto as **Exhibit A-1**.

5.      The following day Scott was in his office on Cole Street, when he noticed a vehicle resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty ("Daugherty"). Scott and Daugherty both previously worked at an investment firm in Dallas and are currently opponents in financial litigation. Scott believes that Daugherty is attempting to harass him, his friends and coworkers due to the litigation. It should be noted that Daugherty has a history of anger issues and he believes Daugherty may be trying to intimidate him.

6.      Scott asked if I could assist him in determining who the person(s) were taking the photos/videos. I advised Scott that I could check some open sources intelligence ("OSINT") sites and see what I could come up with in reference to the vehicle registrations. I also suggested that we set up a counter surveillance program to determine if these were random acts or an organized surveillance effort.

7.      On Feb 4, 2021, an investigation was opened along with a counter surveillance operation. OSINT sources showed Daugherty to be the registered owner of the Black SUV BX9K764 and that Daugherty currently is listed on the vehicle registration of the Infiniti QX4 GPF9512. The Infiniti QX4 closely resembles a Toyota 4 Runner (as observed by Scott above). We believe that Daugherty sold the Infiniti to one of his domestic employees and "borrowed" the vehicle to avoid detection.

8.     On February 4, 2021, at approximately 11:20 A.M., I observed the Infiniti GPF9512 driven by a while male with sandy blonde hair drive by west bound on Cole slow when passing Scott's office (120 Cole St.) and then proceed west on Cole, south on Levee, east on Alley (rear of 120 Cole), U-turn, south on Levee and east on Leslie. I viewed the driver of this vehicle as he was exiting Alley and can verify, after comparing photos, that Daugherty was the driver of the Infiniti.

9.     At approximately 1:22 P.M. on Feb 4, 2021, Scott advised that Daugherty had followed him to 120 Cole, I was parked on Cole and Levee. As Scott parked, I observed the Infiniti driving west on Cole towards me. I observed Daugherty driving Infiniti GPF9512. Daugherty turned south on Levee, U-turn, north on Levee then east on Cole. I kept my distance as the Infiniti slowed and then stopped in front of Scott's office. While stopped in front of Scott's office, Daugherty verbally engaged Stephanie and Joe (friend of Scott). Daugherty proceeds east on Cole, I followed, Daugherty turned left on Rivers Edge, I am unable to follow due to traffic conditions. Stephanie and Joe identified the driver as Daugherty after comparing to photos. A true and correct copy of a photograph of the back of the Infiniti taken on February 4, 2021, on Cole St. is attached hereto as **Exhibit A-2**.

10.    At approximately 5:15 P.M. on February 4, 2021, Reese Morgan ("Reese"), a private investigator with whom I regularly work, drove by Daugherty's residence and confirmed two vehicles parked in the carport. One is a white Lincoln Navigator LPG9001 and the other is a Black GMC Yukon BX9K764, which is the same vehicle that followed Stephanie on February 3, 2021. The Infiniti GPF9512 (with a "WMR" sticker on the back window) is parked on the street across the street from Daugherty's carport. Attached as **Exhibit A-3** is a true and correct copy of a photograph of the Yukon parked at Daugherty's residence, attached as **Exhibit A-4** is a true and

correct copy of a photograph of the Navigator parked at Daugherty's residence, and attached as **Exhibit A-5** is a true and correct coy of a photograph of the Infiniti parked across the street from Daugherty's residence.

11.     February 5, 2021, approximately 1:40 P.M., Reese drove by Daugherty's Residence and verified the Infiniti GPF9512 parked across street from carport.

12.     February 8, 2021, at approximately 10:10 A.M., I drove by Daugherty's Residence and verified that the Infiniti GPF9512 was parked across street from carport.

13.     Additional screen captures clearly identify Daugherty as the driver videoing and/or photographing Scott's office.  *See* **Exhibit A-6** (March 29, 21, three passes by Daugherty in the Infiniti), **Exhibit A-7** (April 16, 2021, Daugherty in the Yukon); **Exhibit A-8** (April 23, 2021, Daugherty in the Yukon).  Daugherty also is clearly identifiable outside of Scott's sister's home.  *See* **Exhibit A-9** (April 25, 2021, Daugherty in the Infiniti).  It is clear that he is recording Scott, his family, and friends.  *See* **Exhibit A-10** (May 3, 2021, Daugherty in the Navigator).

14.     Attached hereto as **Exhibit A-11** is a true and correct copy of a report that I wrote that contains my counter-surveillance log. As documented by the report, following verification that Daugherty was the individual in the Black Yukon with license plate BX9K764 and the Infiniti QX4 with license plate GPF9512, Daugherty was observed an additional 143 times outside Scott's office or the homes of his family or girlfriend between February 19, 2021, and November 23, 2021. In fact, there were many instances where Daugherty would drive by Scott's office several times in a single day. For example, Daugherty was observed driving by Scott's office at least nine (9) times on April 21, 2021. During many of these visits, Daugherty was observed taking photographs or video recordings from the inside of his vehicle.

15.    Additionally, Daugherty was observed at least eight (8) times outside of the home of Marcia Maslow, Scott's sister.  Mrs. Maslow resides with her husband and two minor daughters. Mrs. Maslow resides in Murphy, Texas, approximately a thirty minute drive (without traffic) from the residences of both Scott and Daugherty.  Mrs. Maslow sent me a written message after she observed Daugherty at her residence in which she describes the emotional trauma experienced by both her and her family.

16.    Finally, Daugherty has been observed at least seven (7) times outside the home of Scott's widower father Byron Ellington.   Mr. Byron Ellington lives in Parker, Texas, approximately a thirty-five minute drive (without traffic) from the residences of both Scott and Daugherty.

17.    While the verified instances whereby Daugherty was visited Scott's office or the home of his friends and family are extensive, Daugherty's harassment is almost certainly more extensive. The following factors lead to this conclusion:

    a.  Daugherty was only first spotted because of Stephanie's lay person observations, so the stalking likely started earlier;

    b.  Each photograph and video clip must be manually extracted from manual review of hours of raw video taken during daytime hours, so there is likely to be more encounters unidentified or unrecorded;

    c.  It is difficult to record Daugherty when his vehicle is following Scott's or those of his family;

    d.  There may be other locations associated with Scott that Daugherty stalked where I did not conduct counter-surveillance.

Declaration of Gregory Allen Brandstatter

18.     In my experience on the United States Department of State High Threat Protection Team, the sort of conduct exhibited by Daugherty is a precursor to a physical attack. I therefore called the Dallas Police Department to report the stalking, but could not find anyone to take the report. I was told that Scott needed to call 911 instead and report situation.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

FURTHER DECLARANT SAYETH NOT.

My name is Gregory Allen Brandstatter. My date of birth is <u>May 4, 1954</u>. My address is 1001 County Road 26100, Roxton, Texas 75477. I declare under penalty of perjury that the foregoing is true and correct.

Executed in <u>Dallas</u> County, State of Texas, on the <u>28th</u> day of December, 2021.

_Gregory Allen Brandstatter_

Gregory Allen Brandstatter









0385



EXHIBIT

A-3

0386



**EXHIBIT**

**A-4**

0387



EXHIBIT

A-5

0388











EXHIBIT

A-7

exhibitsticker.com













111521

Greg Brandstatter, Pat D Investigation / Counter Surveillance log

On Feb 3 2021, Scott Ellington (Scott) called, advising me that he believed someone was stalking himself and his girlfriend Stephanie Archer (Stephanie). The day prior, Feb 2 2021 to his calling me Stephanie had been followed to 120 Cole Street, Dallas, Texas, where Scott has an office. Stephanie stated that she had noticed that for the past month or so she had noticed a large Black SUV possibly following her. On Feb 2 2021 she noticed that the person in a Black SUV actively taking pictures, she had, had enough and attempted to confront the individual while taking a picture of the vehicle. Her picture shows the vehicle Make and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding up a cell phone as if taking pictures. See Stephanie's photo.

The following day Scott was in his office on Cole Street, when he noticed a vehicle resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty (Pat). Scott and Pat both previously worked at an investment firm in Dallas, and are currently opponents in financial litigation. Scott believes that Pat is attempting to harass him, his friends and coworkers due to the litigation. It should be noted that Pat has a history of anger issues and he believes Pat may be trying to intimidate him.

Scott asked if I could assist him in determining who the person(s) were taking the photos/videos. I advised Scott that I could check some Open Sources Intelligence sites and see what I could come up with in reference to the vehicle registrations. I also suggested that we set up a counter surveillance program to determine if these were random acts of an organized surveillance effort.

On Feb 4 2021 an investigation was opened along with a counter surveillance operation. OSINT sources showed Pat to be the registered owner of the Black SUV BX9K764 and that Pat was the previous owner of the Infinity QX4 GPF9512. The Infinity QX4 closely resembles a Toyota 4 Runner ( as observed by Scott above). We believe that Pat sold the Infinity to one of his domestic employees and "borrowed" the vehicle to avoid detection.

