# EXHIBIT PD-9

EFiled: Dec 05 2019 09:55AM EST
Transaction ID 64489723
Case No. 2019-0956-MTZ

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,

     Plaintiff,

       v.

JAMES DONDERO, HIGHLAND
ERA MANAGEMENT LLC,
HIGHLAND EMPLOYEE
RETENTION ASSETS LLC,
HUNTON ANDREWS KURTH LLP,
MARC KATZ, MICHAEL HURST,
SCOTT ELLINGTON, THOMAS
SURGENT AND ISAAC
LEVENTON,

     Defendants.

C.A. No. 2019-

PUBLIC VERSION
FILED DECEMBER 5, 2019

## VERIFIED COMPLAINT

Patrick Daugherty brings this action against James Dondero, Highland

Employee Retention Assets LLC ("HERA"), Highland ERA Management

LLC ("HERA Management"), Hunton Andrews Kurth LLP ("Andrews

Kurth"), former Andrews Kurth attorney Marc Katz, former Gruber Hurst

Johansen Hail Shank LLP attorney Michael Hurst, and internal Highland

Capital Management L.P. ("Highland") attorneys Scott Ellington, Thomas

Surgent, and Isaac Leventon (collectively, "Defendants") to recover for

Defendants' wrongdoing, some of which was revealed only during the

0108

course of related litigation in this Court, *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2017-0488-MTZ (the "Delaware Related Action"), which is stayed because of Highland's bankruptcy.

## Introduction

1.      On December 1, 2016, the Court of Appeals for the Fifth District of Texas at Dallas issued a mandate in the lawsuit captioned *Highland Capital Management, L.P. v. Daugherty*, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action"), concluding over four years of litigation between Highland, HERA, and Daugherty.  The appellate court affirmed the final judgment of the trial court.

2.      Under the final judgment, Daugherty was awarded $2.6 million in damages against HERA, plus pre- and post-judgment interest, as compensation for the diminution of value of Daugherty's HERA units based on HERA's breach of the implied covenant of good faith and fair dealing.

3.      HERA has failed to satisfy Daugherty's judgment.  During 2013 and 2014, after the Texas Action commenced, Dondero, HERA, HERA Management, Highland, Katz, Hurst, Ellington, Surgent, and Leventon engaged in fraud, a conspiracy to defraud Daugherty, and civil conspiracy with the goal of defrauding Daugherty and never paying him the

2

compensation he had earned. The wrongdoing was consummated after the Texas appellate court issued its mandate on December 1, 2016.

4.     At that point, Defendants raided assets that they fraudulently told the Texas judge and jury and Daugherty that they had set aside in escrow in Delaware to satisfy his claims. The fraudulent statements that the assets had been set aside for Daugherty's benefit in escrow in Delaware during the Texas Action and were not in the control of Highland were made to preclude Daugherty from bringing his claims related to such assets against Highland itself, among other fraudulent purposes.

5.     What Defendants and Highland intended, however, was a classic bait-and-switch fraud. The scheme was to lie to the Texas judge and jury and Daugherty by telling them the assets were set aside for Daugherty in escrow in Delaware. If the assets could be said to belong to any Highland affiliate, it would be HERA, not Highland itself, because HERA would receive the assets if Daugherty prevailed, they said. This was the bait. Daugherty took the bait and the Texas judge and jury took it too. Both Daugherty and the Texas judge and jury directed their attention to HERA instead of Highland to make Daugherty whole for what had been done to his HERA interests.

3

6.     After the appellate mandate was entered, Defendants and
Highland executed the switch.  Dondero, through Ellington, Surgent,
Leventon, and Katz, on whom he relied, pulled the assets out of the escrow
in Delaware, declared that HERA had no ownership over the assets related to
Daugherty's HERA interest that had been held in escrow in Delaware, and
declared that HERA had no ability to cover its separate $2.6 million
judgment in Daugherty's favor.

7.     In this action, Daugherty seeks recovery for Defendants'
fraudulent scheme from the parties who were implicated as set forth below
during the prosecution of the Delaware Related Action.[1]

### The Parties and Related Persons

8.     Daugherty resides in Dallas, Texas.  Daugherty was a partner
and senior executive of Highland and certain of its affiliates from 1998 until
2011, when Daugherty resigned.

9.     Non-party Highland is a Delaware limited partnership with its
principal place of business at 300 Crescent Court #700, Dallas, Texas 75201.

---

[1] Trial in the Delaware Related Action was scheduled for October 14-
16, 2019.  The Court conducted the first two days of trial, but Highland
declared bankruptcy on the morning of the third day.  The Delaware Related
Action is currently stayed and Daugherty currently is not able to bring the
causes of action set forth in this complaint against Highland outside of the
bankruptcy proceedings.  The transcript of the trial proceedings is
incorporated herein by reference.

4

Highland was co-founded by and is controlled by defendant Dondero and non-party Mark Okada, their affiliates, and various trusts for their benefit and the benefit of their immediate families. Okada announced his departure from Highland in September 2019. Highland declared bankruptcy on October 16, 2019.

10. Defendant Dondero is Highland's co-founder and president. He is also the president of HERA Management, the ostensible manager of HERA. Dondero is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

11. Defendant HERA is a Delaware limited liability company that was formed on June 23, 2009.

12. Defendant HERA Management is a Delaware limited liability company that was formed on February 1, 2013. Dondero's testimony in the Delaware Related Action demonstrates that HERA and HERA Management have been mere instrumentalities and Dondero's alter egos since 2013.