At approx. 1120 on Feb 4th the Infinity GPF9512 driven by a W/M Sandy Blonde hair drives by WB on Cole slows when passing 120 proceeds W on Cole, S on Levee, E on Alley (rear of 120 Cole), U-turn, S on Levee and E on Leslie. I viewed the driver of this vehicle as he was exiting alley and can verify after comparing Photos, that Pat was the driver of the infinity.

At approx 1322 on Feb 4th Scott advises that the Pat had followed him to 120 Cole, I was parked on at Cole and Levee as Scott parked I observe the Infinity drives W on Cole towards me, I observe Pat driving infinity GPF9512. Pat turns south on Levee, U-turn, N on Levee then E on Cole. I keep my distance as Infinity slows and then stops in front of 120, While stopped in front of 120, Pat verbally engages Stephanie and Joe (friend of Scott). Pat proceeds E on Cole, I follow, Pat turns left on Rivers Edge, I am



EXHIBIT

A-11

03398

unable to follow due to traffic conditions. Stephanie and Joe are able to Identify the Driver as Pat after comparing to photos. See photos for rear of Infinity, on Cole Street, Note Sticker (WMR).

At Approx 1715 on Feb 4, Reese Morgan (Reese) PI drives by Pat's residence and is able to confirm two vehicles parked in carport, White Lincoln Navigator LPG9001 and Black GMC Yukon BX9L764, same vehicle that followed Stephanie on Feb 3, The Infinity GPF9512 is parked on the street across the street from Pat's carport, see photos

Feb 5 2021, approx 1340, Reese drive by Pat's Residence verify Infinity GPF9512 parked across street from carport.

Feb 8 2021, approx. 1010, Drive by Pats Residence verify Infinity GPF9512 parked across street from carport

Feb 19 2021 approx 1700 Sarah Goldsmith, moving files to 120 Cole St, confronted my W/M Sandy Blonde, Graying hair, driving a "Silver Toyota 4 Runner" (Infinity). Driver ask "Do you know if Scott is back in town?" She ignored him and went into office space until he left. She did not feel safe, she departed and had her husband accompany her back to Cole St. After viewing a picture of Pat, Sarah was able to verify the driver who confronted her was Pat.

Feb 23 2021 approx 1707 Black GMC Yukon BX9K764, Driven by Pat (visual), business attire blue shirt, E-W on Cole, slows at 120, proceeds N on Levee, E on Oaklawn. (Day in Court)

March 4 2021 approx 1113, Black GMC Yukon BX9K764, drives by E-W on Cole slows when passing 120, S on Levee, pulls over appears to be taking notes, continues S on Levee, turns E on Leslie at.

March 9 2021 approx 1110, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

approx 1340, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

March 23 2021 approx 1450, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, (note Scott's Vic out front with door open), S on Levee, U-turn, N on Levee. Visually confirm Pat driving.

approx 1700, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, Scott is in office and observes Pat taking pictures or video of building and vehicles, Pat proceeds W on Cole , N on Levee

March 25 2021 approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole Stops short of 120, I observed Pat, dressed in business attire, exit vehicle and put trash in trash container, then proceed W on Cole where he stopped in front of 120 for an extend period of time, before proceeding W on Cole

Approx. 1417, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, another extended stop at 120 before proceeding W on Cole.

March 26 2021, approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole. I pass in opposite direction. Pat is wearing business attire, talking on cell phone

March 29 2021, approx 1430, Infinity QX4 GPF9512, with "WMR sticker on the rear window, driven by Pat, drives by E-W Stops front of 120, peers into building.

Approx 1433, Infinity QX4 GPF9512, driven by Pat, drives by E-W Stops front of 120, appears to be taking pictures of building and vehicles.

Approx 1450, Infinity QX4 GPF9512, driven by Pat, drives by E-W Slows front of 120

March 31 2021, approx 1508, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, opens door slightly

Approx 1511, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes pictures

Approx 1518, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes video

Approx 1522, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes extensive video of inside garage door and vehicles out front

April 13 2021, approx 1428, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole

Approx 1430, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows at 120, takes video of building and vehicles

Approx 1433, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 14 2021  Scott's Sister Marcia Reports, Black GMC Yukon Denali, stopped in front of her house and was taking pictures of her home, family and vehicles, she reports this is the second instance. First instance was 3 25 2021, She provides Video of second instance, See Marcia's report. Stealthcam deployed.

April 16 2021, approx 1453, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows takes pics/video of vehicles

Approx 1455, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole,I nterested in Scott' new assistant Charleigh.

Approx 1456, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole, Passenger in vehicle, New Player

April 19 2021, approx 1423, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, Stops takes Video

Approx 1426, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 20 2021, approx 1335, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1338, Black GMC Yukon BX9K764, driven by Pat drives by, E-W on Cole slows takes pictures

Approx 1340, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 21 2021, approx 1028, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1038, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1040, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1043, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops for extended period looking inside garage door, car behind him honks

Approx 1055, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, fast

Approx 1058, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Approx 1215, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops and takes pictures of vehicles

Approx 1217, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, slows at 120 and takes video

Approx 1448, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Stops and takes video of vehicles, Scott confirms he saw, Black GMC Yukon

April 22 2021, approx 1010, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1013, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1220, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, takes picture of Charleigh Vehicle

Approx 1325, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1547, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 23 2021, approx 1027, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1321, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Pics of Ryan's and Trevor Vehicles

Approx 1324, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1457, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Good Facial Picture

Approx 1500, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Infinity QX4 GPF9512, driven by Pat, drives by E-W,  E-W on Cole

Approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 24 2021, (Sat) approx 1158, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

0401

approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

approx 1605 Black GMC Yukon, driven by Pat drives by Marcia's House

April 25 2021, (Sun) approx 1608, Infinity QX4 GPF9512, driven by Pat drives by Marcia's House

April 26 2021, approx 1533, Infinity QX4 GPF9512, driven by Pat drives by Byron's House

approx 1534, Infinity QX4 GPF9512, driven by Pat drives by Byron's House


April 27 2021 Infinity QX4 GPF9512, drives by E-W on Cole, Video only, Not typical behavior, cannot confirm.

April 28 2021, approx 1030, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows takes Video, Faster than normal, visual only

approx 1510, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows but behavior atypical

approx. 1650, Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video confirmation

approx 1745, Black Yukon drives by, Cam Only no Confirmation, (note change vehicle)

April 30 2021, approx. 1634 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Cam only **Atypical**

May 3 2021,   approx. 1506 Lincoln Navigator XXXXXX, driven by Pat, drives by E-W, note vehicle change

approx. 1546 Lincoln Navigator XXXXXX, driven by Pat, drives by W-E

May 4 20212    approx 1642 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1651 Infinity QX4 GPF9512, driven by Pat, drives by W-E, License Plate

approx 1652 Infinity QX4 GPF9512, driven by Pat, drives by E-W

May 5 2021    approx 1123 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video on site

approx 1254 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1040 Infinity QX4 GPF9512, driven by Pat, drives by Marcia's house

May 12 2021    Approx 0955 Infinity QX4 GPF9512, drives by E-W, License Plate

approx 1308 Infinity QX4 GPF9512, driven by Pat, drives by E-W, takes video, sticker

approx 1311 Infinity QX4 GPF9512, drives by E-W, License Plate, sticker

May 13 2021    approx 1055 Infinity QX4, drives by, E-W

approx  1213 Infinity QX4, drives by, E-W, License Plate

May 14 2021    approx 1523 Infinity QX4, drives by, E-W

May 18 2021    approx  1416 Infinity QW4, drives by E-W

0402

| | | |
|---|---|---|
| May 19 2021 | approx 1411 | Infinity QW4, drives by E-W, License Plate |
| May 18 2021 | approx 1436 | Infinity QW4, drives by 4432 Potomac |
| May 21 2021 | approx 1147 | Infinity QW4, drives by E-W, License Plate |
| May 22 2021 | approx 1345 | Infinity QW4, drives by E-W, License plate |
| May 24 2021 | approx 1132 | Infinity QW4, drives by E-W |
| | approx 1436 | Infinity QW4, drives by W-E, License Plate |
| | approx 1526 | Infinity QW4, drives by Marcia's house |
| May 26 2021 | approx 1035 | Infinity QW4, drives by E-W |
| | approx 1329 | Infinity QW4, drives by E-W |
| | approx 1330 | Infinity QW4, drives by W-E |
| | approx 1333 | Infinity QW4, drives by E-W, License Plate |
| | approx 1334 | Infinity QW4, drives by W-E, License Plate, Sticker |
| | approx 1428 | Infinity QW4, drives by Byron's house |
| | approx 1430 | Infinity QW4, drives by Byron's house, Sticker |
| May 27 2021 | approx 1336 | Infinity QW4, drives by E-W |
| May 28 2021 | approx 1043 | Black GMC Yukon, drives by E-W, reverts to GMC, Baseball cap |
| May 29 2021 | approx 1126 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1430 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1432 | Black GMC Yukon, drives by W-E |
| | approx 1432 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1433 | Black GMC Yukon, drives by W-E, License Plate |
| | approx 1506 | Black GMC Yukon, drives by W-E, License Plate |
| June 1 2021 | approx 1325 | Black GMC Yukon, drives by W-E, License Plate |
| June 2 2021 | approx 1012 | Black GMC Yukon, drives by W-E, License Plate, Stop |
| | approx 1012 | Black GMC Yukon, drives by W-E, License Plate, Stop |
| June 4 2021 | approx 1406 | Black GMC Yukon, drives by E-W, License Plate |
| | approx 1411 | Black GMC Yukon, drives by W-E, License Plate |
| June 5 2021 | approx 0959 | Black GMC Yukon, drives by E-W, driven by Pat Blue Shirt |
| | approx 1007 | Black GMC Yukon, drives by E-W, License Plate |