13. Andrews Kurth was a law firm based in Houston, Texas, prior to its merger with Hunton & Williams LLP in April 2018.[2] Defendant Hunton Andrews Kurth LLP is the successor to Andrews Kurth LLP and,

---

[2] In certain locations, Andrews Kurth also operated under the name Andrews Kurth Kenyon after hiring all attorneys of the firm Kenyon & Kenyon LLP in August 2016.

0112

because the events at issue pre-date the merger, is referred to herein as "Andrews Kurth." Andrews Kurth is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

14.   Defendant Katz is an attorney who represents Highland and was a partner of Andrews Kurth LLP from July 2009 to February 2018. In February 2018, Katz joined the firm DLA Piper. Katz is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

15.   Defendant Hurst is an attorney who represents Highland and nominally represented HERA in the Texas Action. Until February 2016, Hurst was a partner of Gruber Hurst Johansen Hail Shank LLP, which was a law firm in Dallas, Texas, prior to its dissolution in April 2018. Hurst is now a partner of Lynn Pinker Cox & Hurst LLP, a law firm in Dallas, Texas. Hurst is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

16.   Defendant Ellington is an in-house attorney at Highland. Ellington is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

17.   Defendant Surgent is an in-house attorney at Highland. Surgent is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

18.   Defendant Leventon is an in-house attorney at Highland. Leventon is subject to this Court's jurisdiction under 10 *Del. C.* § 3104.

0113

## Daugherty's Interest in HERA

19.     Highland performed poorly during the 2008-2009 financial crisis.  Late in 2008, Highland was viewed as a firm likely to default.  It had very little cash and available assets for incentive-compensation purposes.  Accordingly, HERA was created by Highland to curb employee resignations by offering employees a replacement of their previously received deferred compensation that was awarded on February 27, 2009.

20.     HERA was intended to be an independent (from Highland) standalone entity to retain, reward, and incentivize Highland's employees (excluding Dondero and Okada) by granting them equity-like awards in certain funds, and then distributing the proceeds of those interests to the employees in their capacity as unit holders of HERA.

21.     Under the Limited Liability Company Agreement of Highland Employee Retention Assets LLC dated October 26, 2009, the purpose of HERA "shall be to receive and hold assets to be contributed by [Highland] and to distribute the proceeds of such assets from time to time to certain employees of [Highland] (or of affiliates of [Highland], as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing."

0114

22.     Daugherty became a member of HERA on October 26, 2009, subject to a vesting schedule requiring Daugherty to remain employed at Highland through May 15, 2011.

23.     Daugherty was initially awarded 1,571.86 Series A Preferred Units and was the largest holder in HERA.

24.     Daugherty's ownership percentage increased as other employees resigned from Highland prior to vesting. Daugherty remains a member of HERA and holds 1,909.69 vested Series A Preferred Units, representing a 19.0969% ownership share of HERA.

### The 2012 Amendment and Section 12.1

25.     Daugherty resigned from Highland on September 28, 2011. At the time of his resignation, Daugherty was a director of HERA.

26.     On February 16, 2012, all the directors of HERA except Daugherty removed Daugherty as a director. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (drafted by Surgent, Highland's assistant general counsel and chief compliance officer) (the "2012 Amendment").

27.     The 2012 Amendment added a new Article 12, which included dispute-resolution and confidentiality provisions:

8

a.     Under Section 12.1, if any member of HERA, including a holder of Series A Preferred Units (i.e., Daugherty), "commences litigation" or "otherwise initiates any dispute or makes any claim ... related to HERA" against HERA, any of its directors, officers, or agents, or any HERA member, *including Highland*, or that does or could adversely impact the assets held by HERA, "then with the consent of 75% of the Board, all pending and future distributions to" that litigating member "shall be immediately suspended and held in escrow by HERA until the final, non-appealable resolution of the Dispute."

b.     If the litigating member does not prevail, the full costs of the litigation, including attorneys' fees, are deducted from the escrow account and the balance will be distributed to the litigating member. However, even if the litigating member prevails, the Board has sole discretion to withhold the escrowed funds to cover any diminution in value to HERA "resulting from or in connection with" the litigation, as determined by the Board in its sole discretion. Any withheld funds are to be reallocated to the other Preferred Unit holders on a pro-rata basis.

28.     Section 12.1 represented Defendants' first attempt to take Daugherty's compensation through fiat. The evolution of Defendants' positions with respect to Section 12.1 over time has been remarkable. The

9

only continuous thread is that Defendants' positions have changed to whatever they believed to be most convenient at the moment, without regard to coherence with previous positions taken.

### The Texas Action and Dondero's Takeover of HERA

29.     In 2012, after Daugherty participated in a Highland-sanctioned exit interview with concerned investors and after Daugherty testified under court order in Dondero's divorce proceeding, Highland commenced the Texas Action against Daugherty.  The Texas Action was filed just seven weeks after the 2012 Amendment.

30.     Daugherty responded in the Texas Action with counterclaims against Highland for breach of contract and defamation and third-party claims against HERA and others.  Daugherty alleged breach of contract and breach of the covenant of good faith and fair dealing against HERA and Highland based on the 2012 Amendment.

31.     During the Texas Action, Dondero sought to gain control of HERA by buying its units held by current and former employees of Highland and isolating Daugherty to punish him.  This was one of the first steps in the conspiracy to defraud Daugherty and Dondero relied on Ellington, Surgent, and Leventon, who were "coordinating a plethora of

0117

external legal counsel," which, on information and belief, included Andrews

Kurth, Katz, and Hurst.