| | |
|---|---|
| June 7 2021 | approx 1504 Black GMC Yukon, drives by E-W gb Visual from office BX9 |
| June 9 2021 | approx 1022 Black GMC Yukon, drives by E-W taking Pics, Trevor |
| | approx 1023 Black GMC Yukon, drives by W-E, stopped |
| | approx 1023 Black GMC Yukon, drives by W-E, stopped |
| | approx 1024 Black GMC Yukon, drives by E-W,  License Plate, Video |
| | approx 1423 Black GMC Yukon, drives by E-W License Plate Red Shirt |
| | approx 1524 Black GMC Yukon, drives by E-W, License Plate + Visual Red Shirt |
| | |
| July 7 2021 | approx 1037 Black GMC Yukon, drives by E-W, License Plate, visual id |
| Aug 9 2021 | approx 1017 Black GMC Yukon, drives by E-W, License Plate |
| Aug 11 2021 | approx 1141  Black GMC Yukon, drives by E-W, License Plate |
| Aug  21 2021 | approx  1658 Black GMC Yukon, drives by Byron house in |
| Aug 21 2021 | approx  1500 Black GMC Yukon , drives by Byron house out |
| Aug 21 2021 | approx  1509 Black GMC Yukon, drives by Byron house out |
| Aug  22 2021 | approx  1230 Black GMC Yukon, drives by Cole E-W |
| Aug  22 2021 | approx  1316 Black GMC Yukon, drives by Marcia house L-R |
| Aug  24 2021 | approx  1331 Infinity, drives by Cole E-W |
| Aug  26 2021 | approx  1458 Black GMC Yukon, drives by Cole W-E |
| Sept 18 2021 | approx  1720 Black GMC Yukon, drives by Cole E-W |
| Sept 21 2021 | approx  1419 Black GMC Yukon, drives by Cole E-W |
| Oct 16 2021 | approx 1235 Black GMC Yukon, drives by Cole E-W ?? enhance LP |
| Oct 23 2021 | approx 1245 Black GMC Yukon, drives by 3825 Potomac W-E, ID by LP |
| | approx 1635 Black GMC Yukon, drives by 3825 Potomac W-E, ?? enhance LP |
| | approx 1635 Black GMC Yukon, drives by 3825 Potomac E-W, ?? enhance LP |
| Oct 30 2021 | approx 0953 Black GMC Yukon, drives by 3825 Potomac E-W |
| | approx 0956 Black GMC Yukon, drives by 3825 Potomac E-W |
| Nov 3 2021 | approx 1555 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID |
| | approx 1557 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID, either stopped for 2 mins or returned after 2 mins |

Nov 6 2021      approx  1004 Black GMC Yukon, drives by Cole E-W, D clearly visible – driver


Nov 8 2021      approx 1027 Black GMC Yukon, drives by Cole E-W, got in behind PI visual on LP and Driver, Nest Cam Confirm

Nov 10 2021     approx  0747 Black GMC Yukon, drives by Cole W-E, lengthy stop Nest cam confirm

Nov 20 2021     approx 1128 Black GMC Yukon, drives by Cole W-E, Driver Visual

Nov 21 2021     approx 1410 Black GMC Yukon, drives by 3825 W-E, Passenger female? LP

Nov 22 2021     approx 1109 Black GMC Yukon, drives by Cole E-W, Driver visual

Nov 23 2021     approx 1803 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

                Note SE on Cole earlier

                approx 1806 Black GMC Yukon, drives by Cole W-E

                approx 1810 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

**EXHIBIT**

**B**

## DECLARATION OF SCOTT BYRON ELLINGTON

STATE OF TEXAS        §
                            §
COUNTY OF DALLAS     §

Scott Byron Ellington declares as follows:

1.     My name is Scott Byron Ellington. I am over 21 years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this declaration.

2.     I am able to swear, and hereby do swear under penalty of perjury, that the facts stated in this declaration are true and correct and within my personal knowledge.

3.     Starting in January of 2021, my longtime girlfriend, Stephanie Archer ("Stephanie"), noticed a large, Black SUV possibly following her. On February 2, 2021, she was followed by the SUV to my office located at 120 Cole Street, Dallas, Texas. She noticed that the driver in the SUV was taking pictures from inside the vehicle. She confronted the individual while simultaneously taking pictures of the SUV and the driver. The license plate number of the black SUV was BX9K764.

4.     The next day, on February 3, 2021, I was at my office when I noticed a vehicle resembling a tan Toyota 4 Runner stopped in front of my office with the driver either taking photographs or making a videorecording, or both. The license plate number of the vehicle was GPF9512. The driver of the vehicle appeared to be Patrick Daugherty ("Daugherty").

5.     Until January of 2021, I was the general counsel for Highland Capital Management, L.P. ("Highland"). Daugherty is a former employee of Highland. In 2012, Highland sued Daugherty and Daugherty counterclaimed. The lawsuit was ultimately resolved by a jury trial, with

DECLARATION OF SCOTT BYRON ELLINGTON

a jury determining that Daugherty breached his employment agreement and his fiduciary duties and awarding Highland $2,800,000 in attorney's fees and injunctive relief. The jury likewise found that a Highland affiliate, Highland Employee Retention Assets LLC ("HERA") breached the implied duty of good faith and fair dealing and awarded Daugherty $2,600,000 in damages.

6.      Since the filing of the original lawsuit in 2012, Daugherty and Highland—or Highland related entities and individuals—have engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal in his campaign is to "get" me and the founder and former CEO of Highland, Jim Dondero.

7.      Daugherty has a history of anger issues and I believed that his "drive by" of my office and following Stephanie was his attempt to intimidate me.

8.      I hired a private investigator, Greg Brandstatter ("Brandstatter"), to assist in confirming the identity of the driver of the black SUV with license plate BX9K764 and the tan SUV with the license plate GPF9512.

9.      Brandstatter's investigation found that Daugherty was the individual following Stephanie and driving by my office. Further, I have reviewed photographs and video recordings of Daugherty outside my home located at 3825 Potomac Ave, Dallas, Texas 75205, my office, the house of my sister, Marcia, and the house of my father, Byron Ellington.

10.     Daugherty has been documented outside my office, my home, and the homes of my family 143 times since January of 2021. Both Marcia and Stephanie have confronted Daugherty at times and demanded that he stop his harassment, but he has continued to visit my office and home, and the homes of my family members, despite these demands.

11.     I have moved residences three times from January 2021 to today. Daugherty has been recorded outside of the second and third residences to which I moved. The second residence

was Stephanie's house and was not under my name. For the third residence, my address was not searchable under my name on the Dallas County Central Appraisal District website. Nonetheless, Daugherty was recorded outside of that address within two months of me moving. On information and belief, Daugherty could not have located me at either residence without physically following me or others to those locations.

12.     I believe that Daugherty's actions are leading up to a physical attack by him on either myself, Stephanie, or members of my family. I understand that Brandstatter has reported Daugherty's harassment and stalking to the Dallas Police Department. I also called the Dallas Police Department to report the harassment and stalking. The harassment has caused me fear and anxiety and will continue to cause me fear and anxiety.

13.     Daugherty's harassment further interferes with my daily activities. I am constantly looking out for him when I am at my home or at my office. I had to hire Brandstatter to confirm that Daugherty was the individual stalking me and my family and then document the extent of the harassment. I have had security devices, such as cameras, installed at my personal home and office in response to the harassment. I have had to hire personal security. I have also had to change my daily routine to try and avoid being followed by Daugherty.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

FURTHER DECLARANT SAYETH NOT.

My name is Scott Byron Ellington. My date of birth is <u>10.24.1971</u>. My address is 3825 Potomac Ave., Dallas, Texas 75205. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 11th Day of January, 2022.