32.　　On December 26, 2012, Dondero schemed with Ted Dameris,

then a board member of HERA and an employee of Highland, to "offer

everyone except 1 a buyout offer at 100% cash and 40% discount on" non-

cash assets of HERA.  Daugherty was offered nothing for his interest, the

value of which Highland claimed was exceeded by the "costs, expenses and

diminution of the assets."  In fact, Daugherty's value was set at $0 arbitrarily

and in bad faith.  The "costs, expenses and diminution of the assets" tracked

Section 12.1 of the 2012 Amendment, but Defendants stated more than a

dozen times in the Texas Action that Section 12.1 was never employed.

They presented that position to argue that there could be no damage to

Daugherty since the provision had never been employed.

33.　　Hurst argued in closing arguments to the Texas jury that

Daugherty's claim of divestment of his interest through operation of Section

12.1 made no sense: "Divesting by Section 12.1, how can there be breach of

contract for divesting by Section 12.1 when he still has his interest, all of

it[?]"  The jury accepted that argument and did not find a breach of contract

for divesting by operation of Section 12.1.  Defendants would later claim

11

that Highland was entitled to all of Daugherty's interest, but they kept this position secret during the Texas Action.

34.     In January 2013 Highland offered to all HERA unit holders—except Daugherty—to purchase their units for 100 percent of the value of their cash interests and 60 percent of the value of their non-cash interests. All offerees accepted the buyout offer. Dondero relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud, which was necessary to isolate Daugherty to set up the scheme presented in the Texas Action.

35.     Next, in January 2013 the HERA board collaborated with Dondero (who relied on the legal advice of Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud) to transfer the management powers of HERA to HERA Management. This part of the scheme was necessary to give Dondero the appearance of legal authority to act on behalf of HERA to carry out the scheme presented in the Texas Action. At the time, HERA Management was not validly formed under Delaware law.

36.     On January 19, 2013, the HERA board members resigned after each received a buyout offer from Highland, and HERA Management

12

became the sole manager of HERA.  At the time, HERA Management was not validly formed under Delaware law.

37.     With Daugherty isolated as the only remaining equity holder of HERA, Defendants orchestrated a targeted effort to deprive him of the compensation he had earned in the form of HERA units.

38.     Through a series of transactions in early 2013, HERA Management (controlled by Dondero) emptied HERA (controlled by Dondero) of all its underlying assets and transferred those assets to Highland (controlled by Dondero), which Dondero testified was done in reliance on the legal advice provided by Highland's in-house and external counsel who are Defendants in this action to carry out this part of the fraud.

39.     On February 1, 2013, the date that HERA Management was formed under Delaware law, Dondero purportedly executed the Third Amended and Restated Agreement of HERA (the "Third Amended and Restated HERA LLC Agreement") (again drafted by Surgent), which stripped virtually all the rights of HERA unit holders.  It eliminated:

      a.     the purposes for which HERA was created;

      b.     the requirement of HERA to make cash distributions to unit holders to cover pass-through tax obligations attributable to HERA; and

      c.     members' rights to indemnification.

13

40.     The Third Amended and Restated HERA LLC Agreement no longer included a Section 12.1.  The Third Amended and Restated HERA LLC Agreement included a dispute-resolution provision at Section 11.1, but it had been changed materially from the prior agreement.  The 2012 Amendment provided a mechanism whereby a member's interest could be placed "in escrow" (what the agreement called the "Dispute Escrow").  The Dispute Escrow would be paid out to the prevailing party at the conclusion of the dispute subject to a determination by HERA's board that the value of assets held by the Company had been diminished by the dispute.  The 2012 Amendment expressly provides that costs **cannot** be offset against a prevailing party.

41.     The Third Amended and Restated HERA LLC Agreement provided no such mechanism.  Instead, Section 11.1 provided an even more arbitrary process.  It eliminated the concept of a Dispute Escrow altogether.  Nothing would be placed in escrow, there was no recognition that a member who prevailed would be entitled to the interest, and Highland could cancel out all value attributable to the member's interest by fiat and impose costs as an "offset" against value even if the member prevailed.  A comparison of the two provisions is set forth below.

14

Section ~~12.1~~ 11.1 → Dispute Resolution. In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a *"Disputing Party"*), is party to or commences litigation ~~or, solely with respect to persons who have not executed a separation agreement in favor of the Initial Member unless such action constitutes a breach of such separation agreement,~~ or otherwise is party to or initiates or has initiated any dispute or makes or has made any claim, or takes or has taken any action that results in, has resulted in or could be expected to result in any third party making a claim, in each case involving or related to the Company, the Manager, the Initial member, or any of their respective members, officers, directors, agents, representatives, partners, employees, advised funds or accounts equity holders (collectively, *"Relevant Parties"*) or the management or operation ~~thereof or~~ of any such entities or any of the assets held thereby (each, a *"Dispute"*) ~~(i) against the Company, any Member thereof, any officer or director or other agent or representative or equity holder thereof (each, a *"Company Party"*), or (ii)~~ or that in any way does or could adversely impact any of the assets held by any of the ~~Company~~ Relevant Parties, then ~~with~~ in sole discretion of the ~~consent of 75% of the Board~~ Manager, all pending and future distributions to the Disputing Party shall be immediately suspended ~~and held in escrow by the Company (the *"Dispute Escrow"*)~~ until the Manager determines the total of the ~~final~~ full losses, ~~non-appealable resolution of the Dispute, it being understood that the expiration of any applicable statute of limitations~~ costs and expenses (including ~~any applicable tolling periods with respect thereto) shall constitute such a resolution (any such resolution, a *"Dispute Resolution Date"*). The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full~~ costs and expenses ~~incurred by any Company Party in connection with such competent jurisdiction has ruled in favor of Disputing Party in a final non-appealable judgment~~ of legal counsel) of the Relevant Parties, ~~and (B) plus~~ any diminution in value ~~to the~~ of any Relevant Party's assets ~~held by the Company resulting from or~~ (including, without limitation, good will) incurred in connection with ~~such Dispute, as determined by the Board in~~ each Dispute or a Member's disclosure of matters and information regarding any Relevant Party or its assets (except as required by law or directed and authorized in writing by the applicable Relevant Party) in each case as determined by the Manager in its sole discretion (such aggregate losses, costs and expenses, the *"Damages"*). Once the Manager determines the Damages, it may in its sole discretion offset 100% of such Damages against the Capital Account of the Disputing Party and any and all amounts that would otherwise be payable or distributable by the Company to the Disputing Party. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated ~~pro rata to~~ as determined by the ~~other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units~~ Manager in its sole discretion, including without limitation, to any holder(s) of Common Units of the Company. ¶