_____
Scott Ellington

DECLARATION OF SCOTT BYRON ELLINGTON

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Patricia Perkins Mayes on behalf of Julie Pettit
Bar No. 24065971
pperkins@pettitfirm.com
Envelope ID: 60728974
Status as of 1/12/2022 8:55 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |

# LYNN PINKER HURST SCHWEGMANN

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839
mhurst@lynnllp.com

Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
**lynnllp.com**

January 13, 2022

***Via FedEx and E-Mail***
Patrick Daugherty,
c/o Ruth Ann Daniels & Drew York
rdaniels@grayreed.com
dyork@grayreed.com
GRAY REED & MCGRAW, LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201

> **Re:** ***Litigation Hold: Preservation of Information. Scott Byron Ellington v. Patrick Daugherty Cause No. DC-22-00304, in the 101st Judicial District, Dallas County (the "Lawsuit").***

Dear Counsel:

Our Firm represents Scott Byron Ellington in the above-referenced Lawsuit. Texas law requires Defendant Patrick Daugherty to preserve, maintain, and not destroy or delete documents and communications (whether in hard copy or electronic form) that are relevant or could be relevant to this litigation.

Please accept this letter as Mr. Ellington's formal written request that Mr. Daugherty, and any affiliated entities, employees, agents, or representatives of Mr. Daugherty, preserve documents and other evidence, including that stored in magnetic and/or electronic form ("Hold Notice").

The following definitions shall apply in this letter:

- "You" and "your" refers to Mr. Daugherty, your agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions, and their predecessors, successors or affiliates, and their respective agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

- "Ellington Party" refers to Plaintiff Scott Ellington, Byron Ellington, Marcia Maslow, Adam Maslow, the two minor children of Marcia and Adam Maslow, Stephanie Archer and her minor child, and any person who was then accompanying any of the aforementioned individuals.

0411

Ruth Ann Daniels
Drew York
January 13, 2022
Page 2

- "Ellington Location" refers 120 Cole Street, Dallas, Texas 75207, 3825 Potomac Ave, Dallas, Texas 75205, 4432 Potomac, Dallas, Texas 75025, 430 Glenbrook Dr., Murphy, Texas 75094, 5101 Creekside Ct., Parker, Texas 75094, any other residence or place of business of any Ellington Party, and any other location Mr. Daugherty believed to be associated with any Ellington Party.

- "Ellington Recordings" shall mean all electronic recordings of any Ellington Party or Ellington Location, including any persons or vehicles at such Ellington Locations.

**Litigation Hold: Preservation of Information**

You are directed to immediately initiate a litigation hold for potentially relevant evidence comprised of (without limitation), documents, communications, tangible things, and as more fully defined below, electronically stored information (hereinafter "ESI") relating to:

(1) All claims and allegations contained within the Original Petition in this case;

(2) All factual, legal, affirmative, or other defenses Mr. Daugherty may assert in the Lawsuit;

(3) All counter-claims or third-party claims Mr. Daugherty may assert in the Lawsuit;

(4) All Ellington Recordings;

(5) All documents and communications evidencing the transmission of any Ellington Recording to any other party, person, or entity;

(6) All documents and communications with any other party, person, or entity regarding the Ellington Recordings and/or the observation, surveillance, or investigation of any Ellington Party or Ellington Location;

(7) All electronic or hand-written notes, memoranda, or other documents related to or evidencing Mr. Daugherty's recordation, observation, surveillance, or investigation of any Ellington Party or Ellington Location; and

(8) All documents and communications regarding any Ellington Party or Ellington Location from 1/1/2021 – present (or from the date Mr. Daugherty began his observation, surveillance, or investigation of any Ellington Party, if earlier than 1/1/2021).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 3

You must act diligently and in good faith to secure compliance with such litigation hold and thereby preserve the aforementioned documents, tangible things, and ESI (hereinafter, the "Evidence").

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is likely stored on current and former computer systems and other media and devices (including but not limited to personal digital assistants, voice-messaging systems, online repositories, e-mail servers, computer servers, and cellular telephones/smart phones) that belong to you or are in your possession, custody, or control.  For the avoidance of doubt, this includes any documents, communications, and information exchanged with your attorneys or otherwise subject to the attorney-client, work product, or other applicable claims of privilege as such information may be the subject of a privilege log or related motion practice.

"ESI" should be afforded the broadest possible definition and includes (by way of example, only, and not as an exclusive list) potentially relevant information electronically, magnetically, or optically stored (whether in final or draft form) as:

- Digital communications (e.g., e-mail, voice mail, text messages, instant messaging, messaging apps);
- Word-processed documents (e.g., Google Docs and Word documents);
- Email, Calendar and Diary Application Data (e.g., Outlook, Yahoo, blog tools);
- Spreadsheets and tables (e.g., Excel or Google Sheets);
- Social media communications (e.g., Facebook, Snapchat, Instagram, LinkedIn)
- Image and Facsimile Files (e.g., .pdf, .tiff, .jpg, .gif images);
- Sound Recordings (e.g., .wav and .mp3 files);
- Video and Animation (e.g., .avi, .mpg, .mpeg, .mp4, .flv, .mov files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations);
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and
- Back Up and Archival Files (e.g., Zip, .GHO).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 4


## **Suspension of Routine Destruction**

You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity, or other criteria;
- Using data or media wiping, disposal, erasure, or encryption utilities or devices;
- Overwriting, erasing, destroying, or discarding back up media;
- Re-assigning, re-imaging, or disposing of systems, servers, devices, or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and
- Executing drive or file defragmentation or compression programs.

Adequate preservation of potentially relevant evidence requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of the Evidence. *Be advised that sources of ESI are altered and erased by continued use of your computers and other devices.* Booting a drive, examining its contents, or running any application will irretrievably alter the information it contains and may constitute unlawful spoliation of the Evidence.

## **Guard Against Deletion**

You should take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy, or hide ESI on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography, or the like). One way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bit stream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

Ruth Ann Daniels
Drew York
January 13, 2022
Page 5

## Preservation in Native Form

You should anticipate that certain Evidence, including but not limited to spreadsheets and databases, may be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve such Evidence in such native forms, and you should not select methods to preserve the Evidence that remove or degrade the ability to search it by electronic means or make it difficult or burdensome to access or use the information efficiently in a lawsuit. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make it not reasonably accessible and/or illegible.

## Metadata

You should further anticipate that the need to disclose and produce system and application metadata will arise, and you should immediately act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including: deleted content, draft language, commentary, collaboration and distribution data, and dates of creation and printing. All electronically stored documents will contain metadata. You should preserve all metadata associated with any Evidence or other preserved information.

## Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved.

## Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you must preserve both forms.

## Agents, Attorneys and Third Parties

Your preservation obligation extends beyond Evidence in your care, possession, or custody and includes Evidence in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian, or contractor in possession of Evidence and instruct same to preserve such

Ruth Ann Daniels
Drew York
January 13, 2022
Page 6

Evidence to the full extent of their obligation to do so, and you must take reasonable steps to secure their compliance.

## **Failure to Comply – Sanctions**

Failure to preserve potentially relevant evidence resulting in the corruption, loss, or delay in production of evidence to which we are entitled would constitute spoliation of evidence and could subject you to severe court-imposed sanctions.

This preservation demand is continuing in nature and requires Mr. Daugherty's preservation of potentially relevant documents and materials that come into his possession, custody, or control after the date of this Hold Notice.

Please acknowledge receipt of this Hold Notice and promptly confirm that Mr. Daugherty will comply with this preservation demand. Please have your legal counsel contact me at the first opportunity so that we may discuss this matter.

Respectfully,

Michael K. Hurst

cc:     Mary Goodrich Nix (*of the Firm*)
        Nathaniel A. Plemons (*of the Firm*)
        Julie Pettit Greeson (*Co-counsel*)



**Baker & McKenzie LLP**

1900 North Pearl Street
Suite 1500
Dallas, TX 75201
United States

Tel: +1 214 978 3000
Fax: +1 214 978 3099
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East
& Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

January 31, 2022

John A. Morris
Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones
780 Third Avenue, 34th Floor
New York, NY 10017

**By email**
**jmorris@pszjlaw.com**
**jpomerantz@pszjlaw.com**

Re:   *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.); Partial Objection to Debtor's Proposed Settlement Agreement with Daugherty

Dear Mr. Morris,

We write on behalf of Scott Ellington (our "Client") to resolve certain limited objections to the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* dated December 8, 2021 [Doc. 3088, the "***Motion for Entry of Settlement***"] and the proposed *Settlement Agreement* related thereto [Doc. 3089-1, the "***Settlement Agreement***"]. In reviewing the Settlement Agreement, we have serious concerns about two provisions which (1) grant Mr. Daugherty[1] a means to access the Claimant Trust Oversight Board; and (2) assign Mr. Daugherty the Debtor's interest in two entities, HERA and ERA. *See* Settlement Agreement ¶¶ 3, 8. In light of Mr. Daugherty's ongoing inappropriate conduct, including stalking and harassing our Client which formed the basis of a temporary restraining order being issued against Mr. Daugherty, these settlement terms are inappropriate, were not previously mentioned at the Confirmation Hearing, and should be removed.