42.     In the Delaware Related Action, Leventon testified that Section 12.1, which was not in effect in December 2013 when Daugherty's assets were placed in escrow, discussed below, was an "important part of [his] understanding of why" the escrow was set up in December 2013. At the

15

time, Section 11.1, which provided for no escrow mechanism, was in effect. Leventon also testified that it was the "same language," "identical" in Section 11.1 and Section 12.1, but that was false as indicated above.

43.    Defendants have asserted whatever position with respect to Section 12.1 or Section 11.1 and their effect on Daugherty's right to his compensation that has been most convenient in the moment.  Their sole focus has been on depriving Daugherty of his compensation (and later the Texas judgment with respect to such compensation) through their fraud with no regard for determining whether their actions were legal.

44.    Also on February 1, 2013, Dondero executed an Expense Allocation Agreement on behalf of Highland and HERA drafted by Leventon under which the parties reallocated 93.4 percent of Highland's purported legal expenses related to the Texas Action to HERA.  Leventon and Dondero made and approved the calculation in bad faith.  Dondero testified in the Texas Action that the calculation was made by comparing the "claims against Highland [] for $199,000 of the LTIP, and the claims against HERA [] for somewhere between 2.5 and 3. 199,000, over 3 million is approximately 6 or 7 percent."

45.    Highland supposedly incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to $154,029 incurred

16

0123

by HERA over the same time period.  Over the course of the dispute with

Daugherty, Defendants continued to allocate Highland expenses fraudulently

to HERA in a manner designed to harm Daugherty (the "Imposed

Liabilities").  As of December 31, 2018, the total Imposed Liabilities

Defendants had imposed were $9,617,989.32, which were in addition to the

amounts HERA had already paid.  This allocation was part of Defendants'

fraud and was used to improperly and fraudulently funnel assets and benefits

to Dondero, Andrews Kurth, Katz, and Hurst.

46.    All fees and expenses incurred by Highland for its counsel and

other expenses related to the Texas Action were funneled through the

Expense Allocation Agreement.  The largest portion of those expenses were

related to services provided by Andrews Kurth and Katz who knowingly

participated in the fraudulent scheme.

47.    On April 30, 2013, Dondero, relying on the legal advice

provided by Highland's in-house and external counsel who are Defendants

in this action to carry out this part of the fraud, executed an Assignment

Agreement on behalf of Highland and HERA (the "2013 Assignment

Agreement"), declaring that Highland held the "sole economic interest in

HERA" following the HERA unit-holder buyouts.

17

48. The 2013 Assignment Agreement further resolved that "[Highland] and HERA have each determined that it is in their respective best interest" to transfer substantially all the assets of HERA as "in-kind distribution[s]" to Highland (then valued at approximately $9,700,000) to try to keep them from Daugherty as the sole rightful equity holder in HERA.

49. This was the state of affairs one month before the Texas trial.

## Defendants Create the Sham Escrow

50. Although Defendants committed fraud and told a different story at the Texas trial, Dondero, through HERA Management, was and is in full control of HERA and its assets. It was fitting, therefore, in the Texas Action when Dondero described himself as "the man behind the curtain solving financial puzzles."

51. As the Texas trial approached, Defendants conducted a mock trial. After that exercise, in December 2013, approximately one month before trial in the Texas Action, Dondero, Leventon, Andrews Kurth, Katz, and Hurst formed an escrow for Daugherty's HERA assets (the "Escrow") so they could sell to the jury that they had not simply stolen Daugherty's HERA assets. The notion that Defendants did nothing nefarious with Daugherty's assets and merely set them aside would become a theme of Defendants in the

18

Texas trial and was used to insulate Highland and Dondero from being directly liable for the theft through knowing misrepresentations.

52.     Daugherty's HERA interests, valued at the time at approximately $3.1 million, were put in the Escrow with the Delaware law firm Abrams & Bayliss LLP ("Abrams & Bayliss") as escrow agent. Defendants chose Abrams & Bayliss because they expected Abrams & Bayliss to do whatever Defendants requested.  Abrams & Bayliss was a firm that Highland used frequently when any Delaware law issues came up.

53.     Leventon sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day.

54.     The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Action provided that if Daugherty prevailed in the Texas Action, escrowed assets in the amount of the judgment "shall" be transferred to HERA.  The provision states in full:

> In the event Escrow Agent is provided a final, non-appealable judgment against Highland Employee Retention Assets, LLC ("HERA") by Patrick Daugherty, his successors, or assigns ("Daugherty") in the case *Highland Capital Management, L.P. and Cornerstone Healthcare Group Holding, Inc. v. Patrick Daugherty v. Sierra Verde, LLC, et al.*, Cause No. 12-04005 in the 68th Judicial District of Dallas County, Texas ("Daugherty Action"), Escrow Agent shall, within 10 Business Days, transfer to HERA Deposit Assets equivalent to the amount of such judgment,

19

> or if the judgment against HERA exceeds the
> amount of Deposit Assets, Escrow Agent shall
> transfer to HERA all Deposit Assets, including
> accumulated income, held by Escrow Agent.