As background, Mr. Daugherty has engaged in a pattern of stalking our Client and other individuals closely associated with our Client (including our Client's girlfriend, father, sister, and at least three minor children). In an attempt to curtail this illegal behavior, our Client filed a lawsuit against Mr. Daugherty in Texas state court on January 11, 2022. The state court action was removed to the Bankruptcy Court on January 18, 2022 (*see Scott Byron Ellington v. Patrick Daugherty,* Adv. Proc. No. 22-03003-sgj) and is the subject of a pending motion to abstain and remand. The state court petition (Adv. Proc. No. 22-03003-sgj, Doc. 1-1) describes in detail the various acts Mr. Daugherty has engaged in, including 143 documented incidents of following our Client to his home or business, photographing him without permission, or surreptitiously video recording him.

While we do not object to the economics of the Settlement Agreement, two specific provisions therein pose serious concerns in light of Mr. Daugherty's ongoing conduct and

---

[1] Any capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Motion for Entry of Settlement.

Baker & McKenzie LLP is a member of Baker & McKenzie International.



the facts described above, and should not be approved as part of the Settlement Agreement. We request that the Debtor revisit and voluntarily withdraw the following two provisions, neither of which were mentioned by counsel on behalf of the Debtor or Mr. Daugherty in reciting the terms of the Settlement Agreement at the February 2-3, 2021 Confirmation Hearing:

- 3. <u>Observation Access</u>: As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, **HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board**, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest. Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the Claimant Trust Oversight Board.

- 8. <u>HERA and ERA</u>: "The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. . . . To facilitate recovery of such potential claims -- which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties -- **HCMLP will transfer its interests in HERA and ERA to Daugherty** …"

Settlement Agreement ¶¶ 3, 8 (emphasis added).

The Observation Access provision of the Settlement Agreement requires the Debtor to use reasonable efforts to petition the Claimant Trust Oversight Board to permit Mr. Daugherty to have access to meetings of the Claimant Trust Oversight Board. Given the instability of Mr. Daugherty, as demonstrated by his recent actions, we have serious concerns about Mr. Daugherty having any right to such access, which could give him both sensitive insight into information he could use to further harass the targets of his illegal conduct and a platform to influence the Claimant Trust Oversight Board to take actions to further his on-going illegal conduct.[2]

Additionally, the HERA and ERA provision of the Settlement Agreement seems to serve no purpose other than to permit Mr. Daugherty to bring additional causes of action against our Client and other former employees of the Debtor. It also could expose the Debtor's estate to claims that it aided and abetted Mr. Daugherty in the commission of a crime against our Client. Specifically, the Settlement Agreement seeks to assign to Mr. Daugherty shares in Highland Employee Retention Assets LLC ("***HERA***") and Highland ERA

---

[2] Though this provision would only give Mr. Daugherty observer access at the "discretion of the Claimant Trust Oversight Board," the Debtor and the Court should not condone even discretionary access of a stalker to his victims.



Management, LLC ("*ERA*"). Those shares are of defunct entities, and have no economic value. Indeed, the Settlement Agreement acknowledges that "HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released." Settlement Agreement ¶ 8. Again, given the instability of Mr. Daugherty, we have serious concerns about Mr. Daugherty stepping into the shoes of those defunct entities for the sole purpose of further harassing the targets of his illegal conduct.

Neither of these two provisions were necessary or material to the Debtor and Mr. Daugherty's mutual announcement of resolution at the Confirmation Hearing, nor do they seem material to the Settlement Agreement. Yet, they could result in improper harassment and illegal conduct at the hands of Mr. Daugherty. We therefore respectfully request that the Reorganized Debtor withdraw these two provisions of the Settlement Agreement. If you would like to discuss, please let us know and we will arrange a time for a call.

Sincerely,

Michelle Hartmann

+1 214 978-3421
Michelle.Hartmann@bakermckenzie.com

cc: Debra Dandeneau and Frank Grese
    Baker & McKenzie

    Frances Smith and Eric Soderland
    Ross & Smith, PC

# Hearing Search Results

Hearings for Judicial Officer **WILLIAMS, STACI** between **3/21/2022** and **3/28/2022**

| Case Number | Style / Defendant | Case Type | Date / Time | Hearing Type | Judge |
|---|---|---|---|---|---|
| DC-19-07432 | RENE O. CAMPOS vs. WEIS BUILDERS, INC. | OTHER CONTRACT | 3/21/2022 9:30 AM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-20-06109 | DEUTSCHE BANK NATIONAL TRUST COMPANY vs. THE UNKNOWN HEIRS AT LAW OF ESTHER MARTINEZ ET AL, et al | PROPERTY | 3/21/2022 10:00 AM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-21-14759 | WELLS FARGO BANK, NA vs. ROY J BREWER,, Jr. | CNTR CNSMR COM DEBT | 3/21/2022 10:30 AM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-21-05006 | DON ROBINSON vs. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | MOTOR VEHICLE ACCIDENT | 3/21/2022 11:00 AM | Motion - Strike | WILLIAMS STACI |
| DC-18-07866 | Fernando Herrera vs. Dallas Independent School District | EMPLOYMENT | 3/21/2022 1:30 PM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-18-07866 | Fernando Herrera vs. Dallas Independent School District | EMPLOYMENT | 3/21/2022 2:00 PM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-22-00508 | J.G. WENTWORTH ORIGINATIONS, LLC vs. REDACTED ANNUITANT | OTHER (CIVIL) | 3/21/2022 2:30 PM | MOTION HEARING | WILLIAMS STACI |
| DC-20-06623 | MAXWELL PAPERS LP vs. THE HANOVER INSURANCE GROUP et al | INSURANCE | 3/21/2022 3:00 PM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-17-04178 | AMANDA MIZZELL vs. JORGE FERNANDEZ | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-18-05462 | Luis Murillo vs. Jesus Paramo | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-19-06191 | NAN GRAF, et al vs. TEXAS HERITAGE LUXURY HOMES, LLC | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |

0420

| DC-19-15260 | JUSTIN RAMON THOMPSON vs. THAO PHAM NGUYEN | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-15328 | MINERVA BLANCO vs. FRITZ MANAGEMENT, LLC, et al | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-15546 | SHASHU HAGOS BERHE vs. JERRY L VANZIE, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-15897 | PAUL VEGA vs. TIFFANY SHANEE WILLIAMS, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-16019 | CONQUETTA SPENCER vs. LITAKHOM PADAVONG | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-16377 | PABLO GARCIA-SALAZAR vs. NARCIZO VERELA CASTRO | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-16447 | JOSE MURILLO vs. BLESSY CHRISTOPHERSON | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-16586 | KEITH L. HEARNE, et al vs. IGNACIA ZAVALA, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-16968 | RODESIA BROWN vs. SANDRA SMITH | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17056 | DANIEL VEGA vs. AMBER MARTINEZ MORALES | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17599 | CLAUDIA MARTINEZ vs. ALEXIS D. RICO | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17638 | LILIA MAYO, et al vs. CARLOS A. PEREZ, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17647 | ACENETT ROQUE-GARCIA vs. LUIS A. VASQUEZ, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17774 | STACI LOFTON vs. JUAN OCHOA-HERNANDEZ | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-17902 | AMERICAN STATES INSURANCE COMPANY OF TEXAS vs. BLAKELY ELIZABETH MACARI | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19- | MARIA MORALES vs. | MOTOR VEHICLE | 3/22/2022 | Jury Trial - | WILLIAMS |

| | | | | | |
|---|---|---|---|---|---|
| 17941 | MEGAN R. PATTISON | ACCIDENT | | 9:00 AM | Civil | STACI |
| DC-19-18270 | CM VANTAGE SPECIALTY INSURANCE COMPANY vs. VIGOR BUSINESS GROUP, LLC | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-18367 | NII BOTCHWAY vs. FEDREICO D OLIVERA, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-18650 | STONISH L. JOHNSON vs. WILLIAM MICHAEL BURNS | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-19107 | CARMEN PERCY vs. MICHAEL MORLEY, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-19-19314 | DISCOVER BANK vs. VALERIE A KENWELL | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-19-19531 | ANY CARS INC vs. JIMMY CHAUDHRY, et al | OTHER (CIVIL) | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-20-02441 | RAFIA ZAMAN vs. DALLAS SUMMER MUSICALS, INC., et al | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-04806 | TINA ARMSTRONG vs. DOLGENCORP OF TEXAS, INC. | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-09474 | STARTEKK, LLC vs. DAO JENSEN, et al | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-09689 | STEPHANIE MOLINA vs. WILLIAM ARMADILLO | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-09917 | NANETTE STARNES vs. COCA-COLA SOUTHWEST BEVERAGES, LLC, et al | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-12106 | PHILLIP CURRY, et al vs. OMAR PEREZ | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14066 | SOLEDAD ORELLANA vs. MOHAMMED SALEH | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14091 | EVELIA GARFIAS vs. EARMA BOWENS, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14306 | DAVID WRIGHT vs. THE PARKS AT WESTMORELAND SENIOR HOUSING, LP, et al | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20- | DIAA ALMASHNI, et al | MOTOR VEHICLE | 3/22/2022 | Jury Trial - | WILLIAMS |