The substantive design of the Escrow roughly tracked Section 12.1 of the

2012 Amendment.

55.     Katz and Hurst both specifically signed off on the operative

§ 3(b)(i) of the Escrow Agreement.

56.     The Deposit Assets were (1) $1,210,502.03 in cash; (2) a

limited partner interest in RCP with an asset value of $1,820,050.49 as of

September 30, 2013; and (3) 1088.42 shares of NexPoint Credit Strategies.

57.     Three days after executing the Escrow Agreement, Highland

wanted to "slip sheet the Schedule 1 assets" in the Escrow Agreement.

Abrams & Bayliss simply swapped the pages as requested without following

the amendment procedures of the Escrow Agreement.

58.     The version of Schedule 1 that would be presented to

Daugherty and the Texas judge and jury was:

### SCHEDULE 1

The following shall be the Deposit Assets:

| Asset | Amount |
| --- | --- |
| Cash (USD) | $ 1,210,502.03 |
| Highland Restoration Capital Partners, L.P. limited partner interest (USD as of 9/30/2013) | $ 1,820,050.49 |
| Cash equivalent of NexPoint Credit Strategies Deposit Assets (such amount to be updated at the end of each calendar month) | 1088.42 shares |

20

## The Texas Trial

59.     With the appearance of an escrow in place, Defendants falsely presented themselves and Highland in the Texas trial not as thieves, but rather protectors of Daugherty's interest who would respect Daugherty's rights and the judicial process.  That is the story they spun in the Texas trial.

60.     Dondero testified under oath during the Texas trial as follows:

> Q.      We heard from -- from opposing counsel the other day about this -- well, there was money -- the interests were escrowed, if you will, the HERA interests of Mr. Daugherty.  Is that a true statement?
> A.      Yes.
> …
> Q.      Okay.  And [Daugherty's counsel], one of my very learned opposing counsel, they actually said – or showed an escrow agreement in the courthouse.  Did you see that?
> A.      Yes.
> …
> Q.      So why -- why did the escrow agreement not get signed until December of 2013?
> A.      My recollection is as follows: …
> So sometime in the April period, the assets were transferred to Highland, okay, post the -- the end of the year buyout.  Pat Daugherty's assets were always segregated at Highland Capital.  But to formalize the segregation, they were moved into an escrow.
> It took a while to get the escrow set up because they were moving illiquid assets that have all kinds of transfer delays and issues.  And it took until December to formally set up the escrow for the assets that were proportionate to Pat's share that were segregated at Highland.

61.     While Dondero testified that "moving illiquid assets" resulted in "transfer delays," that was just another falsehood that was convenient to tell at the time.

62.     During the Texas Action on January 23, 2014, Dondero also testified as follows during his prepared testimony with Hurst:

> Q.     Okay.  So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and HERA, **what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?**
> A.     **They go to him**.
> Q.     I'm sorry?
> A.     They go **to him** via to HERA and then **to him**.  (Emphasis added.)

63.     Dondero also testified that "Pat's share of all the assets including the cash is in escrow" and that the Escrow was "to protect Pat Daugherty" and that "[t]here's been nothing deducted or removed from Pat's account."  In closing argument, Hurst summed up Defendants' fraudulent pitch to the jury: "[I]f Pat Daugherty happens to prevail in his lawsuit against … HERA you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

64.     Defendants were adamant during the Texas Action that the procedure provided in Section 12.1 of the 2012 Amendment was never implemented.  Some examples include:

22

a.  Hurst argued on summary judgment that "nothing happened with Mr. Daugherty's units" under Section 12.1 because "[t]he board has to vote to suspend escrow distributions. That never happened."

b.  Hurst further represented to the jury in the Texas Action that "[e]ven though you're going to hear a lot of testimony about Section 12.1, you're going to see what the section says, it was never used. … [T]he board never voted to use Section 12.1."

c.  Hurst also said, "[t]he board never took any action on Section 12.1."

d.  Hurst questioned Surgent, Highland in-house counsel and chief compliance officer, in prepared testimony, "[w]hen was Section 12.1 ever used by the HERA board? A. Never. Q. Never? A. Never.");

e.  Surgent confirmed on cross-examination that Section 12.1 was never implemented.

65.  In the Delaware Related Action, Defendants told the Court precisely the opposite and justified their actions against Daugherty by invoking Section 12.1.

**Daugherty's Judgment Against HERA**

66.  After a three-week trial in the Texas Action, the jury found that HERA breached the implied covenant of good faith and fair dealing by

23

adopting Section 12.1 in the 2012 Amendment. The jury awarded Daugherty damages of $2.6 million plus interest.

67.     The final judgment confirmed Daugherty's entitlement to damages and his HERA interest, which Defendants had promised they were protecting through the Escrow. The Texas judge's markup of the final order is below.

> Furthermore, the Court, after considering the jury's findings regarding HERA's breach of the implied covenant of good faith and fair dealing, finds and concludes that Daugherty is entitled to relief hereinafter given.
>
> It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~
>
> It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.
>
> It is further ORDERED that total amount of the actual damages rendered against HERA herein will bear prejudgment interest at the rate of 5% simple interest from May 22, 2012, until the day before this judgment is signed.
>
> It is further ORDERED that the total amount of the judgment here rendered against HERA will bear interest at the rate of 5% per annum, compounded annually, from the date this judgment is signed until paid.