0422

| | | | | | |
|---|---|---|---|---|---|
| 14356 | vs. ADNAN ASAD-ABDUD ALHANINI, et al | ACCIDENT | 9:00 AM | Civil | STACI |
| DC-20-14517 | KEDRICK SAMPSON vs. KAORI ITO | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14531 | CARLOS RAMOS, et al vs. AUSTIN MEGGINSON | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14544 | CITY OF IRVING vs. ISABEL R. KLING, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14859 | METROPLEX PLAZA LP vs. DALLAS CENTRAL APPRAISAL DISTRICT | OTHER (CIVIL) | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14895 | WILLIE THOMPSON vs. STONEGATE SENIOR LIVING LLCet al | MEDICAL MALPRACTICE | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14935 | CLAUDIA GONZALEZ, et al vs. BARBARA JOHNSON-MCMILLAN | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-14936 | HERBERT OBERMAN, et al vs. MEGAN LYNN HANCOCK, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-15050 | PERFECT LIVING, LLC vs. DALLAS CENTRAL APPRAISAL DISTRICT | TAX APPRAISAL | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-15634 | OSCAR JOHNSON vs. MARC D. FERGASON | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-15685 | LUIS MARTINEZ vs. VINCENT DUANE ANDREWS, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-15757 | REGINALD JOHNSON, et al vs. RICHARD CODY METCALF, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-15851 | SERINA JENKINS vs. JEARLEAN JENKINS | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-16730 | OSCAR AGUILAR vs. WILLIAMS CONCRETE PRODUCTS, LLC | PROPERTY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-16860 | NICHOLE HOOTMAN vs. KENIA ROMERO | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-16935 | MARIA ALDANA vs. COLLIERS INTERNATIONAL NORTH TEXAS, LLC, et al | OTHER PERSONAL INJURY | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20- | SEMATA MEHTA vs. JINA | MOTOR VEHICLE | 3/22/2022 | Jury Trial - | WILLIAMS |

0423

| | | | | | |
|---|---|---|---|---|---|
| 17107 | PREAK, et al | ACCIDENT | 9:00 AM | Civil | STACI |
| DC-20-17295 | CONNIE WILKERSON vs. GUIDO CONSTRUCTION, INC. D/B/A GUIDO TRUCKS, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-20-19309 | MOAH ELECTRIC INC. vs. BDGC LLC, et al | OTHER (CIVIL) | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-00692 | TOWER WEST PARTNERS, LP, et al vs. DALLAS CENTRAL APPRAISAL DISTRICT | TAX APPRAISAL | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-01894 | CHRISTINE LESTER vs. JENNIFER SCHLACHTER | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-01993 | IRVING NAPERT vs. USAA GENERAL INDEMNITY COMPANY | OTHER CONTRACT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-21-02117 | DALLAS PAINT & BODY, LLC vs. MARTIN LOPEZ, et al | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-02289 | PROSPERITY BANK vs. ENERGY PRODUCTION CORPORATION, et al | OTHER (CIVIL) | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-02437 | BRANDON LILLMARSet al vs. HOMA J. PORTER II, MDet al | MEDICAL MALPRACTICE | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-21-03471 | YESENIA RAMIREZ vs. TUAN KHANH NGUYEN | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-21-03837 | JACQUELINE LEATCH vs. RITA MCCLENDON, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-03902 | ESTELLA ESPINOZA vs. EMMANUEL GABRIEL LEEPER | MOTOR VEHICLE ACCIDENT | 3/22/2022 9:00 AM | Jury Trial - Civil | WILLIAMS STACI |
| DC-21-06954 | BANK OF AMERICA, N.A. vs. DEBRA G LANG | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-07746 | O FORECLOSURE et al vs. TERESA MARIE VANGILDER et al | FORECLOSURE | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-21-09198 | AMERICAN EXPRESS NATIONAL BANK vs. BEVERLY DILL | CNTR CNSMR COM DEBT | 3/22/2022 9:00 AM | Non Jury Trial | WILLIAMS STACI |
| DC-19-19711 | MARSHA SMITH vs. VANESSA WU, et al | MOTOR VEHICLE ACCIDENT | 3/22/2022 1:30 PM | Motion - Reconsider | WILLIAMS STACI |
| DC-21- | DWAIN MALONE vs. | MEDICAL | 3/22/2022 | MOTION | WILLIAMS |

0424

| | TEXAS HEART HOSPITAL OF THE SOUTHWEST LLPet al | MALPRACTICE | 2:00 PM | HEARING | STACI |
|---|---|---|---|---|---|
| DC-21-09077 | DWAIN MALONE vs. TEXAS HEART HOSPITAL OF THE SOUTHWEST LLPet al | MEDICAL MALPRACTICE | 3/22/2022 2:30 PM | MOTION HEARING | WILLIAMS STACI |
| DC-21-06299 | DELORIS PHILLIPS vs. TEXAS DEPARTMENT OF INSURANCE DIVISION OF WORKERS COMPENSATION, FLEMING COMPANIES INC, BANKERS STANDARD, ESIS, UNITED PARCEL SERVICE INC, LIBERTY MUTUTAL INSURANCE CO, TEAMSTERS LOCAL UNION 767, CITY OF DALLAS MUNICIPALITY, DALLAS COUNTY MUNICIPALITY, DALLAS POLICE DEPARTMENT MUNICIPALITY, International Brotherhood of Teamsters, Local Union 767 | WORKERS COMPENSATION | 3/22/2022 3:00 PM | Motion - Quash | WILLIAMS STACI |
| DC-21-09080 | EX PARTE DELORIS PHILLIPS | OTHER (CIVIL) | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-09811 | EQUIPMENTSHARE.COM, INC. vs. CRAWFORD R W, LLC, et al | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-11513 | DISCOVER BANK vs. EDWIN HERNANDEZ | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-12017 | JOSE G. LICEA vs. AGUSTIN BERDEJO | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-12578 | TBK BANK, SSB vs. IM SERVICES GROUP, LLCet al | OTHER CONTRACT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-14141 | MARIA BERMUDEZ-BUSTILLO vs. TYREK ANTYONE WAITS | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |

| DC-21-14726 | PHILEMON RAY BROWN, Jr.et al vs. CASTRO'S POOL AND GENERAL CONTRACTOR COMPANYet al | OTHER CONTRACT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-14961 | DISCOVER BANK vs. ANDREA VANCE | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-15713 | GABRIELA LEIJA vs. JOSE MARTINEZ | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-17060 | ONCOR ELECTRIC DELIVERY COMPANY LLC vs. SERGIO ALBERTO CLETO GUERRA | OTHER PERSONAL INJURY | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-17387 | WELLS FARGO BANK, NA. vs. MARTIN W KAUP | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-17485 | NEORA, LLC vs. NERIUM BIOTECHNOLOGY, INC. | OTHER (CIVIL) | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-00640 | TABORIC LEE vs. LENA JOHNSON, et al | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-00980 | GWENDOLYN FROST vs. JOHN DOE, et al | PROPERTY | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-00986 | STATE OF TEXAS vs. TWENTY -FOUR THOUSAND FIVE HUNDRED SIXTY-THREE DOLLARS IN UNITED STATES CURRENCY, et al | SEIZURE/FORFEITURE | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-00989 | ROBERT FLETCHER, et al vs. FIX N FLIP SOLUTIONS, LLC, et al | OTHER (CIVIL) | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-00995 | DISCOVER BANK vs. ROSLYN RATLIFF | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01014 | JUDY Y HAN, et al vs. BARKAT ALI | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01015 | JESSICA LOPEZ vs. BECKWITH, INC., et al | OTHER (CIVIL) | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF | WILLIAMS STACI |

| | | | | | PROSECUTION | |
|---|---|---|---|---|---|---|
| DC-22-01026 | NATALIE SOKOL , et al vs. KIMBERLY-CLARK CORPORATION | OTHER (CIVIL) | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01029 | PROGRESSIVE COUNTY MUTUAL INSURANCE COMPANY vs. VICTRON ENERGY INC. | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01031 | GEICO COUNTY MUTUAL INSURANCE COMPANY vs. CANDACE MARLENE SHEPPEARD | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01039 | O FORCLOSURE et al vs. WILFRED D SASSER , Jr. et al | FORECLOSURE | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01040 | 21ST MORTGAGE CORPORATION vs. JAIME VILLEGAS, et al | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01054 | AGUSTIN GUERRERO vs. ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01057 | DISCOVER BANK vs. ACASIO T FLORES | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01070 | LACEY JEFFREY, et al vs. GLOBAL CAR RENTALS, LLC | OTHER PERSONAL INJURY | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01131 | PRESTON BEND VILLAGE II CONDOMINIUM ASSOCIATION, INC. vs. CASSANDRA C. COSSet al | OTHER CONTRACT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01156 | CAPITAL ONE BANK (USA), N.A. vs. CORREION R MOSBY | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01172 | GEICO COUNTY MUTUAL INSURANCE COMPANY vs. TERESA SOTO NIETO | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01188 | MASON DAVID DIFFEE vs. DAVID GUTIERREZ, et al | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22- | SUNDUS ALZUBAIDIet | MEDICAL | 3/25/2022 | DISMISSAL | WILLIAMS |