24

68.     The jury also found that Dondero and Highland defamed Daugherty with malice and that Daugherty breached contractual and fiduciary duties by retaining Highland information after his Highland employment, but awarded zero damages.  Highland was awarded attorneys' fees in the amount of $2.8 million plus interest.  All parties appealed.

### Throughout the Texas Appeal, Defendants Maintained That the Escrow Was for Daugherty's Benefit

69.     Defendants adhered to their position that the Escrow was for Daugherty's benefit while the Texas Action was on appeal.

70.     In September 2014, David Klos of Highland, expressly in his capacity as Senior Manager of Finance of Highland, represented to the Texas court as follows regarding the Escrow on behalf of HERA:

> [HERA holds a] contingent interest in assets held in escrow pursuant to an Escrow Agreement, a true and correct copy of which is attached hereto as Exhibit 2 (the "Deposit Assets").  The Deposit Assets are not presently controlled by or available to HERA.  **Per the Escrow Agreement, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the Deposit Assets to HERA**.  (Emphasis added.)

71.     The filing also represented that HERA was insolvent and liable to Highland for legal expenses funded on its behalf in the amount of $7,459,568 and that only $2,555,071 was included in the net worth

25

computation because Highland had written off $4,904,497 of the liability as of December 31, 2013, because of "lack of collectability."

72.     HERA's opening appellate brief, filed by Hurst and dated May 20, 2015, posited that "it is undisputed that Daugherty continues to own an interest in HERA and assets representing his interest have been escrowed for his benefit[.]"  Hurst continued this theme.  "Highland acquired the interests of all the other members of HERA as a result of [the Buyout]. … Daugherty did not sell and still owns his interest in HERA today. … His interests were, however, moved into an escrow account, where they remain to this day."

73.     Meanwhile, in June 2016, as Daugherty attempted to obtain a loan from Highland-affiliate NexBank Capital and provided the bank with requested confidential details of his personal financial information, including his HERA interests held in escrow, Surgent arranged with NexBank's CEO (John Holt) and COO (Matt Siekielski) to receive the details of Daugherty's assets and liabilities as disclosed in the loan application.  On information and belief, Defendants used this information to target and strategize their effort to deprive Daugherty of his HERA interests and Texas judgment and inflict maximum financial pain on Daugherty upon the Texas judgment becoming final and nonappealable.

## The Mandate and the Stolen Escrow Assets

74.     On December 1, 2016, Daugherty's judgment against HERA, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate court's mandate.  The mandate was electronically served on the parties' counsel, including Katz and Hurst, on December 1, 2016, and Katz told Ellington about the mandate.  Defendants sprang into action to consummate the fraud they had set up during the pendency of the Texas Action.

75.     Defendants scrambled to unwind the Escrow.  Thirty-nine minutes after the mandate was distributed by the court, an Andrews Kurth associate sent Abrams & Bayliss an email, copying Katz, and saying, "[w]e need to have a call as early tomorrow as possible regarding the escrow arrangements."

76.     Defendants' acts over the next few days, which culminated in the seizure by Highland of Daugherty's escrow assets, were concealed from Daugherty.  Daugherty would not learn of Defendants' acts until February 2017 when Abrams & Bayliss disclosed them at a superficial level.

77.     On February 16, 2017, Abrams & Bayliss unveiled Defendants' fraudulent scheme to Daugherty:

> By letter dated December 2, 2016, Abrams
> & Bayliss notified Highland that it was resigning

27

as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

78. Highland encouraged Abrams & Bayliss to resign to terminate the Escrow. Highland's in-house and external counsel who are Defendants in this action were intimately involved in this part of the fraudulent scheme. The Abrams & Bayliss letter copied Ellington, Leventon, and Katz.

79. After Highland seized the Escrow assets, efforts to collect Daugherty's judgment have failed, as HERA claims to be insolvent.

80. On May 17, 2019, this Court in the Delaware Related Action found that the crime-fraud exception applied to otherwise-privileged advice sought from Abrams & Bayliss regarding the Escrow. The Court found that

28

there was a reasonable basis to believe that the legal advice was to enable or aid in the furtherance of a fraud.

### After Pillaging the Escrow, Highland Began
### Its Onslaught of Collection Efforts Against Daugherty

81.     While Defendants were secretly making good on their fraud and pocketing Daugherty's HERA assets and damages judgment in December 2016, they were simultaneously taking hyper-aggressive collection steps against him.  Daugherty, unaware of the concealed fraud, paid the Texas judgment against him in cash.

82.     On December 2, 2016, Katz requested a Writ of Execution against Daugherty.  On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

83.     On December 5, 2016, Katz filed a judgment lien on Daugherty's home on Highland's behalf.  On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

84.     On December 8, 2016, Katz requested a Writ of Garnishment to seize HERA' assets owed to Daugherty under the judgment.  The Writ of Garnishment was premised on HERA having a neutral or positive net worth in December 2016 such that when the Deposit Assets were returned to it, it

29

could pay Daugherty and he could then pay Highland. This was effectively a request for an offset of the judgments—Katz on behalf of Highland was seeking to collect the judgment in Highland's favor by garnishing Daugherty's judgment. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

85. On December 9, 2016, Highland was granted a second Writ of Execution requested by Katz. Also on December 9, 2016, Katz filed an Application for Turnover directing that Daugherty's interest in Highland affiliates NexBank and Trussway Holdings, Inc., be turned over to Highland. On information and belief, Highland's in-house counsel who are Defendants in this action were also part of this aspect of the fraudulent scheme.