| | | | | | |
|---|---|---|---|---|---|
| 01226 | al vs. BAYLOR MEDICAL CENTERS AT GARLAND AND MCKINNEYet al | MALPRACTICE | 9:00 AM | FOR WANT OF PROSECUTION | STACI |
| DC-22-01253 | JANGA CHETTYREDDY vs. ARVINDBHAI PATEL, et al | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01259 | WINDSOR PARK NO. 2 OWNERS ASSOCIATION, INC et al vs. CAROLYN JONES et al | FORECLOSURE | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01275 | PROGRESSIVE COUNTY MUTUAL INSURANCE COMPANY vs. KARLA DEL TORO-GONZALEZ | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01276 | CLARA LIZETTE CASTRO PADILLA, et al vs. JENNIFER TOVAR | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01280 | WASEE CHOWDHURY, et al vs. MADHUMITHA SAKTHIVEL | MOTOR VEHICLE ACCIDENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01291 | JPMORGAN CHASE BANK, N.A. vs. KENNY NGUYEN | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01295 | CARFAX, INC. vs. EECU | GARNISHMENT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-22-01316 | GOLDMAN SACHS BANK USA vs. CHERYL MCCANE | CNTR CNSMR COM DEBT | 3/25/2022 9:00 AM | DISMISSAL FOR WANT OF PROSECUTION | WILLIAMS STACI |
| DC-21-09555 | CHARLES THOMAS WESNER, Jr. vs. TY EISHA LA'SHA COOPER | MOTOR VEHICLE ACCIDENT | 3/25/2022 2:00 PM | MOTION HEARING | WILLIAMS STACI |
| DC-21-15021 | ACCELERATED INVENTORY MANAGEMENT, LLC vs. FRANK PEREZ | CNTR CNSMR COM DEBT | 3/25/2022 2:00 PM | MOTION HEARING | WILLIAMS STACI |
| DC-21-18409 | RYAN CARTER vs. HO VAN THANH | MOTOR VEHICLE ACCIDENT | 3/25/2022 2:00 PM | MOTION HEARING | WILLIAMS STACI |
| DC-20-06196 | ROBERT CANTWELL vs. PAUL DESCHENES, et al | CNTR CNSMR COM DEBT | 3/28/2022 9:30 AM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-21-01416 | STACIA PRICE, et al vs. ERIC RICO, et al | OTHER PERSONAL INJURY | 3/28/2022 10:00 AM | Motion - Dismiss | WILLIAMS STACI |
| DC-21- | STACIA PRICE, et al vs. | OTHER PERSONAL | 3/28/2022 | Motion - | WILLIAMS |

| | | | | | |
|---|---|---|---|---|---|
| 01416 | ERIC RICO, et al | INJURY | 10:30 AM | Dismiss | STACI |
| DC-21-15997 | FLORENTINO ANDRES vs. DAVID STERMER | CNTR CNSMR COM DEBT | 3/28/2022 11:00 AM | Motion - Transfer | WILLIAMS STACI |
| DC-18-09310 | WILLIE BICKHAM, III, et al vs. BARNES CHRISTOPHER COUNCIL | MOTOR VEHICLE ACCIDENT | 3/28/2022 1:30 PM | Motion - Reconsider | WILLIAMS STACI |
| DC-21-02885 | EMCASCO INSURANCE COMPANY vs. PHILIPPE PEREIRA TEIXEIRA | MOTOR VEHICLE ACCIDENT | 3/28/2022 2:00 PM | Motion - Summary Judgment | WILLIAMS STACI |
| DC-20-07845 | SWIFT FINANCIAL, LLC vs. SH ADDISON, LLC, et al | OTHER (CIVIL) | 3/28/2022 3:00 PM | Motion - Compel | WILLIAMS STACI |

1 - 127 of 127 items

# Hearing Search Results

Hearings for Judicial Officer **WILLIAMS, STACI** between **4/18/2022** and **4/25/2022**

| Case Number | Style / Defendant | Case Type | Date / Time | Hearing Type | Judge | Courtroom |
|---|---|---|---|---|---|---|
| DC-21-17587 | ONESOURCE VIRTUAL, INC. vs. PRIMEPAY, LLC | CNTR CNSMR COM DEBT | 4/18/2022 1:30 PM | Motion - Dismiss | WILLIAMS, STACI | |
| DC-19-19876 | MICHAEL EDWARDS vs. ROYCE GARRETT, et al | MOTOR VEHICLE ACCIDENT | 4/18/2022 2:00 PM | MOTION HEARING | WILLIAMS, STACI | |
| DC-21-06299 | DELORIS PHILLIPS vs. TEXAS DEPARTMENT OF INSURANCE DIVISION OF WORKERS COMPENSATION, FLEMING COMPANIES INC, BANKERS STANDARD, ESIS, UNITED PARCEL SERVICE INC, LIBERTY MUTUTAL INSURANCE CO, TEAMSTERS LOCAL UNION 767, CITY OF DALLAS MUNICIPALITY, DALLAS COUNTY MUNICIPALITY, DALLAS POLICE DEPARTMENT MUNICIPALITY, International Brotherhood of Teamsters, Local Union 767 | WORKERS COMPENSATION | 4/18/2022 2:30 PM | MOTION HEARING | WILLIAMS, STACI | |
| DC-21-02318 | BANK OF AMERICA, N.A. vs. JOHN W BICKEL, II | CNTR CNSMR COM DEBT | 4/18/2022 3:00 PM | Motion - Summary Judgment | WILLIAMS, STACI | |
| DC-18- | OSCAR D. | PROPERTY | 4/19/2022 | Non Jury | WILLIAMS, | |

0430

| | | | | | |
|---|---|---|---|---|---|
| 07091 | MARMOLEJO vs. JORGE CHAVEZ, et al | | 9:00 AM | Trial | STACI |
| DC-19-00456 | VALORIE TORRES vs. JOSE CARMEN GARCIA | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-02481 | DALIA POPOCA vs. SILVIA MORALES ARIZMENDIZ, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-04371 | DAVID HANSCHEN, et al vs. JAMES HANSCHEN | OTHER (CIVIL) | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-19-06204 | CHARTER DRYWALL DALLAS, INC. vs. ELIJAH KORD CUSTOM HOMES, INC., ET AL | CNTR CNSMR COM DEBT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-06498 | CHARLOTTE DUNN vs. JON DODD | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-10595 | FIRST GLENDORA PARTNERS, LTD. vs. PORTOLANI FAMILY, L.P. | CNTR CNSMR COM DEBT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-14277 | MATRIX FINANCIAL SERVICES CORPORATION vs. SANDY WALLACE, et al | PROPERTY | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-19-14442 | ELDREDGE AVIATION, LLC vs. JOSHUA MICHAEL HOFFMAN, et al | CNTR CNSMR COM DEBT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-19-15492 | DIONCA WESLEY, et al vs. ALAA RAHHAL, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-00219 | ALBERT MCBRIDE vs. KEVIN OMAR SALAZAR ROSALES, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-00358 | LATOYA MARTIN vs. MARIA DEJESUS GARCIA | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-01891 | ERNESTO LOPEZ vs. NOGALES | MOTOR VEHICLE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |

0431

| | | | | | |
|---|---|---|---|---|---|
| | PRODUCE, INC., et al | ACCIDENT | | | |
| DC-20-03940 | RAMON BALTAZAR vs. RG WELDING OILFIELD SERVICES LLC, et al | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04062 | MARCO TORRES, et al vs. LOGAN SMITH, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04276 | JEFFREY DELON DAVIS vs. DAMARQUES ANTWON DAVIS, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04595 | SOPHIA BROWN, et al vs. EDGAR NAVA SILVA, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04708 | DAVID SCOTT vs. AURLIANA CAMARGO, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04848 | NICOLE QUINN vs. PATRICK NIYIBIZI, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04881 | SANDRA PEREZ vs. ALISON SIRAVO | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04900 | LULA ANDERSON, et al vs. ALEXA DOMINGUEZ-RODRIGUEZ, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04972 | MARIA ROCHA vs. TEXAS THRIFT STORES INC., et al | PROPERTY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-04982 | SHIRLEY MEDARIS vs. BRUCE MORRIS, MDet al | MEDICAL MALPRACTICE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-05080 | JENNIFER NICOLE REYES vs. RAJAN PANTA | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-05192 | NATIONAL LLOYDS INSURANCE COMPANY vs. LISA GARAY | OTHER (CIVIL) | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |

| DC-20-05228 | MARC P. GAJIWALA vs. REGINA GAJIWALA | OTHER (CIVIL) | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
|---|---|---|---|---|---|
| DC-20-06440 | CHARLESEA ALLEN vs. JOSE SANTIAGO CASTILLO | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-06505 | LEON TACKETT vs. LAURA COOKSEY | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-06578 | ETHEL BUCKLEY vs. JASMINE HERNANDEZ | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-06625 | CAROL COTTON vs. CLAUDIA IRENE MERCHER | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-06644 | LADAMONYON HALL vs. CLINT TURNIPSEED, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-06788 | ANGELA MERRIDY vs. JUANITA RODRIGUEZ, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-07140 | JAMES HARRIS, et al vs. DALLAS AREA RAPID TRANSIT | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-07310 | JOSE LOZANO, et al vs. JOSE SANCHEZ, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-07447 | ALEJANDRA SOTO, et al vs. JESSICA BOATMAN | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-07692 | CLAUDIA FOWLER vs. DALLAS COUNTY TAX OFFICE, et al | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-07901 | GUADALUPE YOLANDA RODRIGUEZ vs. JOHN OLIPHANT, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-08551 | HOMERO CORTEZ ALVAREZ vs. UNITED SITE SERVICES OF TEXAS INC, et al | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |

0433

| | | | | | |
|---|---|---|---|---|---|
| DC-20-08835 | TERRY WATSON vs. CHRISTOPHER REID, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-08854 | TERRY COZBY vs. LETICIA POOLE | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-08869 | MARY BELL vs. CARMEN MAJORS, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-09313 | SJB DEVELOPMENT LLC et al vs. LONESTAR TAPE, BED & TEXTURE CENTRAL TEXAS LLC et al | CONSTRUCTION | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-09719 | LISA M ISAACS vs. TEXAS WING INC., et al | PROPERTY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-09810 | BENJAMIN HILL LLC vs. CHARLES GEORGE | OTHER (CIVIL) | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-20-10141 | SEBASTIAN PHENIX vs. V & M TRUCK SALES INC, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-11445 | DEONITA HUBBARD vs. MARIA SILVIA, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-11580 | VICTOR GASPAR vs. PNP HOSPITALITY, INC. | PROPERTY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-12065 | RUFINA RAMIREZ-GARCIA vs. JUSTIN BLAINE SHEAD, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-12946 | UNIONINVESTMENT REAL EST GMBH vs. DALLAS CENTRAL APPRAISAL DISTRICT | TAX APPRAISAL | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-13054 | JJN SPIRIT, LP vs. KINZIE ADELE NORRIS | CNTR CNSMR COM DEBT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-13269 | INTERNATIONAL CENTER DEVELOPMENT | TAX APPRAISAL | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |

0434

| | XVIII LLC vs. DALLAS CENTRAL APPRAISAL DISTRICT | | | | |
|---|---|---|---|---|---|
| DC-20-13789 | JOSE MENDOZA vs. ADRIANA GUERRERO | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-14116 | HSRE-RCP GATEWAY, LP (6121 North State Highway 161) vs. DALLAS CENTRAL APPRAISAL DISTRICT | TAX APPRAISAL | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-14720 | WANDA HOUSTON vs. RICARDO VEGA GARCIA, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18252 | JORGE CHEL, et al vs. ESTHER NKEM NWACHOKOR | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18267 | BARRON LADELL vs. MICHAEL DOTY, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18279 | CHERIE COMPOTARO vs. ALEJANDRA HERNANDEZ, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18489 | AJIBOLA OMISORE vs. ERA GILLESPIE, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18552 | PRECIOUS WILLIAMSet al vs. CHRISTOPHER L. BELL, MDet al | MEDICAL MALPRACTICE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18790 | QUINESTZ TILLMAN vs. JENNIFER TOVAR | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18919 | HOWARD GYLER vs. BRANDON RAMIREZ | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20-18993 | TERREON ANDERSON, et al vs. BRANDI MAE VEGA, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-20- | DAVID COLE vs. | PROPERTY | 4/19/2022 | Jury Trial - | WILLIAMS, |

| | | | | | |
|---|---|---|---|---|---|
| 19037 | MELBA TOMPKINS | | 9:00 AM | Civil | STACI |
| DC-20-19054 | ANGELA WADE vs. CHARLES FLOYD, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-19321 | CARLTON RUSSELL vs. NANA YAW AMOAH et al | PROFESSIONAL LIABILITY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-00049 | JOSEPH KOWALSKI vs. KAREN BELL | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-00124 | MAURO CURIEL BELTRAN vs. ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY | OTHER (CIVIL) | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-00636 | MELODY WALKER vs. CATHERINE PHAM | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-00727 | PASHA & SINA, INC. vs. DALLAS CENTRAL APPRAISAL DISTRICT | TAX APPRAISAL | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-00806 | STEPHANIE BIGNELLet al vs. CHILDREN'S MEDICAL CENTER DALLASet al | MEDICAL MALPRACTICE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-01038 | LARRY WILLIAMS vs. ANTENEH MENGESTABE, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-01079 | WENDY KRATZ vs. RANDALL FRAKES, et al | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-01171 | JENNIFER WILSON vs. ERIKA MUNOZ | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-01434 | MICHAEL DAVENPORT vs. JOSE AUGUSTO MARQUEZ JAN, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-01623 | DE'YUNA HILL, et al vs. PROGRESSIVE | MOTOR VEHICLE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |

0436

| | CASUALTY INSURANCE COMPANY | ACCIDENT | | | | |
|---|---|---|---|---|---|---|
| DC-21-01737 | ELIAZAR JOSEMARIA, et al vs. MARVIN MILHOUSE, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-03124 | MAURICIO MARTINEZ vs. EOS GROUP INC, et al | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-03437 | JENNIFER MUSSELL vs. MIDLAND FUNDING, LLC, et al | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-05198 | MARIA DE LA CRUZ SALAS vs. ANGELICA SUSANA GANDARA ESCAJEDA | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-07675 | JAMES WHITE, et al vs. CHRISTA LEE EVANS | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-07709 | DISCOVER BANK vs. GISELLE MARTINEZ | CNTR CNSMR COM DEBT | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-08262 | WARREN DALE MCDONALD, et al vs. CHARLOTTE COOK, et al | PROPERTY | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-08575 | ONCOR ELECTRIC DELIVERY COMPANY LLC vs. MARCO ANTONIO CRUZ | OTHER PERSONAL INJURY | 4/19/2022 9:00 AM | Non Jury Trial | WILLIAMS, STACI |
| DC-21-11289 | KATHERINE COLEMAN vs. MERIDIAN WILLIAMSBURG ACQUISITION PARTNERS, LPet al | MEDICAL MALPRACTICE | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21-15170 | TAMIA JONES WILSON, et al vs. JACQUELINE PHILLIPS | MOTOR VEHICLE ACCIDENT | 4/19/2022 9:00 AM | Jury Trial - Civil | WILLIAMS, STACI |
| DC-21- | Dan Kennedy EPSP | CNTR CNSMR | 4/25/2022 | Motion - | WILLIAMS, |

| | | | | | |
|---|---|---|---|---|---|
| [12339](#) | 401K, et al vs. Fontana Holdings, Inc., et al | COM DEBT | 9:30 AM | Summary Judgment | STACI |
| [DC-21-12339](#) | Dan Kennedy EPSP 401K, et al vs. Fontana Holdings, Inc., et al | CNTR CNSMR COM DEBT | 4/25/2022 10:00 AM | Motion - Summary Judgment | WILLIAMS, STACI |
| [DC-21-06299](#) | DELORIS PHILLIPS vs. TEXAS DEPARTMENT OF INSURANCE DIVISION OF WORKERS COMPENSATION, FLEMING COMPANIES INC, BANKERS STANDARD, ESIS, UNITED PARCEL SERVICE INC, LIBERTY MUTUTAL INSURANCE CO, TEAMSTERS LOCAL UNION 767, CITY OF DALLAS MUNICIPALITY, DALLAS COUNTY MUNICIPALITY, DALLAS POLICE DEPARTMENT MUNICIPALITY, International Brotherhood of Teamsters, Local Union 767 | WORKERS COMPENSATION | 4/25/2022 10:30 AM | Motion - Dismiss | WILLIAMS, STACI |
| [DC-21-18178](#) | IN RE: CODY LEWIS | OTHER (CIVIL) | 4/25/2022 11:00 AM | MOTION HEARING | WILLIAMS, STACI |
| [DC-18-07866](#) | Fernando Herrera vs. Dallas Independent School District | EMPLOYMENT | 4/25/2022 1:30 PM | Plea to Jurisdiction | WILLIAMS, STACI |
| [DC-20-15967](#) | PALAZZO HOLDINGS LLC vs. PASMAA GP INVESTMENT FUND MANAGER LLC, et al | CNTR CNSMR COM DEBT | 4/25/2022 2:00 PM | MOTION HEARING | WILLIAMS, STACI |
| [DC-21-](#) | EPHRAIM KENG vs. | MOTOR | 4/25/2022 | Motion - | WILLIAMS, |

| 03464 | HECTOR GARCIA, et al | VEHICLE ACCIDENT | 2:30 PM | Strike | STACI |
| DC-21-03296 | PAKITA ROGERS, et al vs. LUCAS JENSON, et al | MOTOR VEHICLE ACCIDENT | 4/25/2022 3:00 PM | Motion - Strike | WILLIAMS, STACI |

1 - 97 of 97 items