86. On December 14, 2016, nine days after Defendants swept the Escrow and after the onslaught of collection efforts against him, Daugherty paid the fee award against him. Defendants have caused HERA not to honor the Texas damages award and have never returned to Daugherty the HERA assets that the Texas final judgment made clear he still owns.

**The Fraudulent Allocations**

87. In the Texas Action, Defendants produced invoices in connection with their request for attorneys' fees under two contracts. Those

30

invoices and Defendants' position regarding the fees attributable to those contract claims demonstrate that the liabilities imposed on HERA by Defendants (the "Imposed Liabilities") are fraudulent and that Highland was already reimbursed for Imposed Liabilities that nevertheless are counted as purported unpaid expenses owed to Highland.

88.     At trial in the Texas Action, Highland's expert opined that of the $3,417,015.71 in Andrews Kurth invoices through October 2013, "the amount of attorneys' fees attributable to the breach of contract claims (through October 2013) is at least $2,000,000." But, under the Expense Allocation Agreement, those Andrews Kurth invoices had already been charged to HERA on the contradictory premise that such proportion was related to Daugherty's claims for compensation from HERA, not Highland's affirmative contract claims.

89.     Until mid-2013, HERA was paying its fabricated share to Andrews Kurth directly. For example, in its January 2013 invoice, Andrews Kurth billed Highland for its work and HERA wired Andrews Kurth payment. After Defendants emptied HERA of its cash and other assets, it began fabricating the purportedly unpaid Imposed Liabilities.

90.     Costs Defendants represented in the Texas Action were costs attributable to Highland had actually been charged to and paid by HERA.

31

Defendants obtained a double recovery that damaged Daugherty and fraudulently represented liabilities as being owed by HERA. For example, under the Expense Allocation Agreement, four invoices from Robert Half Legal that were included in Highland's request for legal fees in the Texas Action were charged to, and paid by, HERA.

91.     On December 14, 2016, Daugherty paid his judgment, which represented "the reasonable fee for the necessary services of Highland's attorneys in this case." Although all expenses of Defendants related to the Texas Action were funneled through the Expense Allocation Agreement and imposed on HERA, Defendants did not reduce the amount of the Imposed Liabilities at HERA when Daugherty paid the judgment for attorneys' fees and expenses. For the $2.8 million of Highland's legal expenses recovered in the Texas Action to constitute 6.6% of the total legal expenses and be entirely allocable to Highland under the Expense Allocation Agreement, the total legal expenses would have to be approximately $39.6 million.

92.     The invoices that are available make clear the charges are a sham and not properly attributable to HERA and were attributed to HERA solely to harm Daugherty.

93.     When Highland declared bankruptcy on October 16, 2019, it listed DLA Piper, c/o Marc Katz, as a creditor of Highland that was owed

32

approximately $1 million for unpaid legal services. On information and belief, this unpaid liability related to services that Defendants represented in the Delaware Related Action had already been paid by Highland.

### Highland's Other Judgment Creditors

94. Daugherty is not the only person with an uncollectable judgment against Highland or its affiliates. In a situation that Dondero has compared to the "Daugherty scenario," Highland rendered an entity insolvent to defeat a judgment for $8 million obtained by former Highland employee Josh Terry. The court made the "logical inference that the [Acis Entities] had … no intention of paying [Mr. Terry's judgment] any time soon based on their conduct after the Arbitration Award" and "found the testimony of almost all of the [Highland-affiliated] witnesses for the [Acis Entities] to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability."

95. Other creditors have faced similar obstacles. One such case is *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/2009 (N.Y. Sup. Ct.), in which UBS claims that Highland fraudulently transferred certain assets from the counterparty affiliate to the Crusader Fund to make the counterparty judgment proof and to defraud UBS.

96.     Another involves the Highland Credit Strategies Fund, which went through a similar redemption and liquidation process as the Crusader Fund that began in 2008.  Highland was found to have engaged in various types of misconduct, including Dondero personally threatening the redeemer committee's personnel with retribution.  The most important aspect of the misconduct is that Highland effectively moved the assets to other Highland-controlled entities for far less than their actual value.  In fact, Highland paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties even those hired by Highland (up to $37 million).  Highland did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee.  An arbitration panel found that "Highland not only breached its obligations under the Plan [of liquidation], but engaged in willful misconduct in its sale of the Fund's Cornerstone equity."  The panel found Highland's explanations to excuse its conduct as "to put it mildly, far-fetched."

97.     The Crusader Fund obtained a $189 million arbitration judgment against Highland and, rather than pay it, Highland declared bankruptcy on October 16, 2019.

34

## Count One
### (Fraudulent Transfer)
### (Against Andrews Kurth, Katz, Hurst,
### Ellington, Surgent, and Leventon)

98.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

99.    One of the reasons that HERA has failed to satisfy Daugherty's judgment in the Texas Action is that the Defendants secretly caused the Escrow assets—reserved for a judgment in Daugherty's favor—to be transferred to Highland.  Now HERA claims to be insolvent.

100.    Dondero testified at trial in the Delaware Related Action that he was relying on the advice of counsel who are Defendants in this action with respect to the buyout of all HERA holders except Daugherty, the purported assignment of assets from HERA in 2013, and the taking of assets from HERA in December 2016, all of which formed part of the fraud that was consummated in December 2016.  Legal advice that Highland was permitted to take Daugherty's assets was not rendered in good faith.  Instead the legal advice was an integral part of the fraudulent bait-and-switch scheme Katz, Hurst, Leventon, Ellington, and Surgent had formulated to cheat Daugherty out of his compensation.

101.    Delaware has a potent fraudulent transfer statute enabling creditors, such as Daugherty, to challenge actions by parent companies

siphoning assets from subsidiaries. The statute also recognizes that

attorneys are liable under the statute if they acted in bad faith as to a transfer.

102.    The transfer of HERA's funds reserved for Daugherty in the

Escrow to Highland, achieved through the resignation of Abrams & Bayliss,

constitutes a fraudulent transfer under Delaware law. It also contradicts

sworn representations and counsel representations of the Defendants and

their agents in the Texas Action regarding the Escrow.

103.    Defendants are liable to Daugherty for the assets fraudulently

or otherwise wrongfully transferred to Highland by or on behalf of HERA.

### Count Two
### (Conspiracy to Commit Fraud)
### (Against all Defendants)

104.    Daugherty restates each of the foregoing allegations as if fully

set forth in this paragraph.

105.    Dondero, through HERA Management, exercises total control

over HERA and treats its funds as his own, which is routine for Dondero.

106.    As an example, Josh Terry, a former Highland employee,

asserted in a lawsuit:

> Okada, the co-founder of Highland, stated on
> February 10, 2016, "Dude are you aware Jim
> [Dondero] hasn't paid any taxes in the past year?
> And he took out a loan from NexBank to pay them
> but then he got caught up in one of the leverage
> situations he did with American [Airlines] and a

36

> couple of other stocks and he doesn't have the
> money until March 31 to actually do this. So he's
> put a lien on his assets…but if some clerk there
> decides to put the lien on, it would be a PR
> nightmare. I was just in his office yelling at him, 'I
> approved the loan at the bank so you could pay
> your taxes but you never paid your taxes.'"

107.    In this case, Dondero was not using money from his bank to

pay his personal taxes, but was instead siphoning money from one of his

subsidiaries.  HERA Management is nothing more than a mere

instrumentality or alter ego of Dondero.  Dondero did not even know that he

was president of HERA Management because he does not observe any actual

distinction between his own interests and those of the entities under his

control.  All acts of HERA Management advantaged Dondero and

disadvantaged Daugherty.

108.    Dondero and the other Defendants personally participated in

the conspiracy to defraud Daugherty of his compensation and damages

awarded by the Texas jury as described herein.

109.    Defendants made and caused to be made false representations

in the Texas Action that were designed to induce the Texas judge and jury

and Daugherty to rely on those false representations.  Defendants knew the

representations to be false at the time made because at all times Defendants

intended to take the assets they represented were set aside for Daugherty's benefit.

110.    Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty.

111.    Daugherty relied on Defendants' false representations by not bringing claims for his assets against Highland in the Texas Action because Defendants represented that Highland had no interest in the assets, by paying his judgment without seeking a remedy for Defendants secretly taking his assets for Highland and saying nothing as Daugherty paid the judgment against him.

112.    Daugherty was damaged by Defendants' fraudulent scheme in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

113.    The conspiracy to commit fraud involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit.  All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

38

## Count Three
## (Civil Conspiracy)
## (Against All Defendants)

114.    Daugherty restates each of the foregoing allegations as if fully set forth in this paragraph.

115.    Dondero, through HERA Management, exercises total control over HERA and treats its funds as his own, which is routine for Dondero.

116.    Dondero and the other Defendants personally participated in the conspiracy to defraud Daugherty of his compensation and damages awarded by the Texas jury as described herein.

117.    Defendants made and caused to be made false representations in the Texas Action that were designed to induce the Texas judge and jury and Daugherty to rely on those false representations. Defendants knew the representations to be false at the time made because at all times Defendants intended to take the assets they represented were set aside for Daugherty's benefit.

118.    Defendants formed a conspiracy to cooperate in the scheme to defraud Daugherty and all acted in accordance with the conspiracy to defraud Daugherty. In effect, Defendants aided and abetted the unjust enrichment of Highland through the actions described herein. These actions were part of the conspiracy to unjustly enrich Highland at the expense of

39

Daugherty.  Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich Highland at the expense of Daugherty.

119.    Highland was unjustly enriched by the taking of the assets in escrow that Defendants had misrepresented had been set aside for Daugherty.  Defendants themselves benefited from Highland's unjust enrichment through the payment of their legal fees and salaries.  Defendants took the actions described herein to aid and abet this unjust enrichment as part of a civil conspiracy to enrich Highland and impoverish Daugherty.

120.    Daugherty was impoverished by Defendants' civil conspiracy in that he should have received his assets related to his HERA interest and the damages judgment related to such assets, but received neither and paid the judgment against him before Defendants disclosed that they had taken his assets.

121.    The civil conspiracy involved a plan to take assets held in a Delaware escrow that Defendants had misrepresented had been set aside in Delaware for Daugherty's benefit.  All Defendants knew about this act in furtherance of the conspiracy which required action in Delaware.

* * *

WHEREFORE, Daugherty respectfully requests that the Court:

40

a.      enter judgment in favor of Daugherty and against Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally;

b.      order Dondero, HERA Management, HERA, Andrews Kurth, Katz, Hurst, Ellington, Surgent, and Leventon, jointly and severally, to return to HERA the equivalent of all the assets fraudulently or otherwise wrongfully caused to be transferred from HERA;

c.      award Daugherty damages;

d.      award Daugherty pre- and post-judgment interest;

e.      award Daugherty his reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

f.      grant such other relief that is just and proper.

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Hayley M. Lenahan (#6174)
McCollom D'Emilio Smith
  Uebler LLC
Little Falls Centre Two
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960

*Attorneys for Patrick Daugherty*

December 1, 2019

41

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

0148